# EXHIBIT J

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re *Ex Parte* Reexamination of:

Group Art Unit:    To be assigned

Examiner:    To be assigned

Patent No.:    11,163,931 to Ricci

Control No.:    To be Assigned

Request for Reexamination Under
U.S.C. §§302-307 and 37 C.F.R. §1.510

Filed:    April 16, 2021

Title:    ACCESS AND PORTABILITY OF USER PROFILES STORED
AS TEMPLATES

Attorney Docket No.:    84960946 / FPGP0158RX

## REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 11,163,931

Mail Stop *Ex Parte* Reexamination
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## Table of Contents

EXHIBIT LIST ................................................................................................................ ix

I.    Introduction ........................................................................................................ 1

II.   Requirements for *Ex Parte* Reexamination Under 37 C.F.R. §1.510 .............. 1

      A.    37 C.F.R. §1.510(b)(1): Statement Pointing Out Each Substantial New
            Question of Patentability ............................................................................ 1
      B.    37 C.F.R. §1.510(b)(2): An identification of every claim for which
            reexamination is requested, and a detailed explanation of the pertinency
            and manner of applying the cited prior art to every claim for which
            reexamination is requested ......................................................................... 1
      C.    37 C.F.R. §1.510(b)(3): Copy of Every Patent or Printed Publication Cited
            Against the Claims ...................................................................................... 1
      D.    37 C.F.R. §1.510(b)(4): Copy of the Entire Patent .................................... 2
      E.    37 C.F.R. § 1.510(b)(5): Certification that a Copy of the Request Has
            Been Served in its Entirety on the Patent Owner ...................................... 2
      F.    37 C.F.R. §1.510(a): Fee for Requesting Reexamination ......................... 2
      G.    A certification by the third-party requester that the statutory estoppel
            provisions of 35 U.S.C. §315(e)(l) or 35 U.S.C. §325(e)(l) do not prohibit
            the requester from filing the *ex parte* reexamination request ................. 2

III.  Other Proceedings .............................................................................................. 2

IV.   Request for Expedited Reexamination ............................................................... 2

V.    Identification of Claims for Which Reexamination Is Requested ...................... 3

VI.   Overview of the '931 Patent and Prosecution History ........................................ 3

      A.    Alleged Priority Claim ................................................................................ 3
      B.    Summary of the '931 Patent ....................................................................... 5
      C.    Claims 1–13 of the '931 Patent .................................................................. 5
      D.    Prosecution History ................................................................................... 11

VII.  Priority Argument .............................................................................................. 12

      A.    Claims 1–13 are not supported by the specification of '931 Patent. ....... 13
      B.    Claims 1–13 of the '931 Patent recite limitations not supported by the
            parent non-provisional patent applications. ............................................ 16
      C.    Claims 1–13 of the '931 Patent recite limitations not supported by the
            provisional patent applications. .............................................................. 16
      D.    The reexamination examiner is permitted to and should conduct a priority
            analysis and consider intervening prior art. ........................................... 17

VIII. Person of Ordinary Skill in the Art ................................................................... 17

IX.   Identification of Prior Art ................................................................................. 17

      A.    Overview of Tokunaga (Ex. PA-1) ............................................................ 18
      B.    Overview of Kleve (Ex. PA-2) .................................................................. 19

C.    Overview of Tuukkanen (Ex. PA-3) ............................................. 22

X.    Substantial New Questions of Patentability .................................... 24

A.    SNQ 1: Claims 1–4, 7–9, and 12 are Obvious over Tokunaga ............. 25
      1.    This is the first post-grant proceeding ............................. 25
      2.    This request is the first challenge of the claimed priority date and application of intervening prior art. ............................. 26
      3.    No tribunal has ever considered the patentability of claims 1–4, 7–9 and 12 in view of Tokunaga. ............................. 26

B.    SNQ 2: Claims 5–6 and 10–11 are Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tokunaga in view of Tuukkanen ................. 28

C.    SNQ 3: Claims 1–13 are Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tuukkanen in view of Kleve. ............................. 28

XI.   Detailed Explanation of the Pertinency and Manner of Applying the Prior Art ..... 28

A.    SNQ 1: Claims 1–4, 7–9, and 12 Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tokunaga ............................................. 29
      1.    Independent Claim 1 ............................................. 29
      [1.0] A vehicle system comprising: ............................................. 29
      [1.1] a vehicle including a locking system configured to lock and unlock the vehicle; ............................................. 30
      [1.2] a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device; ............................................. 31
      [1.3] a first user computing device that is used by a first user and generates a user interface configured to receive a user input from the first user; ............................................. 35
      [1.4] a second user computing device that is used by a second user; ............................................. 37
      [1.5] a server system configured to communicate with the vehicle and the first user computing device, ............................................. 38
      [1.6] wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and ............................................. 41
      [1.7] transmit, to the server system, the command and an identifier of the second user computing device, ............................................. 44
      [1.8] wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device; ............................................. 46
      [1.9] access the database to retrieve the vehicle profile data; ............................................. 47
      [1.10] update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and ............................................. 48
      [1.11] transmit, to the vehicle the updated vehicle profile data; ............................................. 50
      [1.12] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; ............................................. 50
      [1.13] wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device; ............................................. 51

[1.14] identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and ........................... 52

[1.15] based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device is in proximity to the vehicle. ....................................................................... 54

2.    Dependent Claim 2 ..................................................................... 57

[2.0] The vehicle system of claim 1, wherein the vehicle profile data includes authentication data to authenticate the first user computing device with respect to the vehicle. ............................................. 57

3.    Dependent Claim 3 ..................................................................... 59

[3.0]. The vehicle system of claim 2, wherein the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device; and ............................ 59

[3.1] upon receiving, from the first user computing device, the command and the identifier of the second user computing device, authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data. ............... 61

4.    Dependent Claim 4 ..................................................................... 66

[4.0]. The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to remove the vehicle control permission from the second user computing device; and ......................................................... 66

[4.1] transmit, to the server system, the removal command and the identifier of the second user computing device; ....................................... 70

[4.2] wherein the server system is further configured to remove the vehicle control permission from the second user computing device ...................... 71

5.    Dependent Claim 7 ..................................................................... 71

[7.0] The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle; and ............................... 71

[7.1] transmit, to the server system, the restriction command and the identifier of the second user computing device; ....................................... 75

[7.2] wherein the server system is further configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle. ......................................... 75

6.    Dependent Claim 8 ..................................................................... 76

[8.0] The vehicle system of claim 7, wherein the server system is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device, the restriction command and the identifier of the second user computing device; .................................................................................... 76

[8.1] based on the restriction command and the identifier of the second user computing device, update the vehicle profile data to indicate

that the vehicle function is restricted when the second user
computing device is located in the vehicle; and ........................................ 77

[8.2] transmit, to the vehicle, the updated vehicle profile data, and ..................... 78

[8.3] wherein the vehicle is further configured to: receive, from the server
system, the updated vehicle profile data; and ........................................... 78

[8.4] store the updated vehicle profile data ................................................... 78

7.    Dependent Claim 9 ......................................................................... 78

[9.0] The vehicle system of claim 1, wherein the updated vehicle profile
data includes instructions to transmit vehicle condition data for the
vehicle to the server system while the second user computing
device is located in or within a threshold distance of the vehicle ............. 78

8.    Dependent Claim 12 ....................................................................... 81

[12.0] The vehicle system of claim 1, wherein the updated vehicle profile
data includes instructions to transmit location data for the vehicle's
current location to the server system while the second user
computing device is located in or within a threshold distance of the
vehicle. ............................................................................................ 81

B.    SNQ 2 – Claims 5–6 and 10–11 are Obvious over Tokunaga in view of
Tuukkanen ............................................................................................ 81

1.    Dependent Claim 5 ......................................................................... 81

[5.0]. The vehicle system of claim 4, wherein the server system is
configured to remove the vehicle control permission by performing
operations comprising: receive, from the first user computing
device, the removal command and the identifier of the second user
computing device; ............................................................................. 81

[5.1] based on the removal command and the identifier of the second user
computing device, update the vehicle profile data by disassociating
the vehicle profile of the vehicle from the second user computing
device; and ....................................................................................... 82

[5.2] transmit, to the vehicle, the updated vehicle profile data, and ..................... 85

[5.3] wherein the vehicle is further configured to: receive, from the server
system, the updated vehicle profile data; and ........................................... 86

[5.4] store the updated vehicle profile data ................................................... 86

2.    Dependent Claim 6 ......................................................................... 86

[6.0]. The vehicle system of claim 5, wherein, after storing the updated
vehicle profile data, the vehicle is further configured to: wirelessly
receive, from the second user computing device in proximity to the
vehicle, the identifier of the second user computing device; ..................... 86

[6.1] deny access to the second user computing device based on the
identifier of the second user computing device not being included
in updated vehicle profile data. ............................................................ 87

3.    Dependent Claim 10 ....................................................................... 88

[10.0] The vehicle system of claim 9, wherein the server system is further
configured to: receive, from the vehicle, vehicle condition data
while the second user computing device is located in or within a
threshold distance of the vehicle; and ................................................... 88

[10.1] transmit, to the first user computing device, the vehicle condition data, and ................................................................................. 88
[10.2] wherein the first user computing device is further configured to: receive, from the server system, the vehicle condition data; and ............ 90
[10.3] display the vehicle condition data. ................................................. 91
4.     Dependent Claim 11 ................................................................... 92
[11.0] The vehicle system of claim 10, wherein the vehicle condition data include at least one of number of passengers in the vehicle, speeds, current and historical locations, or timestamps associated with the locations. ......................................................................................... 92
C.     SNQ 3: Claims 1–13 are Obvious Over Tuukkanen in view of Kleve ................. 93
1.     Independent Claim 1 ................................................................... 93
[1.0] A vehicle system comprising: ....................................................... 93
[1.1] a vehicle including a locking system configured to lock and unlock the vehicle; ..................................................................................... 94
[1.2] a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device; ........................... 97
[1.3] a first user computing device that is used by a first user and generates a user interface configured to receive a user input from the first user; ................................................................................................ 103
[1.4] a second user computing device that is used by a second user; ................. 106
[1.5] a server system configured to communicate with the vehicle and the first user computing device, ............................................................. 107
[1.6] wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and................................................................................................... 110
[1.7] transmit, to the server system, the command and an identifier of the second user computing device, ..................................................... 113
[1.8] wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device; ......................................................... 115
[1.9] access the database to retrieve the vehicle profile data; ........................ 116
[1.10] update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and................................................................................................... 118
[1.11] transmit, to the vehicle the updated vehicle profile data; ..................... 120
[1.12] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; ...................................... 121
[1.13] wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device; ....................... 122
[1.14] identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and........................ 127

[1.15] based on the identification, control the lock system to lock or
       unlock the vehicle while the mobile computing device is in
       proximity to the vehicle. .................................................................. 130

2.       Dependent Claim 2 ............................................................... 131

[2.0] The vehicle system of claim 1, wherein the vehicle profile data
       includes authentication data to authenticate the first user
       computing device with respect to the vehicle. ........................................ 131

3.       Dependent Claim 3 ............................................................... 133

[3.0] The vehicle system of claim 2, wherein the server system is further
       configured to: receive, from the first user computing device, an
       identifier of the first user computing device; and ................................... 133

[3.1] upon receiving, from the first user computing device, the command
       and the identifier of the second user computing device,
       authenticate the first user computing device based on the identifier
       of the first user computing device and the vehicle profile data. ............. 134

4.       Dependent Claim 4 ............................................................... 136

[4.0] The vehicle system of claim 1, wherein the first user computing
       device is further configured to: receive, via the user interface, a
       command to remove the vehicle control permission from the
       second user computing device; and ................................................. 136

[4.1] transmit, to the server system, the removal command and the
       identifier of the second user computing device; .................................. 139

[4.2] wherein the server system is further configured to remove the vehicle
       control permission from the second user computing device. .................. 140

5.       Dependent Claim 5 ............................................................... 141

[5.0] The vehicle system of claim 4, wherein the server system is
       configured to remove the vehicle control permission by performing
       operations comprising: receive, from the first user computing
       device, the removal command and the identifier of the second user
       computing device; .................................................................... 141

[5.1] based on the removal command and the identifier of the second user
       computing device, update the vehicle profile data by disassociating
       the vehicle profile of the vehicle from the second user computing
       device; and .............................................................................. 141

[5.2] transmit, to the vehicle, the updated vehicle profile data, and .................. 144

[5.3] wherein the vehicle is further configured to: receive, from the server
       system, the updated vehicle profile data; and ................................... 144

[5.4] store the updated vehicle profile data. ............................................... 144

6.       Dependent Claim 6 ............................................................... 145

[6.0] The vehicle system of claim 5, wherein, after storing the updated
       vehicle profile data, the vehicle is further configured to: wirelessly
       receive, from the second user computing device in proximity to the
       vehicle, the identifier of the second user computing device; .................. 145

[6.1] deny access to the second user computing device based on the
       identifier of the second user computing device not being included
       in updated vehicle profile data. ..................................................... 147

7.    Dependent claim 7 ............................................................... 149
[7.0] The vehicle system of claim 1, wherein the first user computing
      device is further configured to: receive, via the user interface, a
      command to restrict a vehicle function while the second user
      computing device is located in the vehicle; and ................... 149
[7.1] transmit, to the server system, the restriction command and the
      identifier of the second user computing device; ................... 153
[7.2] wherein the server system is further configured to restrict the vehicle
      function during operation of the vehicle while the second user
      computing device is located in the vehicle. ......................... 155
8.    Dependent Claim 8 ............................................................. 156
[8.0] The vehicle system of claim 7, wherein the server system is further
      configured to restrict the vehicle function by performing operations
      comprising: receive, from the first user computing device, the
      restriction command and the identifier of the second user
      computing device; .............................................................. 156
[8.1] based on the restriction command and the identifier of the second
      user computing device, update the vehicle profile data to indicate
      that the vehicle function is restricted when the second user
      computing device is located in the vehicle; and ................... 157
[8.2] transmit, to the vehicle, the updated vehicle profile data, and ......... 158
[8.3] wherein the vehicle is further configured to: receive, from the server
      system, the updated vehicle profile data; and ..................... 158
[8.4] store the updated vehicle profile data. ..................................... 158
9.    Dependent Claim 9 ............................................................. 158
[9.0] The vehicle system of claim 1, wherein the updated vehicle profile
      data includes instructions to transmit vehicle condition data for the
      vehicle to the server system while the second user computing
      device is located in or within a threshold distance of the vehicle. ........... 158
10.   Dependent Claim 10 ........................................................... 161
[10.0] The vehicle system of claim 9, wherein the server system is further
       configured to: receive, from the vehicle, vehicle condition data
       while the second user computing device is located in or within a
       threshold distance of the vehicle; and ............................... 162
[10.1] transmit, to the first user computing device, the vehicle condition
       data, and ....................................................................... 162
[10.2] wherein the first user computing device is further configured to:
       receive, from the server system, the vehicle condition data; and ........... 163
[10.3] display the vehicle condition data. ...................................... 164
11.   Dependent Claim 11 ........................................................... 165
[11.0] The vehicle system of claim 10, wherein the vehicle condition data
       include at least one of number of passengers in the vehicle, speeds,
       current and historical locations, or timestamps associated with the
       locations. ...................................................................... 165
12.   Dependent Claim 12 ........................................................... 165

[12.0] The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit location data for the vehicle's current location to the server system while the second user computing device is located in or within a threshold distance of the vehicle. ................................................................................ 165

13.    Dependent Claim 13 ................................................................ 167

[13.0]. The vehicle system of claim 1, wherein the server system is further configured to: receive, from the vehicle, location data of the vehicle while the second user computing device is located in or within a threshold distance of the vehicle; ................................................. 167

[13.1] determine that the vehicle is located outside a geographical limitation, the geographical limitation being included in the vehicle profile data; and .................................................................................. 167

[13.2] transmit, to the first user computing device, alert data that indicates the vehicle is located outside the geographical limitation, and .............. 169

[13.3] wherein the first user computing device is further configured to: receive, from the server system, the alert data; and based on the alert data, output a notification indicating that the vehicle is located outside the geographical limitation. ........................................................ 170

XII.    Conclusion ..................................................................................... 171

**EXHIBIT LIST**

| Attachments | Description |
|---|---|
| 1 | Certificate of Service on Patent Owner (December 15, 2025) |
| 2 | Information Disclosure Statement |
| 3 | Certificate of Service on Patent Owner (December 16, 2025) |

| Exhibits | Description |
|---|---|
| A | U.S. Patent No. 11,163,931 B2 to Ricci ("the '931 Patent") |
| B | U.S. Patent No. 11,163,931 B2 Certified File History ("the '931 Patent File History") |
| C | Declaration of Scott Andrews |
| D | CV of Scott Andrews |

| Prior Art Exhibits | Description |
|---|---|
| PA-1 | U.S. Patent Application Pub. No. 2018 / 0103022 A1 to Tokunaga et al. ("the '022 Publication") |
| PA-2 | U.S. Patent No. 8,522,320 B2 to Kleve et al. ("the '320 Patent") |
| PA-3 | U.S. Patent Application Pub. No. 2014/0303837 A1 to Tuukkanen ("the '837 Patent") |

| Background Exhibits | Description |
|---|---|
| BACK-1 | Comparison Report 931 Specification to 14252876 (Publication 20140309863) Specification |

## I.    Introduction

Third Party Requestor Ford Motor Company ("Ford") respectfully requests *ex parte* reexamination under 35 U.S.C. § 302 and 37 C.F.R. § 1.510 of claims 1–13 of U.S. Patent No. 11,163,931 ("the '931 Patent"; Exhibit A), which issued to Christopher P. Ricci on October 13, 2021. The '931 Patent is assigned to AutoConnect Holdings LLC, of Newbury, CT per the assignment recorded at Reel/Frame: 68206/0503 on March 27, 2020. This request for *Ex Parte* Reexamination is being made during the period of enforceability of the '931 Patent.

## II.    Requirements for *Ex Parte* Reexamination Under 37 C.F.R. §1.510

Requestor satisfies each requirement for *ex parte* reexamination of the '931 Patent as stated below.

### A.    37 C.F.R. §1.510(b)(1): Statement Pointing Out Each Substantial New Question of Patentability

A statement pointing out each substantial new question of patentability ("SNQ") based on the cited patents in accordance with 37 C.F.R. §1.510 (b)(1) and (b)(2) is in Section X.

### B.    37 C.F.R. §1.510(b)(2): An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited prior art to every claim for which reexamination is requested

The identification of the claims is set forth in Section V of this Request. The detailed explanation of the applied prior art is in Section IX of this Request. The detailed explanation of pertinency and manner of applying the cited prior art to every claim is set forth in Section XI of this Request.

### C.    37 C.F.R. §1.510(b)(3): Copy of Every Patent or Printed Publication Cited Against the Claims

A copy of each patent or printed publication relied upon is set forth in Exhibits PA-A, PA-B, and PA-C of this Request.

### D.    37 C.F.R. §1.510(b)(4): Copy of the Entire Patent

A full copy of the '931 Patent is submitted herein as Exhibit A in accordance with 37 C.F.R. §1.510(b)(4).

### E.    37 C.F.R. § 1.510(b)(5): Certification that a Copy of the Request Has Been Served in its Entirety on the Patent Owner

A copy of proof of service to the Patent Owner is attached.

### F.    37 C.F.R. §1.510(a): Fee for Requesting Reexamination

In accordance with 37 C.F.R. §1.510(a), the reexamination fee has been paid as part of the EFS-WEB submission. Any deficiency or overpayment may be debited/credited to Deposit Account No. 06-1510.

### G.    A certification by the third-party requester that the statutory estoppel provisions of 35 U.S.C. §315(e)(l) or 35 U.S.C. §325(e)(l) do not prohibit the requester from filing the *ex parte* reexamination request

Requester hereby certifies that the statutory estoppel provisions of 35 U.S.C. §315(e)(1) or 35 U.S.C. §325(e)(l) do not prohibit the requester from filing the *ex parte* reexamination request.

## III.    Other Proceedings

As far as Requestor is aware, the '931 Patent is involved in the following proceedings:

| Case No. | Parties | Venue | Filed |
|---|---|---|---|
| 2-24-cv-00802 | *AutoConnect Holdings LLC v. Toyota Motor Corporation et al.* | EDTX | Oct. 3, 2024 |
| 1-24-cv-01327 | *AutoConnect Holdings, LLC v. Ford Motor Company* | D. Del | Dec. 6, 2024 |

## IV.    Request for Expedited Reexamination

Due to the ongoing nature of the above-identified lawsuit, Ford respectfully requests that, pursuant to 35 U.S.C. § 305, that this Request be granted and reexamination be conducted not only with "special dispatch," but also with "priority over all other cases" in accordance with MPEP §

2261.

## V.    Identification of Claims for Which Reexamination Is Requested

In accordance with 37 C.F.R. § 1.510(a), Ford respectfully requests *ex parte* reexamination of claims 1–13[1] of the '931 Patent and the issuance of a reexamination certificate cancelling those claims.

## VI.    Overview of the '931 Patent and Prosecution History

### A.    Alleged Priority Claim

The '931 Patent matured from U.S. Patent Application serial no. 17/223,412 filed April 16, 2021. (Ex. A, Cover; Ex. B, 1.) The '931 Patent claims priority to a series of provisional and non-provisional patent applications filed between April 15, 2013 and January 14, 2019[2]:

> The present application is a continuation of and claims priority to U.S. patent application Ser. No. 16/247,128, filed on Jan. 14, 2019, entitled "User Profile Exchange via Vehicle Supported Communications Protocol", which is a continuation of and claims priority to U.S. patent application Ser. No. 15/288,244, filed Oct. 7, 20[]16, entitled "Access and Portability of User Profiles Stored as Templates; which is a continuation of and claims priority to U.S. patent application Ser. No. 14/252,863, filed on Apr. 15, 2014, of the same title; Ser. No. 14/252,865, filed on Apr. 15, 2014, entitled "User Profile Exchange via Vehicle Supported Communications Protocol"; Ser. No. 14/252,868, filed on Apr. 15, 2014, entitled "Transfer of User Profile Data via Vehicle Agency Control"; Ser. No. 15/099,413, filed on Apr. 14, 2016, entitled "Guest Vehicle User Reporting," which is a continuation of U.S. patent application Ser. No. 14/252,871, filed on Apr. 15, 2014, of the same title; and Ser. No. 14/831,696, filed on Aug. 20, 2015, entitled "Parental Control over Vehicle Features and Child Alert System," which is a continuation of U.S. patent application Ser. No. 14/252,876, filed on Apr. 15, 2014, of the same

---

[1] Issued claims 1–13 were claims 21–33 during prosecution.
[2] Since the earliest claimed priority date is after March 16, 2013, AIA applies.

title. Each of the foregoing applications claims the benefits of and priority, under 35 U.S.C. § 119(e), to U.S. Provisional Application Ser. No. 61/811,981, filed on Apr. 15, 2013, entitled "Functional Specification for a Next Generation Automobile"; Ser. No. 61/865,954, filed on Aug. 14, 2013, entitled "Gesture Control of Vehicle Features"; Ser. No. 61/870,698, filed on Aug. 27, 2013, entitled "Gesture Control and User Profiles Associated with Vehicle Features"; Ser. No. 61/891,217, filed on Oct. 15, 2013, entitled "Gesture Control and User Profiles Associated with Vehicle Features"; Ser. No. 61/904,205, filed on Nov. 14, 2013, entitled "Gesture Control and User Profiles Associated with Vehicle Features"; Ser. No. 61/924,572, filed on Jan. 7, 2014, entitled "Gesture Control and User Profiles Associated with Vehicle Features"; and Ser. No. 61/926,749, filed on Jan. 13, 2014, entitled "Method and System for Providing Infotainment in a Vehicle." The entire disclosures of the applications listed above are hereby incorporated by reference, in their entirety, for all that they teach and for all purposes.

(Ex. A, 1:7-46.)



**Priority Map**

The nine non-provisional parent patent applications have a common specification. The '931 Patent also has the same common specification. Attached as an example is exhibit Back-1

(Ex. Back-1), which is a comparison document showing that there are no differences between the '931 Patent specification and the parent application.

This priority claim is disputed as discussed in Section VII below.

### B.    Summary of the '931 Patent

The '931 Patent is titled "Access and Portability of User Profiles Stored as Templates" and issued on November 2, 2021. ('931 Patent, Ex. A, Cover.) The '931 Patent explains "[t]here is a need for a vehicle ecosystem, which can integrate both physical and mental comforts, while seamlessly communicating with current electronic devices to result in a totally intuitive and immersive user experience." (Ex. A, 3:52-55.) To do this, the '931 Patent proposes the creation of portable user profiles and a system that allows a user to access that profile from different vehicles. For example:

> A system to access one or more user profiles that govern one or more vehicle functions comprising: means for verifying, using a processor, one or more of biometric information, gesture recognition, facial recognition and device identification information, that a user has authority to access the one or more user profiles, the one or more profiles being stored in one or more of a vehicle, a cloud and a communications device; and means for allowing the user to make one or more edits to the one or more user profiles.

(Ex. A, 3:63-4:5, *see also* 4:6-17.)

### C.    Claims 1–13 of the '931 Patent

This Request concerns all claims (1–13) of the '931 Patent. Claim 1 is the sole independent claim.

| | |
|---|---|
| [1.0] | A vehicle system comprising: |
| [1.1] | a vehicle including a locking system configured to lock and unlock the vehicle; |
| [1.2] | a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device; |
| [1.3] | a first user computing device that is used by a first user and generates a user interface configured to receive a user input from the first user; |
| [1.4] | a second user computing device that is used by a second user; |
| [1.5] | a server system configured to communicate with the vehicle and the first user computing device, |
| [1.6] | wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and |
| [1.7] | transmit, to the server system, the command and an identifier of the second user computing device, |
| [1.8] | wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device; |
| [1.9] | access the database to retrieve the vehicle profile data; |
| [1.10] | update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and |
| [1.11] | transmit, to the vehicle the updated vehicle profile data; |
| [1.12] | wherein the vehicle is further configured to: receive, from the server |

| | |
|---|---|
| | system, the updated vehicle profile data; |
| [1.13] | wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device; |
| [1.14] | identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and |
| [1.15] | based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device is in proximity to the vehicle. |
| [2.0] | The vehicle system of claim 1, wherein the vehicle profile data includes authentication data to authenticate the first user computing device with respect to the vehicle. |
| [3.0] | The vehicle system of claim 2, wherein the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device; and |
| [3.1] | upon receiving, from the first user computing device, the command and the identifier of the second user computing device, authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data. |
| [4.0] | The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to remove the vehicle control permission from the second user computing device; and |
| [4.1] | transmit, to the server system, the removal command and the identifier of |

| | |
|---|---|
| | the second user computing device; |
| [4.2] | wherein the server system is further configured to remove the vehicle control permission from the second user computing device. |
| [5.0] | The vehicle system of claim 4, wherein the server system is configured to remove the vehicle control permission by performing operations comprising: receive, from the first user computing device, the removal command and the identifier of the second user computing device; |
| [5.1] | based on the removal command and the identifier of the second user computing device, update the vehicle profile data by disassociating the vehicle profile of the vehicle from the second user computing device; and |
| [5.2] | transmit, to the vehicle, the updated vehicle profile data, and |
| [5.3] | wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and |
| [5.4] | store the updated vehicle profile data. |
| [6.0] | The vehicle system of claim 5, wherein, after storing the updated vehicle profile data, the vehicle is further configured to: wirelessly receive, from the second user computing device in proximity to the vehicle, the identifier of the second user computing device; |
| [6.1] | deny access to the second user computing device based on the identifier of the second user computing device not being included in updated vehicle profile data. |

| | |
|---|---|
| [7.0] | The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle; and |
| [7.1] | transmit, to the server system, the restriction command and the identifier of the second user computing device; |
| [7.2] | wherein the server system is further configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle. |
| [8.0] | The vehicle system of claim 7, wherein the server system is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device, the restriction command and the identifier of the second user computing device; |
| [8.1] | based on the restriction command and the identifier of the second user computing device, update the vehicle profile data to indicate that the vehicle function is restricted when the second user computing device is located in the vehicle; and |
| [8.2] | transmit, to the vehicle, the updated vehicle profile data, and |
| [8.3] | wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and |
| [8.4] | store the updated vehicle profile data. |

| [9.0] | The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit vehicle condition data for the vehicle to the server system while the second user computing device is located in or within a threshold distance of the vehicle. |
|---|---|
| [10.0] | The vehicle system of claim 9, wherein the server system is further configured to: receive, from the vehicle, vehicle condition data while the second user computing device is located in or within a threshold distance of the vehicle; and |
| [10.1] | transmit, to the first user computing device, the vehicle condition data, and |
| [10.2] | wherein the first user computing device is further configured to: receive, from the server system, the vehicle condition data; and |
| [10.3] | display the vehicle condition data. |
| [11.0] | The vehicle system of claim 10, wherein the vehicle condition data include at least one of number of passengers in the vehicle, speeds, current and historical locations, or timestamps associated with the locations. |
| [12.0] | The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit location data for the vehicle's current location to the server system while the second user computing device is located in or within a threshold distance of the vehicle. |
| [13.0] | The vehicle system of claim 1, wherein the server system is further configured to: receive, from the vehicle, location data of the vehicle while the second user computing device is located in or within a threshold distance of the |

| | |
|---|---|
| | vehicle; |
| [13.1] | determine that the vehicle is located outside a geographical limitation, the geographical limitation being included in the vehicle profile data; and |
| [13.2] | transmit, to the first user computing device, alert data that indicates the vehicle is located outside the geographical limitation, and |
| [13.3] | wherein the first user computing device is further configured to: receive, from the server system, the alert data; and based on the alert data, output a notification indicating that the vehicle is located outside the geographical limitation. |

### D.    Prosecution History

AutoConnect Holdings LLC filed U.S. patent application serial no. 17/223,412 (hereinafter "the '412 Application") on April 16, 2021. (Ex. B, 1, 2-4.) The as-filed application included 20 claims. The application was examined under the first-to-file provisions of American Invents Act (AIA). (Ex. B, 205.)

Patent Owner filed a preliminary amendment on April 19, 2021 cancelling original claims 1–20 and adding new claims 21–33, without identifying support for the new claims. (Ex. B, 182-187.) The Patent Office did not issue any office actions and issued a Notice of Allowance on July 2, 2021. (Ex. B, 201.) In the reasons for allowance, the Examiner stated that the prior art did not teach the "particular user transfer steps/options from one device to another for unlocking and locking a vehicle" limitations of independent claim 21 (issued as claim 1):

3.    The following is an examiner's statement of reasons for allowance: The prior art of record fails to disclose either singularly or in combination the invention as claimed, including:

21. (New) A vehicle system comprising . . . <u>wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and transmit, to the server system, the command and an identifier of the second user computing device, wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device; access the database to retrieve the vehicle profile data; update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and transmit, to the vehicle the updated vehicle profile data; wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device; identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device is in proximity to the vehicle.</u>

4.    Prior art including Lindsay (US 2007/0250920), Hamid (US 2003/0046552), and Ricci (2016/0306615) all disclose user profiles and control mechanisms and server or internet data storage. **However, Lindsay, Hamid, and/or Ricci do not disclose the particular user transfer steps/options from one device to another for unlocking and locking a vehicle as claimed.**

(Ex. B, 206-207.) (Underlining original, Boldface added).

The '412 Application issued as the '931 Patent on November 2, 2021. (Ex. A, 1.)

## VII.    Priority Argument

Claims 1–13 of the '931 Patent are not entitled to any claimed priority date and should be given the date of April 19, 2021, which is when they were added via amendment.

### A.    Claims 1–13 are not supported by the specification of '931 Patent.

A POSA reading the specification of the '931 Patent would not have understood the applicant as being in possession of the following limitations of claim 1. (Ex. C, ¶77.)

- [1.2] a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device

- [1.6] wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and

- [1.7] [a first user computing device configured to:] transmit, to the server system, the command and an identifier of the second user computing device,

- [1.8] wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device;

- [1.9] [the server system is further configured to:] access the database to retrieve the vehicle profile data;

- [1.10] [the server system is further configured to:] update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and

- [1.11] [the server system is further configured to:] transmit, to the vehicle the updated vehicle profile data;

- [1.14] [the vehicle is further configured to:] identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the

13

identifier of the second user computing device[.]

(Ex. PA-A, Claim 1.)

Claim 1 focuses on remotely granting a secondary user's device ("*second computing device*") permission to unlock a vehicle. The claimed vehicle system includes a server system, a database, a first user computing device (e.g., vehicle owner's mobile phone), a second user computing device (e.g., a secondary user's mobile phone), and a vehicle including a locking system. (Ex. C, ¶78.) Claim 1 claims a specific sequence of operations for granting the "*second computing device*" permission to unlock the vehicle. The sequence begins at limitation [1.6] where "*the first user computing device . . . receive*[s], *via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device*[.]" Next, the first user computing device "*transmit*[s], *to the server system, the command and an identifier of the second user computing device*" (limitation [1.7]). In limitation [1.8], "*the server system . . . receive*[s], *from the first user computing device, the command and the identifier of the second user computing device*[.]" Next, the server system "*access*[es] *the database to retrieve the vehicle profile data*" (limitation [1.9]) and then "*update*[s] *the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device*" (limitation [1.10]). Following the update, the server system "*transmit*[s], *to the vehicle the updated vehicle profile data*" (limitation [1.11]). At this point, the vehicle system is now configured for the "*second user computing device*" to unlock the vehicle. Limitation [1.14] relates to the secondary computing device unlocking the vehicle. This occurs by the secondary computing device sending the "*identifier*" to the vehicle. The vehicle then "*identif*[ies] *the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing*

14

*device*[.]" If successful, the vehicle will unlock the doors (limitation [1.15]). The specification and drawings of the '931 Patent do not even contemplate the gist of claim 1—let alone the claimed sequence quoted above. (Ex. C, ¶80.)

The '931 Patent fails to disclose a server system that updates "*vehicle profile data by associating the vehicle profile*" with an identifier of a second computing device as claimed in limitation [1.10]. The term "*identifier*" does not appear in the specification, however the specification does disclose that a mobile device has a "device ID," e.g., a MAC address and a phone number. (Ex. A, 78:65-66, 79:5-13.) Requester does not dispute that a "device ID" or a "phone number" is an identifier. But, the specification never discusses a "*first user computing device*" "*transmit*[ting], *to the server system, a* [device ID or phone number]" as claimed in [1.7] nor "*updat*[ing] *the vehicle profile data by associating the vehicle profile for the vehicle with the* [device ID or phone number]" as claimed in [1.10]. Accordingly, there is no disclosure of a "*server system*" transmitting an "*identifier of the second user computing device*" (limitation [1.10]) to the vehicle as part of "*updated vehicle profile data*" as claimed in [1.11]. (Ex. C, ¶¶82–83.)

The specification further fails to disclose a "first user computing device . . . further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device" as claimed in limitation [1.6]. In the specification, there are 10 recitations of "command" or "commands." (*See, e.g.,* Ex. A, 17:51-54 ("user interface receiving commands via touch, buttons or voice input"), 23:6-9 ("retrieving data in response to commands"), 39:8-11 ("receiving voice commands"), 44:66-45:2 ("microphone for receiving voice commands"), 48:34-38 ("vehicle systems transceiver may send steering commands"), 48:38-40 ("automobile controller determines effect of commands"), 48:38-40 ("automobile controller can adjust the commands as needed"), 51:14-16 ("command line interface"), 51:25-34 ("software

handling of drive commands"), and 73:47-49 ("animated user interface responding to driver commands"). None of these commands are to *"grant vehicle control permission for the vehicle to the second user computing device"* as claimed in limitation [1.6]. (Ex. C, ¶84.)

Furthermore, claim 1 read as a whole requires the "identifier" be transmitted, received, used to update, again transmitted, and finally matched to an identifier received from a mobile device. This sequence of events is not disclosed in the as-filed application that matured into the '931 Patent. (Ex. C, ¶80.)

Moreover, the '931 specification does not disclose a "vehicle profile" nor "vehicle profile data." The only type of "profile" disclosed in the specification is a "user profile." (Ex. A, Abstract) Therefore, the applicant was not in possession of the claimed *"vehicle profile"* or *"vehicle profile data"* of claim limitation [1.2]. (Ex. C, ¶81.)

Therefore, the applicant was not in possession of claim 1 when the patent application was filed on April 16, 2021. Claims 1–13 were not original claims and were added via preliminary amendment (as claims 21–33) on April 19, 2021. (Ex. B, 182-187.) Therefore, issued claims 1–13 should be given the date of **April 19, 2021** for the purposes of determining prior art. (Ex. C, ¶¶87-88.)

## B.    Claims 1–13 of the '931 Patent recite limitations not supported by the parent non-provisional patent applications.

As discussed above, the parent non-provisional patent applications have the same specification as the '931 Patent and therefore also fail to show the applicant was in possession of claim 1 prior to April 19, 2021. (Ex. C, ¶89.)

## C.    Claims 1–13 of the '931 Patent recite limitations not supported by the provisional patent applications.

The '931 Patent also claims priority to seven provisional applications. These provisional

applications do not contain any disclosure beyond that of the '931 Patent specification as related to the claimed subject matter. Therefore, the incorporated provisional patent applications do not show applicant was not in possession of claims 1–13 prior to April 19, 2021. (Ex. C, ¶90.)

### D. The reexamination examiner is permitted to and should conduct a priority analysis and consider intervening prior art.

"A patent's claims are not entitled to an earlier priority date merely because the patentee claims priority." *In re NTP, Inc.*, 654 F.3d 1268, 1276 (Fed. Cir. 2011) citing *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986). While reexamination is limited to prior-art challenges, a patentee's priority claim is challengeable during reexamination. *In re NTP, Inc.*, 654 F.3d at 1277. ("There is no statutory limitation during a reexamination proceeding prohibiting the examiner from conducting a priority analysis. Otherwise, the examiner would be stripped of a critical legal tool needed in performing a proper reexamination.") In *NTP*, the Court affirmed the Board's determination that the reexamination examiner correctly determined that NTP's claims were not entitled to their priority claim and the claims were anticipated in view of intervening prior art. (*Id.*, 1270, 1279.)

## VIII. Person of Ordinary Skill in the Art

A POSA of the claimed subject matter of the '931 Patent would have been a person having a Bachelor's degree in Electrical Engineering, Mechanical Engineering, or an equivalent degree with at least two years of experience in vehicle control systems, vehicle sensor systems, electronic user interface systems, or related technologies. Additional industry experience could make up for less education and vice versa. Such a person of ordinary skill in the art would have been capable of understanding the '931 Patent and the prior-art references discussed herein. (Ex. C, ¶49.)

## IX. Identification of Prior Art

Reexamination is requested in view of the following references: U.S. Patent Pub. No.

2018/0103022 (hereinafter "Tokunaga") attached as Exhibit PA-1; U.S. Patent No. 8,522,320 (hereinafter "Kleve") attached as Exhibit PA-2; and U.S. Patent Pub. No. 2014/0303837 (hereinafter "Tuukkanen") attached as Exhibit PA-3. *See also* Attachment A attached as Information Disclosure Statement.

### A.    Overview of Tokunaga (Ex. PA-1)

Tokunaga was filed October 10, 2016 and published April 12, 2018. (Ex. PA-1, Cover.) Tokunaga is prior art under 35 U.S.C. § 102(a)(1) when claims 1–13 are given their correct priority dates of April 19, 2021.

Tokunaga discloses a system for providing access to a vehicle and enabling the off-boarding (i.e., external transfer) of vehicle data, with a particular focus on managing user privileges and consent for data sharing. (Ex. PA-1, [0003]-[0004], Abstract.) The system enables a primary portable device (such as a smartphone belonging to the vehicle owner) to be linked to the vehicle and granted administrative privileges. (Ex. PA-1, [0022], [0026]-[0027], [0064].) This primary device can then be used to associate one or more secondary portable devices (such as those belonging to additional drivers or family members) with the vehicle, granting each secondary device specific levels of access and enabling privileges. (Ex. PA-1, [0029]-[0030], [0038].) These privileges can be granularly controlled by the primary device, including restrictions based on time, usage, or specific vehicle functions (e.g., unlocking doors, starting the engine). (Ex. PA-1, [0075].) Example privileges 308/310 are shown in Figure 3:

FIG. 3

**Ex. PA-1, Fig. 3**

The link table 300 is a profile for the vehicle that that records user IDs, device IDs, user types, and privilege levels for all associated devices. Tokunaga also discloses off-boarding vehicle data. (Ex. PA-1, [0065].) Both the primary and secondary devices are presented with terms and conditions related to data sharing, and off-boarding of vehicle data (such as geolocation, points of interest, or system logs) is only enabled when the relevant user accepts these terms. (Ex. PA-1, [0004], [0043]-[0044].) Driver authentication is handled through device IDs, signal strength, and optionally biometric or behavioral data (such as facial recognition or driving patterns), ensuring that privileges and data sharing are tied to the correct user. (Ex. PA-1, [0088], [0109], [0141].)

### B.    Overview of Kleve (Ex. PA-2)

Kleve was filed April 1, 2011 and issued August 27, 2013[3].(Ex. PA-2, Cover.) Therefore, Kleve is prior art under at least 35 U.S.C. § 102(a)(2) regardless of the priority dispute. Kleve discloses a system for authorized access to the vehicle from a remote device:

> In at least one embodiment, a system for authorizing use of a vehicle communication and information system may include one or more data processors configured to receive information associating one or more devices with a vehicle

---

[3] Kleve also published as U.S. Patent. Pub. No. 2012/0254948 on October 4, 2012. The publication is prior art under 35 U.S.C. § 102(a)(1) even if the '931 Patent is given its earliest claimed priority date.

computer. The data processor(s) may be also configured to receive information identifying a user requesting authorization to command the vehicle controls from the one or more devices associated with the vehicle computer. The user(s) may be authorized to command the vehicle controls from the one or more devices associated with the vehicle computer based on performing an authentication process for authenticating the user, determining that the user is an authenticated user based on the authentication process, and enabling command of one or more vehicle controls from the one or more remote devices via the associated vehicle computer based on the user being authenticated.

(Ex. PA-2, Abstract.)

Kleve discloses that the users of remote device, e.g., the nomadic device 103, can communicate with the vehicle 121 over a network. (Ex. PA-2, 3:57-4:2, 4:18-32.)



**Ex. PA-2, Fig. 1**

Kleve further discloses a method for authorizing the users of the nomadic device to remotely command the vehicle.

The user may request authorization to command one or more vehicle controls from the one or more devices which are associated with the vehicle computer. The data

20

processor(s) may be further configured to authorize the user to command one or more vehicle controls from the one or more devices associated with the vehicle computer.

(Ex. PA-2, 1:37-58.)



*Fig-4A*

Ex. PA-2, Fig. 4A

Once authorized, Kleve discloses various remote commands that can be performed by authorized users. For example, a user can remotely control the vehicle locking system. (Ex. PA-2, 8:66-9:10.) The users in Kleve may have different permissions. For example, requesting users may have permissions that additional substitute users do not have. (Ex. PA-2, 10:51-55.)

C.    **Overview of Tuukkanen (Ex. PA-3)**

Tuukkanen was filed on April 9, 2013 and published on October 9, 2014. (Ex. PA-3, Cover.) Tuukkanen was filed prior to the earliest claimed priority date of April 15, 2013. Therefore, Tuukkanen is prior art under at least 35 U.S.C. § 102(a)(2) regardless of the priority dispute.

Tuukkanen discloses a system and method for authorizing access to and utilization of vehicle functions through the use of digital certificates. The system enables a vehicle owner to define, configure, and associate specific access rights and action rights with digital certificates, which can then be transferred to other users or service providers. (Ex. PA-3, Abstract.) These rights can include, for example, the ability to access the vehicle, start the engine, move the vehicle, or utilize specific in-vehicle features, and can be limited by parameters such as time, location, or user identity. (Ex. PA-3, [0037], [0040].) The certificates are managed and distributed via a secure platform, and the system supports granular control—such as restricting a temporary user's access to only certain vehicle features or for a limited duration—by associating rights and functional limitations with the certificates. (Ex. PA-3, [0048].) The system further provides mechanisms for updating, revoking, or invalidating certificates based on user input or detected events, and for notifying users or service providers of status changes or urgent events via integrated sensors and communication modules. (Ex. PA-3, [0044]-[0047], [0051]-0052].)



**Ex. PA-3, Fig. 1**

Tuukkanen discloses the storage and management of user-specific rights and preferences that govern vehicle functions, and the transfer of these profiles between devices, users, and vehicles via digital certificates. (Ex. PA-3, [0034]-[0036].) The system supports the retrieval, updating, and synchronization of these rights/profiles across multiple platforms, including vehicles, user devices, and cloud-based servers. (Ex. PA-3, [0027].) Tuukkanen also describes the use of authentication and verification mechanisms (such as device identification, user credentials, and potentially biometrics) to ensure that only authorized users can access or modify these profiles. (Ex. PA-3, [0062], [0035].)

FIG. 2



**Ex. PA-3, Fig. 2**

The disclosure further discloses the ability to enable or disable vehicle features based on a user's certificate/profile, and to update or synchronize user-specific settings when a user enters or exits a vehicle. (Ex. PA-3, [0027], [0077].)

## X.    Substantial New Questions of Patentability

The above-identified prior art was not considered during original examination and raises substantial new questions of patentability as follows:

| SNQ | Basis | References | Claims Challenged |
|-----|-------|-----------|-------------------|
| 1 | § 103 | Tokunaga | 1–4, 7–9, and 12 |
| 2 | § 103 | Tokunaga and Tuukkanen | 5–6, 10–11 |
| 3 | § 103 | Tuukkanen and Kleve | 1–13 |

"For a substantial new question of patentability (SNQ) to be present, it is only necessary that: (A) an item of information raises a SNQ regarding at least one claim, i.e., the teaching of the

item of information is such that a reasonable examiner would consider the teaching to be <u>important</u> in deciding whether or not the claim is patentable; and (B) the same question of patentability as to the claim has not been decided by the Office in an earlier concluded examination or review of the patent, decided in a final holding of invalidity (after all appeals) by a federal court in a decision on the merits involving the claim, or raised to or by the Office in a pending reexamination or supplemental examination of the patent." MPEP 2816.02(I). Each SNQ in this Request complies with the requirements of MPEP 2816.02(I).

Additionally, each SNQ is different than the grounds the Office considered previously and applies prior art that was never previously considered by the Patent Office or any other tribunal. Therefore, the discretional denial set forth in *In re Vivint, Inc.,* 14 F.4th 1342, 1350 (Fed. Cir. 2021) does not apply here.

Each proposed rejection in the Request presents a distinct SNQ that a reasonable examiner would consider important in deciding whether the claims are patentable. As explained below in detail, the prior art relied on in this Request teaches these all claim limitations and presents SNQs of patentability.

## A.    SNQ 1: Claims 1–4, 7–9, and 12 are Obvious over Tokunaga

### 1.    This is the first post-grant proceeding

This is the first post-grant proceeding challenging the '931 Patent. Patent Owner asserted the '931 Patent in district-court litigation. *See AutoConnect Holdings, LLC v. Ford Motor Company*, 1:24-cv-01327-JCG (D. Del) (December 6, 2024) and *AutoConnect Holdings LLC v. Toyota* 2-24-cv-00877 (EDTX) (October 3, 2024). These cases are in early stages and no federal court has issued a final invalidity decision yet.

Accordingly, "(B) the same question of patentability as to the claim has not been decided

by the Office in an earlier concluded examination or review of the patent, decided in a final holding of invalidity (after all appeals) by a federal court in a decision on the merits involving the claim, or raised to or by the Office in a pending reexamination or supplemental examination of the patent." MPEP 2816.02(I).

### 2.    This request is the first challenge of the claimed priority date and application of intervening prior art.

Tokunaga is prior art to the filing date of the application for the '931 Patent, but Tokunaga is not prior art to the earliest claimed priority date of the '931 Patent. A full analysis of the '931 Patent's claim of priority for claims 1–13 should be performed here as the original examiner did not perform any priority analysis and because the cited priority documents do not support the claimed subject matter. The Court in *NTP* explained that it cannot be assumed that the original examiner considered priority. *In re NTP, Inc.*, 654 F.3d at 1278. ("[T]here is no presumption that the examiner considered whether the written description of the Parent Application supports the claims of the '592 patent simply because the MPEP requires it." Further, '[i]n the absence of an interference or rejection which would require the PTO to make a determination of priority, the PTO does not make such findings as a matter of course in prosecution.'") (internal citations omitted.) As such, reviewing the priority claims and evaluating the claims in view of intervening prior art is a substantial new question.

### 3.  No tribunal has ever considered the patentability of claims 1–4, 7–9 and 12 in view of Tokunaga

Tokunaga was not cited on the '931 Patent and was never considered by the Patent Office when determining the patentability of the claims. (Ex. A, (56) Pages 2-4; Ex. B.) Additionally, no other tribunal has considered the patentability of the '931 Patent in view of Tokunaga.

In the notice of allowance, the examiner identified the following limitations of claim 21

26

(issued claim 1) as being the reason for allowance:

> wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and transmit, to the server system, the command and an identifier of the second user computing device, wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device; access the database to retrieve the vehicle profile data; update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and transmit, to the vehicle the updated vehicle profile data; wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device; identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device is in proximity to the vehicle.

(Ex. B, 206-207.)

As explained below, Tokunaga discloses or renders obvious all of the limitations of claim 1 that the examiner identified as allowable subject matter during prosecution. (Ex. B, 206-207.) Accordingly, Tokunaga is "(A) an item of information [that] raises a SNQ [of patentability] regarding at least one claim, i.e., the teaching of the item of information is such that a reasonable examiner would consider the teaching to be <u>important</u> in deciding whether or not the claim is patentable." MPEP 2816.02(I).

Therefore, Tokunaga raises a SNQ at least because a reasonable examiner would consider this reference's disclosure to be important in deciding whether claims 1–4, 7–9 and 12 are patentable, and because the reference was not cited or applied by the examiner during prosecution

of the '931 Patent.

**B.    SNQ 2: Claims 5–6 and 10–11 are Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tokunaga in view of Tuukkanen**

This SNQ, like SNQ 1, challenges priority for the first time. As such, reviewing the priority claims and evaluating the claims in view of intervening prior art is a substantial new question. Also, neither Tokunaga nor Tuukkanen were considered in determining the patentability of claim 5–6 and 10–11.

**C.    SNQ 3: Claims 1–13 are Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tuukkanen in view of Kleve.**

Tuukkanen and Kleve are prior art to the earliest claimed priority date of the '931 Patent. These prior art references were not cited on the '931 Patent and were never considered by the Patent Office when determining the patentability of claims 1–13. (Ex. A, (56) Pages 2-4.)

As explained below, Tuukkanen and Kleve disclose and render obvious the "particular user transfer steps/options from one device to another for unlocking and locking a vehicle" limitations of claim 1 that the examiner identified as allowable subject matter during prosecution. (Ex. B, 206-207.) Accordingly, Tuukkanen and Kleve are each "(A) an item of information [that] raises a SNQ of patentability regarding at least one claim, i.e., the teaching of the item of information is such that a reasonable examiner would consider the teaching to be <u>important</u> in deciding whether or not the claim is patentable." MPEP 2816.02(I).

Tuukkanen and Kleve raise a SNQ at least because a reasonable examiner would consider their disclosures to be important in deciding whether claims 1–13 are patentable, and because they were not cited or applied by the examiner during prosecution of the '931 Patent. MPEP 2816.02(I).

**XI.    Detailed Explanation of the Pertinency and Manner of Applying the Prior Art**

### A.    SNQ 1: Claims 1–4, 7–9, and 12 Unpatentable Under 35 U.S.C. § 103 as Being Obvious Over Tokunaga

#### 1.    Independent Claim 1

*[1.0] A vehicle system comprising:*

Tokunaga discloses a system 100 that allows a user to control a vehicle 102 using his phone.

> Generally, the **system 100** may include a vehicle link application 104. The vehicle link application 104 may be hosted and executed at a plurality of locations, that may include, but are not limited to the vehicle 102, an externally hosted server infrastructure 106, and/or one or more portable devices that may include a **primary portable device 108 that is utilized by a designated vehicle owner (not shown) of the vehicle 102**, and one or more secondary portable devices 110 that are utilized by users (not shown) authorized **to access and/or use (e.g., drive) the vehicle 102** by the designated vehicle owner.

(Ex. PA-1, [0027].)



FIG. 1

Ex. PA-1, Fig. 1

A POSA would have understood that the system 100 is a "*vehicle system*" because it includes a vehicle 102 and is used to the control the vehicle 102. (Ex. C, ¶¶91-92.)

> *[1.1] a vehicle including a locking system configured to lock and unlock the vehicle;*
>
> The vehicle 102 includes "*a locking system.*"
>
> As will be described in more detail below, the primary driver of the vehicle 102 may utilize the vehicle link application 104 to identify themselves as the designated vehicle owner in order to grant authorization to authorized users of the vehicle 102 to access (**e.g., unlock/lock one or more locations of the vehicle 102**) and/or enable (e.g., enable/disable one or more ignition modes of the vehicle 102) the vehicle 102.

(Ex. PA-1, [0028].)

Tokunaga explains that the system 100 allows a user to lock and unlock the doors of the vehicle using a permission signal that is sent from a portable device to the vehicle.

> The **permission signal may provide** the primary **portable device 108** with permanent and unlimited **accessing privileges to the vehicle 102 to unlock and lock all of the locations** of the vehicle 102 that may include, but are not limited to, **the locks of doors**, compartments, trunk, hood, and the like of the vehicle 102 without any restrictions with respect to time or usage (time or usage restrictions).

(Ex. PA-1, [0075].)

A POSA would have understood that Tokunaga's disclosure of the "locks of the doors," which permit or deny entry to the passenger cabin, as being a *"a locking system configured to lock and unlock the vehicle."* (Ex. C, ¶¶93-95.)

> *[1.2] a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device;*

Tokunaga discloses a plurality of storage devices including vehicle storage unit 116, server storage 146, vehicle link data repository 150, memory 134, and memory 136.



FIG. 1

**Ex. PA-1, Fig. 1**

The system 100 includes a vehicle link application 104 that is "hosted and executed at a plurality of locations" such as the vehicle 102, server 106, and portable devices 108/110. (Ex. PA-1, [0027], [0035], [0050], [0056], [0058].)

The vehicle link application 104 enables the portable devices 108 and 110 to control the vehicle, such as unlocking the doors.

As will be described in more detail below, **the primary driver of the vehicle 102 may utilize the vehicle link application 104 to identify themselves as the designated vehicle owner in order to grant authorization to authorized users of the vehicle 102 to access (e.g., unlock/lock one or more locations of the vehicle 102) and/or enable (e.g.,** enable/disable one or more ignition modes of the vehicle 102) the vehicle 102. This authorization may be granted in a form of accessing privileges associated with the vehicle 102 and a form of enabling privileges associated with the vehicle 102. **For example, the vehicle link**

> application 104 may allow the primary driver to link (e.g., pair, connect) the
> primary portable device 108 with the vehicle 102 to access and enable the
> vehicle 102. The primary portable device 108 may send one or more signals to
> the vehicle 102 to lock and unlock the doors and compartments of the vehicle
> 102 and turn on and turn off the vehicle ignition to enable an engine (not shown)
> of the vehicle 102.

(Ex. PA-1, [0028].)

The vehicle link application 104 has an associated "*database*", *i.e.*, the vehicle data link repository 150, which includes a vehicle link table (e.g., table 300), and is stored in server storage 146, vehicle storage 116, or device memory 134.

> In an exemplary embodiment, the externally hosted server infrastructure 106 may
> include **a vehicle data link repository 150 that is stored on the storage 146. The**
> **vehicle data link repository 150 may store a vehicle link table associated with**
> **the vehicle link application 104.** In alternate embodiments, the vehicle data link
> repository 150 may be replicated to the **storage unit 116** of the vehicle 102 and/or
> the **memory 134** of the primary portable device 108.

(Ex. PA-1, [0052].)

The table 300 of the repository 150 includes entries 312-322 that include several data fields (e.g., 304-310) for several different users (e.g., users 1-6). A POSA would have understood that the data fields, e.g., 304, 306, etc., are "*vehicle profile data*" as they define permissions to use certain vehicle features, such as starting the engine, and are the data of the "*vehicle profile*" (table 300). (Ex. C, ¶¶96-106.)

| "Vehicle Profile" | | | | 300 |
|---|---|---|---|---|
| 302 | 304 | 306 | 308 | 310 |
| USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
| USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

(row labels at left: 312, 314, 316, 318, 320, 322)

FIG. 3

**Ex. PA-1, FIG. 3 (Annotated)**

FIG. 3 is an illustrative example of an exemplary **vehicle link table 300 that is associated with the vehicle 102**. As discussed in more detail below, the **vehicle link application 104** may be utilized by the primary driver of the vehicle 102 to **populate underlying records** that reside within entries associated with the primary driver and possibly one or more authorized uses of the vehicle 102. The **records are associated with the fields 302-310 of the vehicle link table 300**. The vehicle link table 300 may be provided in a variety of formats and with a variety of fields that include associated records within entries in lieu or in addition to the fields 302-310 shown within the exemplary table 300.

(Ex. PA-1, [0053].)

As illustrated in Figure 3 above, each entry 312-322 includes a "user ID field 320" a "device ID field 304" a "user type field 306 . . . an accessing privilege level field 308 and an enabling privilege level field 310". (Ex. PA-1, [0055]) For example, entry 312 includes an accessing privilege level 308 and an enabling privilege level 310 for the primary driver (User 1) using their primary device (PHN 1); and entry 314 includes an accessing privilege level 308 and an enabling privilege level 310 for the secondary driver (User 2) using a secondary device (FOB 2).

In an exemplary embodiment, the vehicle link table 300 may include a **user ID field 302** that is populated with user names of the primary driver and the one or

> more authorized users that respectively utilize the primary portable device 108 and the one or more secondary portable devices 110 that are linked to the vehicle 102 by the vehicle link application 104. The vehicle link table 300 may also include **a device ID field 304** that is populated with device IDs on the primary portable device 108 and possibly one or more secondary portable devices 110 that are linked to the vehicle 102. In addition, the table 300 may include a **user type field 306** that may include a designation of the primary driver and possibly one or more authorized users authorized by the primary driver. Additionally, the table 300 may include an **accessing privilege level field 308 and an enabling privilege level field 310** that may include a designation of the types and levels of privileges granted to the primary driver and possibly one or more authorized users through their respective primary portable device 108 and one or more secondary portable devices 110.

(Ex. PA-1, [0055].)

Accordingly, Tokunaga discloses "*a database* [e.g., vehicle data link repository 150] *storing vehicle profile data* [data fields 302–310 of table 300] *that associates a vehicle profile* [e.g., entry 312 and entry 314 of the table 300] *for the vehicle* [vehicle 102] *with at least one mobile device* [e.g., the primary device 108 and the secondary device 110]." (Ex. C, ¶¶96-106.)

> *[1.3] a first user computing device that is used by a first user and generates a user interface configured to receive a user input from the first user;*

The system 100 includes a primary portable device 108 that is "*used by*" the vehicle owner or primary driver, i.e., "*a first user*" to "access and enable the vehicle 102":

> For example, the vehicle link application 104 may allow the **primary driver to link (e.g., pair, connect) the <u>primary portable device 108</u> with the vehicle 102 to access and enable the vehicle 102.** The primary portable device 108 may send one or more signals to the vehicle 102 to lock and unlock the doors and compartments of the vehicle 102 and turn on and turn off the vehicle ignition to enable an engine (not shown) of the vehicle 102.

35

(Ex. PA-1, [0028].)

Tokunaga discloses the portable device 108 is a "*computing device,*" such as a smart phone.



**Ex. PA-1, Fig. 1**

In the exemplary embodiment shown in FIG. 1, the primary **portable device 108** and the one or more secondary portable devices 110 may be a **computing device** that includes respective control units 130, 132, respective memories 134, 136, respective communication devices 138, 140, and respective touch screen displays 142, 144. Generally, the primary portable device 108 and the one or more secondary portable devices 110 may include, but are not limited to, a handheld device, a mobile device, a **smart phone**, a smart key fob, a tablet, an e-reader, and the like.

(Ex. PA-1, [0045].)

The device 108 includes a touch screen display 142 that "*generates a user interface configured to receive a user input from the first user.*"

In an exemplary embodiment, the respective **touch screen displays 142**, 144 of the primary portable device 108 and the one or more secondary portable devices 110 enable <u>user input</u> (e.g., touch input) on various <u>user interfaces</u> that are

presented via the touch screen displays **142, 144**. In one embodiment, the vehicle link application 104 may present user interfaces via the respective touch screen displays 142, 144. As discussed below, the primary driver and/or the authorized users may utilize the user interfaces to access and/or utilize the vehicle 102 in addition to providing consent to off-board vehicle data from the vehicle 102 to the externally hosted server infrastructure 106.

(Ex. PA-1, [0049].)

One example user interface is the "vehicle administration user interface," which is used to authorize secondary devices to use the vehicle 102. (Ex. PA-1, [0080].)

Accordingly, Tokunaga discloses, "*a first user computing device* [e.g., device 108] *that is used by a first user* [e.g., vehicle owner] *and generates a user interface configured to receive a user input* [e.g., a touch input on touch screen 142] *from the first user*." (Ex. C, ¶¶107-110.)

**[1.4] *a second user computing device that is used by a second user;***

Tokunaga further discloses a secondary portable device 110.



FIG. 1

37

**Ex. PA-1, Fig. 1**

> In an exemplary embodiment, the one or more **secondary portable devices 110** may be linked to the vehicle 102 and may be provided with a level of vehicle accessing privileges and vehicle enabling privileges as determined by the primary driver to allow the one or more authorized users to access (e.g., unlock/lock one or locations of the vehicle 102) and/or enable (e.g., enable/disable one or more ignition modes of the vehicle 102) the vehicle 102 through their respective linked secondary portable devices 110.

(Ex. PA-1, [0029].)

Tokunaga discloses that the secondary device 110 is a "*computing device*," such as a smart phone.

> In the exemplary embodiment shown in FIG. 1, the primary portable device 108 and the one or more **secondary portable devices 110 may be a computing device** that includes respective control units 130, 132, respective memories 134, 136, respective communication devices 138, 140, and respective touch screen displays 142, 144. Generally, the primary portable device 108 and the one or more secondary portable devices 110 may include, but are not limited to, a handheld device, a mobile device, a **smart phone**, a smart key fob, a tablet, an e-reader, and the like.

(Ex. PA-1, [0045].)

Accordingly, Tokunaga discloses, "*a second user computing device* [e.g., device 110] *that is used by a second user.*" (Ex. C, ¶¶111-112.)

*[1.5] a server system configured to communicate with the vehicle and the first user computing device,*

As discussed above, the system 100 includes a server infrastructure 106:

> Generally, the system 100 may include a vehicle link application 104. The vehicle link application 104 may be hosted and executed at a plurality of locations, that may include, but are not limited to the vehicle 102, an externally hosted **server infrastructure 106**, and/or one or more portable devices that may include a primary

> portable device 108 that is utilized by a designated vehicle owner (not shown) of
> the vehicle 102, and one or more secondary portable devices 110 that are utilized
> by users (not shown) authorized to access and/or use (e.g., drive) the vehicle 102
> by the designated vehicle owner.

(Ex. PA-1, [0027].)

The server infrastructure 106 includes a plurality of servers:

> With reference to the externally hosted server infrastructure 106 of the system 100,
> in one or more embodiments, the externally hosted **server infrastructure 106 may
> include a plurality of interconnected servers (not shown) that may include but
> are not limited to web servers, data servers, database servers, domain
> controllers, backup servers**, and the like. In one embodiment, the plurality of
> interconnected servers may include **one or more server clusters** that may be
> located at a plurality of different locations (e.g., at a non-local global site and at a
> local national site).

(Ex. PA-1, [0050].)

A POSA would have understood the server infrastructure 106 as being "*a server system*"
since it includes multiple servers. Moreover, the server infrastructure 106 also includes associated
storage 146, a communication device 148, and software, e.g., vehicle link application 104, which
further form "*a server system*." (Ex. C, ¶¶113-116.)



FIG. 1

**Ex. PA-1, Fig. 1**

Tokunaga discloses that the *"server system"* communicates with the vehicle 102 and the device 108, e.g., "the TCU 120 of the vehicle 102 . . . facilitates the sending and receiving of data between the vehicle 102 and the primary portable device 108 . . . [and] the externally hosted server infrastructure 106":

> Moreover, in one embodiment, **the vehicle link application 104** additionally enables the primary driver to select one or more types of vehicle data that may be off-boarded from the vehicle 102 and may additionally enable the primary driver and/or the one or more authorized users of the vehicle 102 to provide proper consent through their respective linked portable devices 108, 110 **to off-board the one or more types of vehicle data selected by the primary driver from the vehicle 102 to the externally hosted server infrastructure 106.**

(Ex. PA-1, [0030], see also [0048].)

> In one embodiment, the primary device **linking module 202 may send a command signal to the externally hosted server infrastructure 106** to send (e.g., transmit)

> a linking signal to the primary portable device 108 through the **communication device(s) 148** that links the primary portable device 108 to the vehicle 102. In an alternate embodiment, the primary device linking module 202 may send a command signal to the **TCU 120** of the vehicle 102 to send the linking signal to the primary portable device 108.

(Ex. PA-1, [0062].)

> In an exemplary embodiment, **the TCU 120 of the vehicle 102 may be an external interface for mobile communication that facilitates the sending and receiving of data between the vehicle 102** and the **primary portable device 108**, the one or more secondary portable devices 110, the externally hosted **server infrastructure 106**, and/or additionally externally hosted systems (not shown).

(Ex. PA-1, [0041].)

Accordingly, Tokunaga discloses, "*a server system* [server infrastructure 106] *configured to communicate with the vehicle* [102] *and the first user computing device* [device 108]." (Ex. C, ¶¶113-116.)

> *[1.6] wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and*

The device 108 ("*first user computing device*") has a user interface, e.g., a touch screen 142. (Ex. PA-1, [0049].) The system 100 allows the vehicle owner to "*grant vehicle control permission*" to other users so that they can control the vehicle 102 using a secondary device 110.

> In an exemplary embodiment, the one or more **secondary portable devices 110 may be linked to the vehicle 102 and may be provided with a level of vehicle accessing privileges** and vehicle enabling privileges as determined by the primary driver to allow the one or more authorized users to access (e.g., unlock/lock one or locations of the vehicle 102) and/or enable (e.g., enable/disable one or more ignition modes of the vehicle 102) the vehicle 102 through their respective linked secondary portable devices 110.

(Ex. PA-1, [0029].)

Tokunaga discloses the system 100 has a "vehicle administration user interface" displayed on the touch screen 142 and used by the owner of the primary device 108 to grant vehicle-use permissions to secondary devices 110:

> Linking of the at least one secondary portable device 110 to the vehicle 102 and granting privileges to the at least one secondary portable device 110 by the vehicle link application 104 will now be discussed in more detail. With reference again to FIG. 2, in one embodiment, once the primary driver is provided with administrative privileges through his or her primary portable device 108, the primary device linking module 202 may communicate a linking signal to the secondary device linking module 204 that includes data associated with the primary portable device 108. **Upon receipt of the linking signal, the secondary device linking module 204 may send a command signal to the control unit 130 of the primary portable device 108 and/or the head unit 114 of the vehicle 102 to present a <u>vehicle administration user interface to the primary driver through the touch screen display 142</u> of the primary portable device 108 and/or the display device 118 of the vehicle 102. The vehicle administration user interface may be initialized by the primary driver at any time** per his or her choosing and **<u>provides a means to designate one or more additional persons as one or more authorized users by granting vehicle accessing permissions and/or vehicle enabling permissions to one or more secondary portable devices 110</u>**.

(Ex. PA-1, [0080].)

The device 108 receives, via the touch screen 142 and the "vehicle administration user interface," inputs from the owner that command a grant of vehicle control permission for the second user computing device as previously discussed. (*See* Ex. PA-1, [0080].)

The above discussed "vehicle administration user interface" enables the owner to grant privileges to secondary devices 110 at "at any time per his or her choosing." (Ex. PA-1, [0080].)

Tokunaga also discloses another example that meets claim limitation [1.6]. Here, the owner

responds to vehicle-use requests from a secondary user via input into the touch screen 142. Tokunaga discloses a "request indication user interface" that allows a secondary user to request vehicle permissions for a secondary device 110. Here, the "request indication user interface" includes an icon displayed on the secondary device 110, which once selected, causes a request to be sent to the primary device 108. The owner may then grant the requested permission using the "request indication user interface" displayed on the primary device 108.

> In an alternate embodiment, one or more additional persons may input a request to be granted vehicle accessing privileges and/or vehicle enabling privileges through his or her respective secondary portable device 110. In particular, the secondary device linking module 204 may include request user interface input (e.g., **icon**) through a user interface of the vehicle link application 104 that may be presented on one or more secondary portable devices 110. **Upon input of the request user interface input by the one or more additional persons, the secondary device linking module 204 may communicate a respective signal to the control unit 130 of the primary portable device 108 to present a request indication user interface to the primary driver through the primary portable device 108. The request indication user interface may indicate the request by one or more additional persons to request vehicle accessing permissions and/or vehicle enabling permissions. The request indication user interface may provide the primary driver a portal to the vehicle administration user interface to grant the vehicle accessing privileges and/or vehicle enabling privileges of his or her choosing in order to designate the one or more additional persons as one or more authorized users of the vehicle 102.**

(Ex. PA-1, [0089].)

A POSA would have understood that "request indication user interface," when presented on the owner's device, also discloses "*the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device*[.]" (Ex. C, ¶122.)

43

Accordingly, Tokunaga discloses, *"wherein the first user computing device* (device 108)] *is further configured to: receive, via the user interface, a command* [level of vehicle accessing privileges] *to grant vehicle control permission for the vehicle* [102] *to the second user computing device* [device 110].(Ex. C, ¶¶117-122.)

> **[1.7] transmit, to the server system, the command and an identifier of the second user computing device,**

Tokunaga discloses transmitting the command to add an authorized user to the server infrastructure 106 ("*server system*"). This transmission includes a user ID and a device ID for the added secondary user.

> In one or more embodiments, **upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users of the vehicle 102, the secondary device linking module 204 may communicate respective data to the externally hosted server infrastructure 106 to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users.** With reference back to FIG. 3, the entries associated to the authorized users 314–322 may include records that are populated with the **user ID** of the secondary user, the **device ID** of the secondary user (that may be manually or automatically updated), user type designation, accessing privilege level, and the enabling privilege level.

(Ex. PA-1, [0088].)

> At block 606, the method 600 includes updating **the vehicle link table 300 with the device ID(s) of the one or more secondary portable devices 110 and/or the user ID(s) associated with the one or more respective authorized users.** In one or more embodiments, **upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users and link their respective secondary portable devices 110 to the vehicle 102, the secondary device linking module 204 may communicate respective data to the**

> **externally hosted server infrastructure 106 to update the vehicle link table 300**
> **with respective additional entries that are associated with the one or more**
> **authorized users**. The secondary device linking module 204 may additionally
> populate one or more records under the **user ID field 302** and the **device ID field**
> **304** on the vehicle link table 300 associated with the respective additional entries
> with the user ID(s) that are associated with the one or more authorized users, and/or
> the device ID(s) that are associated with their one or more respective secondary
> portable devices 110.

(Ex. PA-1, [0141].)

A POSA would have understood Tokunaga's "device ID" as being "*an identifier of the
second user computing device*" since it is used to identify the secondary device 110.

> **The primary portable device 108 and the one or more secondary portable**
> **devices 110 may include a corresponding device identification (device ID). The**
> **device ID may be a unique identifier** that may be utilized by the vehicle link
> application 104 to link the primary portable device 108 and the one or more
> secondary portable devices 110 to the vehicle 102. In one embodiment, the device
> ID may include a unique identification code that is assigned by the vehicle link
> application 104 that identifies the user of the respective portable devices 108, 110.
> In another embodiment, the device ID may include the serial number corresponding
> to the respective portable devices 108, 110. As discussed below, upon linking the
> primary portable device 108 the respective device IDs of the portable devices 108,
> 110 may be sent to the vehicle 102, communicated between one another, and/or
> sent the externally hosted server infrastructure 106 to be stored and used by the
> vehicle link application 104.

(Ex. PA-1, [0046].)

300

| 302 | 304 | 306 | 308 | 310 |
|---|---|---|---|---|
| USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
| USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

312
314
316
318
320
322

FIG. 3

**Ex. PA-1, Fig. 3**

The vehicle link table 300 may also include **a device ID field 304** that is populated with device IDs on the primary portable device 108 and possibly one or more secondary portable devices 110 that are linked to the vehicle 102.

(Ex. PA-1, [0055].)

The secondary device linking module 204 is a module of the vehicle link application 104. The vehicle link application 104 is hosted on the primary device 108. (Ex. PA-1, [0056].) Therefore, a POSA would have understood that the "*first user computing device* [primary device 108] *is further configured to . . . transmit, to the server system, the command and an identifier* [device ID] *of the second user computing device.*" Indeed, the request to grant permissions and inputting of the user ID and device ID occurs on the primary device 108, therefore, it was transmitted from the device 108 to the server infrastructure 106. (Ex. PA-1, [0060].) (Ex. C, ¶¶123-125.)

> *[1.8] wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier of the second user computing device;*

Claim limitation [1.8] is merely the server side of the above discussed transmission of the command and device ID of claim limitation [1.7]. As discussed above, the server infrastructure

46

106 ("*server system*") "*receives from the first user computing device* [device 108], *the command and the identifier* [device ID] *of the second user computing device.*" (Ex. PA-1, [0088], [0141].) (Ex. C, ¶126.)

### *[1.9] access the database to retrieve the vehicle profile data;*

As discussed above, Tokunaga discloses a vehicle link data repository 150 ("*database*") storing a vehicle link table 300 ("*vehicle profile*") containing "*vehicle profile data*" such as data fields 302, 304, 306, 308, and 310.



| | 302<br>USER ID | 304<br>DEVICE ID | 306<br>USER TYPE | 308<br>ACCESSING PRIVILEGE LEVEL | 310<br>ENABLING PRIVILEGE LEVEL |
|---|---|---|---|---|---|
| 312 | USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| 314 | USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| 316 | USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| 318 | USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| 320 | USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| 322 | USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

FIG. 3

Ex. PA-1, Fig. 3

The server infrastructure 106 accesses the data repository 150 ("*database*") when querying the vehicle link table 300. Indeed, a POSA would have understood that to "query" a database means to "*access the database*" and retrieve the data stored therein. (Ex. C, ¶128.) In Tokunaga, the vehicle link application 104, which is part of the server infrastructure 106 (Ex. PA-1, [0027]), queries ("*access*[es]") the table 300 stored in the data repository 150 ("*database*").

> At block 602, the method 600 includes determining if one or more secondary portable devices 110 is linked to the vehicle 102. In an exemplary embodiment, when the vehicle link application 104 is being used via the one or more secondary portable devices 110, the secondary device linking module 204 of **the vehicle link application 104 may query the vehicle link table 300 residing on the externally**

> hosted server infrastructure 106 to determine if a record(s) exists that contains the device ID(s) of the respective secondary portable devices 110.

(Ex. PA-1, [0139].)

> The table 300 is also accessed when a new secondary user is added by the owner.

> At block 606, the method 600 includes **updating the vehicle link table 300 with the device ID(s) of the one or more secondary portable devices 110** and/or the user ID(s) associated with the one or more respective authorized users. In one or more embodiments, upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users and link their respective secondary portable devices 110 to the vehicle 102, **the secondary device linking module 204 may communicate respective data to the externally hosted server infrastructure 106 to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users.** The secondary device linking module 204 may additionally populate one or more records under the **user ID field 302 and the device ID field 304** on the vehicle link table 300 associated with the respective additional entries with the user ID(s) that are associated with the one or more authorized users, and/or the device ID(s) that are associated with their one or more respective secondary portable devices 110."

(Ex. PA-1, [0141], *see also* [0088].)

> A POSA would have understood that server infrastructure *"retrieve[s] the vehicle profile data"* when it updates the data fields, e.g., 302 and 304." (Ex. C, ¶130.)

> Accordingly, Tokunaga discloses, *"wherein the server system is further configured to: . . . access* [e.g., query] the database [data repository 150] *to retrieve the vehicle profile data* [data fields of table 300]." (Ex. C, ¶¶127-131.)

> *[1.10] update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and*

> The data (*"vehicle profile data"*) of the vehicle link table 300 (*"vehicle profile"*) is updated

by the server infrastructure 106 when a new secondary user is added.

> In one or more embodiments, upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users of the vehicle 102, **the secondary device linking module 204 may communicate respective data to the externally hosted server infrastructure 106 to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users.** With reference back to FIG. 3, the entries associated to the authorized users 314-322 **may include records that are populated with the user ID of the secondary user, the device ID of the secondary user (that may be manually or automatically updated), user type designation, accessing privilege level, and the enabling privilege level.**

(Ex. PA-1, [0088], *see also* [0141].)

As also discussed above, the table 300 includes a device ID field 304 that includes device IDs, e.g., "FOB 2," is an "*identifier of the second user computing device.*"

| | 302 USER ID | 304 DEVICE ID | 306 USER TYPE | 308 ACCESSING PRIVILEGE LEVEL | 310 ENABLING PRIVILEGE LEVEL |
|---|---|---|---|---|---|
| 312 | USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
| 314 | USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| 316 | USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| | USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| 318 | USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| 320 | USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| 322 | USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

FIG. 3

**Ex. PA-1, Fig. 3**

A POSA would have understood that when the server infrastructure 106 updates the table 300 with the device ID 304 of the new secondary user device 110, the server infrastructure 106 associates the vehicle profile 300 for the vehicle 102 with device ID ("*identifier*") of the second user device 110. Specifically, the existence of the device ID field 304 in the table 300, which includes various vehicle profile data such as operating privileges and restrictions, "*associate*[es]

*the vehicle profile* [table 300] *for the vehicle* [102] *with the identifier* [e.g. device ID] *of the second user computing device* [device 110]" as claimed. (Ex. C, ¶¶132-134.)

### [1.11] transmit, to the vehicle the updated vehicle profile data;

Tokunaga discloses that the primary storage location for the vehicle data link table 300 is in the vehicle data link repository 150 on server storage 146. Tokunaga also discloses that the table 300 can be "replicated to the storage unit 116 of the vehicle 102":

> In an exemplary embodiment, the **externally hosted server infrastructure 106 may include a vehicle data link repository 150 that is stored on the storage 146.** The vehicle **data link repository 150 may store a vehicle link table** associated with the vehicle link application 104. **In alternate embodiments, the vehicle data link repository 150 may be replicated to the storage unit 116 of the vehicle 102** and/or the memory 134 of the primary portable device 108.

(Ex. PA-1, [0052].)

A POSA would have understood that the server infrastructure 106 would transmit the data of the table 300 to the vehicle 102 in order for the table 300 to be replicated in storage unit 116. A POSA would have further understood that the data of the most-recent table 300 ("*updated vehicle profile*") would be transmitted to the vehicle as Tokunaga teaches that the vehicle link table 300 is "replicated to the storage unit 116 of the vehicle 102." (Ex. PA-1, [0052]; Ex. C, ¶136.) Replicated means a copy. Therefore, when the server infrastructure 106 transmits the data of the table 300 to the vehicle 102, it is the most recent or "*updated*" version of the "*vehicle profile data*."

Accordingly, Tokunaga discloses, "*wherein the server system is further configured to: . . . transmit, to the vehicle the updated vehicle profile data.*" (Ex. C, ¶¶135-136.)

### [1.12] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data;

Limitation [1.12] is merely the vehicle-side of the data transmission discussed in limitation

[1.11] and is disclosed by Tokunaga for at least the above-discussed reasons. As discussed in claim limitation [1.11], the vehicle 102 receives the vehicle link table 300 data containing the "*updated vehicle profile data*" from the server infrastructure 106 ("*server system*") for replication in the vehicle storage 146. (Ex. PA-1, [0052].) (Ex. C, ¶137.)

> *[1.13] wirelessly receive, from a mobile computing device in proximity to the vehicle, an identifier of the mobile computing device;*

Tokunaga discloses that the vehicle 102 is configured to receive a device ID ("*identifier*") from the portable devices 108/110.

> **The primary portable device 108 and the one or more secondary portable devices 110 may include a corresponding device identification (device ID).** The device ID may be a unique identifier that may be utilized by the vehicle link application 104 to link the primary portable device 108 and the one or more secondary portable devices 110 to the vehicle 102. In one embodiment, the device ID may include a unique identification code that is assigned by the vehicle link application 104 that identifies the user of the respective portable devices 108, 110. In another embodiment, the device ID may include the serial number corresponding to the respective portable devices 108, 110. As discussed below, upon linking the primary portable device 108 **the respective device IDs of the portable devices 108, 110 may be sent to the vehicle 102,** communicated between one another, and/or sent the externally hosted server infrastructure 106 to be stored and used by the vehicle link application 104.

(Ex. PA-1, [0046], *see also* [0101].)

> In one embodiment, the secondary device linking module 204 may communicate a command signal to the communication device(s) 140 of the one or more respective **secondary portable devices 110 to send the** <u>**device ID(s)**</u> **of the respective devices 110 along with a respective vehicle accessing signal or vehicle enabling signal to the TCU 120 of the vehicle 102.**

(Ex. PA-1, [0095].)

Tokunaga discloses that the vehicle *"wirelessly receive*[s]" the device ID (*"identifier"*) for devices 108/110 "in proximity to the vehicle" using short-range wireless communication, such as Bluetooth®.

> [T]he **TCU 120 may utilize** a global system for mobile communications (GSM), general packet radio service (GPRS), Wi-Fi®, WiMax®, **Bluetooth®,** or LTE® **wireless connection to send and receive one or more data signals to and from primary portable device 108, the one or more secondary portable devices 110,** and/or externally hosted server infrastructure 106 directly through the internet cloud.

(Ex. PA-1, [0041], *see also* [0048].)

> In one or more embodiments, when the primary driver uses his or her primary portable device 108 to access or enable the vehicle 102, the primary device linking module 202 may determine if more than one portable device is detected with respect to the vehicle 102 such that more than one portable device is connected to the vehicle 102, **more than one portable device is determined to be in a** <u>surrounding area</u> **of the vehicle 102 (e.g., a predetermined area internal and/or external to the vehicle 102), more than one portable device is sending one or more signals within the surrounding area of the vehicle 102, and the like.** For example, the primary device linking module 202 may determine if more than one portable device is detected with respect to the vehicle 102 based on if more than one portable device is connected to the vehicle 102 through a GSM, GPRS, Wi-Fi®, WiMax®, **Bluetooth®,** or LTE® wireless connection.

(Ex. PA-1, [0073].)

Accordingly, Tokunaga discloses, *"wherein the vehicle is further configured to: … wirelessly receive, from a mobile computing device* [e.g., device 108/110)] *in proximity to the vehicle* [102], *an identifier* [device ID] *of the mobile computing device."* (Ex. C, ¶¶138-139.)

> *[1.14] identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device*

> *with the updated vehicle profile data that stores the identifier of the second user*
> *computing device; and*

Tokunaga discloses that the secondary device 110 ("*mobile computing device*") sends the device ID to the TCU 120 of the vehicle 102 and, upon receipt, the secondary device linking module 204 queries the vehicle link table 300 to find a match for the received device ID ("*wirelessly-received identifier*").

> In one embodiment, the secondary device linking module 204 may communicate a command signal to the communication device(s) 140 of the one or more respective **secondary portable devices 110 to send the device ID(s) of the respective devices 110** along with a respective vehicle accessing signal or vehicle enabling signal **to the <u>TCU 120 of the vehicle 102</u>. <u>Upon receipt</u>** of the respective vehicle accessing signal or vehicle enabling signal that includes the device ID(s) of the one or more secondary portable devices 110, the secondary device linking module 204 may **query the vehicle link table 300 to determine if a corresponding record exists under the device ID field that includes the device IDs of the one or more secondary portable devices 110**.

(Ex. PA-1, [0095].)

This query will result in the vehicle identifying the portable device 110 as the second user 314 if the received device ID matches the stored device ID for PHN 2 associated with the second user.

|  | USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
|---|---|---|---|---|---|
| 312 | USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| 314 | USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| 316 | USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| 318 | USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| 320 | USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| 322 | USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

302   304   306   308   310

300

FIG. 3

Ex. PA-1, Fig. 3

The secondary device linking module 204 is a module of the vehicle link application 104. Tokunaga discloses that the vehicle link application 104 "may be stored on the storage unit 116 of the vehicle 102 to be executed by the head unit 114 of the vehicle 102." (Ex. PA-1, [0056].) As discussed above, the table 300 can also be stored on the storage unit 116. (Ex. PA-1, [0052].) A POSA would have understood that paragraph 95 of Tokunaga is discussing an embodiment where the vehicle 102 has the link application 104 and table 300 on the storage unit 116 and the vehicle is performing the matching of the received device ID with the device IDs 304 in the table 300 to identify the secondary device 210 as an authorized user. This is made clear by the device 110 sending the device ID to the vehicle and "[u]pon receipt" "query[ing] the vehicle link table 300 to determine if a corresponding record exists under the device ID field." (Ex. PA-1, [0095].)

Accordingly, Tokunaga discloses, "*wherein the vehicle is further configured to: . . . identify the mobile computing device* [device 110] *as the second user computing device by matching the wirelessly-received identifier* [device ID] *of the mobile computing device* [device 110] *with the updated vehicle profile data* [data fields of table 300] *that stores the identifier* [device ID] *of the second user computing device* [device 110]."(Ex. C, ¶¶140-142.)

**[1.15] based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device is in proximity to the vehicle.**

If the received device ID matches one of the stored device IDs in table 300, the portable

device associated with the received device ID can be used to lock or unlock the vehicle doors:

> In one embodiment, **if the secondary device linking module 204 retrieves the**
> **record(s) that includes the device ID(s) of the one or more secondary portable**
> **devices 110,** the secondary device linking module 204 may send a command signal
> to the communication device 138 of the **primary portable device 108 to send (e.g.,**
> **transmit) the permission signal(s) to the one or more secondary portable**
> **devices 110** used by the respective authorized users. **In one embodiment, the**
> **permission signal(s) may provide the one or more secondary portable devices**
> **110 with the level of accessing privileges to the vehicle to possibly** <u>**unlock and**</u>
> <u>**lock the locks of doors**</u>, compartments, trunk, hood, and the like of the vehicle 102
> **based on the respective accessing privilege level associated with the user ID of**
> **the respective authorized user(s) within the vehicle link table 300,** as granted
> by the primary driver.

(Ex. PA-1, [0096].)

Tokunaga discloses user interface icons for unlocking and locking the doors from the

portable device 110.

> In one embodiment, **the one or more authorized users may input one or more**
> **respective user** <u>**interface icon**</u>**s related to accessing privileges associated with**
> **the vehicle 102 (e.g., unlock/lock icons)** and/or enabling privileges associated with
> the vehicle 102 (e.g., enabling one or more ignition modes of the vehicle
> 102/disabling one or more ignition modes of the vehicle 102). The secondary device
> linking module 204 may acknowledge the one or more authorized users' use of their
> linked respective secondary portable devices 110 to determine that the one or more
> authorized users are using their linked one or more respective secondary portable
> devices 110 to access or enable the vehicle 102.

(Ex. PA-1, [0146].)

Tokunaga discloses that the vehicle is "*configured to*" "*control the lock system to lock or*

*unlock the vehicle*" based on "identification" of the portable device as an authorized user.

> **If it is determined that the one or more secondary portable devices 110 have been linked to the vehicle 102** (at block 622), at block 624, the method 600 includes **granting the one or more secondary portable devices 110 with vehicle accessing and/or vehicle enabling privileges** by the primary portable device 108. In an exemplary embodiment, once the secondary device linking module 204 determines that the one or more secondary portable devices 110 have been linked to the vehicle 102 at block 622, the secondary device linking module 204 may send a command signal(s) to the communication device 138 to send (e.g., transmit) a permission signal to the one or more secondary portable devices 110. The permission signal may provide the one or more secondary portable devices 110 with accessing privileges and enabling privileges to the vehicle 102 based on the level of accessing privileges and/or enabling privileges granted by the primary driver (at block 608). **The secondary device linking module 204 may enable the communication device(s) 140 to send accessing signals to the TCU 120 of the vehicle 102 upon input of the one or more respective user interface icons related to accessing privileges associated with the vehicle 102 to possibly <u>unlock and lock</u> the predetermined locations of the vehicle 102 based the respective accessing privilege level associated to the one or more secondary portable devices 110 as granted by the primary driver (at block 608).**

(Ex. PA-1, [0151].)

In addition, Tokunaga discloses a "secondary device linking module 204" that "may determine that more than one portable device is detected with respect to the vehicle 102 by communicating [with] the TCU 120 to scan radio frequencies within the surrounding area of the vehicle 102 to determine if more than one portable device exists that is emitting wireless signals." (Ex. PA-1, [0099]), disclosing the exchange of cellular, Bluetooth® and/or WiFi signals between the vehicle and the mobile computing device.) A POSA would have understood that the communication infrastructure disclosed in Tokunaga permits the vehicle to control the lock

system, e.g., to lock or unlock in response to a command by the secondary device wherever it is located (providing wireless communication is available), which includes when the mobile computing device is *"in proximity to the vehicle."* (Ex. C, ¶147.)

Accordingly, Tokunaga discloses, *"wherein the vehicle is further configured to: ... based on the identification* [matching of device IDs], *control the lock system to lock or unlock the vehicle while the mobile computing device* [device 110] *is in proximity to the vehicle* [102]." (Ex. C, ¶¶143-147.)

### 2. Dependent Claim 2

*[2.0] The vehicle system of claim 1, wherein the vehicle profile data includes authentication data to authenticate the first user computing device with respect to the vehicle.*

With reference to the flow chart of Figure 5, at block 504, the vehicle owner creates a "vehicle owner profile" through a "vehicle owner profile creation user interface" displayed on the primary device 108. This interface allows the owner to enter a user ID/password and the device ID of the primary device 108:

> [A]t block 504, the method 500 includes presenting a **vehicle owner profile creation user interface to create a vehicle owner profile**. In one embodiment, the primary device linking module 202 may present the vehicle owner profile creation user interface that may be utilized by the primary driver to create the vehicle owner profile. The vehicle owner profile allows the vehicle link application 104 to classify the primary driver as the vehicle owner and as an administrator to the vehicle 102. In one embodiment, **the vehicle owner profile creation user interface may provide capability for the primary driver to create a user account with a** <u>user</u> <u>ID and password</u> **associated with the primary driver and may manually or automatically input the** <u>device ID</u> **of the primary portable device 108 within the vehicle owner profile**. In one embodiment, the primary device linking module 202 may send a command signal to the externally hosted server infrastructure 106

to send (e.g., transmit) a linking signal to the primary portable device 108 through the communication device(s) 148 that links the primary portable device 108 to the vehicle 102. In an alternate embodiment, the primary device linking module 202 may send a command signal to the TCU 120 of the vehicle 102 to send the linking signal to the primary portable device 108.

(Ex. PA-1, [0125].)



FIG. 5

Ex. PA-1, Fig. 5

Following creation of the vehicle owner profile, the vehicle link table 300 is updated with the user ID/password and the device ID at block 506.

At block 506, the method 500 includes **updating the vehicle link table 300 with the primary portable device ID**. In one embodiment, the primary device linking module 202 may store the vehicle owner profile within the vehicle data link repository 150 and may **create an entry on the vehicle link table 300 with one or more records that are associated to the primary driver and/or the primary portable device 108.**

(Ex. PA-1, [0126].)

The system 100 requires a matching user ID and password prior to the vehicle 102 sending vehicle data to the primary device 108 via a provisioning file. That is, the vehicle data will not be sent from the vehicle 102 to the device 108 unless the received user ID and password matches (authenticated) with the user ID and password stored in the vehicle link table 300.

> The primary device linking module 202 may send a signal to the control unit 130 of the primary portable device 108 to **present a user ID/password prompt to the primary driver through the touch screen display 142 of the primary portable device 108. Upon receiving the user ID/password** that is associated with the primary driver, **the primary device linking module 202 may provide a query on the vehicle link table 300 based on the user ID/password to confirm the designation of the primary driver.** In one embodiment, **upon confirming the designation of the primary driver**, the primary device linking module 202 may send a command signal to the externally hosted server infrastructure 106 to send the authentication code associated with the provisioning file to the vehicle 102 through the communication device(s) 148 of the externally hosted server infrastructure 106.

(Ex. PA-1, [0129], *see also* [0128].)

Therefore, Tokunaga discloses the *"vehicle profile data includes authentication data* [e.g., a device ID or a password that is used] *to authenticate the first user computing device with respect to the vehicle."* (Ex. C, ¶¶148-151.)

### 3. Dependent Claim 3

*[3.0]. The vehicle system of claim 2, wherein the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device; and*

As discussed above, the vehicle link table 300 has several data fields (*"vehicle profile data"*) including a user ID data field 302 and a device ID data field 304. Entry 312 is for the owner

of the vehicle and has the associated user ID (USER 1) and the associated device ID (PH1) for the primary portable device 108 ("*first user computing device*"). The device ID of PHN 1 discloses "*an identifier of the first user computing device.*"

| | USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
|---|---|---|---|---|---|
| | 302 | 304 | 306 | 308 | 310 |
| 312 | USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| 314 | USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| 316 | USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| 318 | USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| 320 | USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| 322 | USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

300

FIG. 3

**Ex. PA-1, Fig. 3**

The flow chart of Figure 5 (reproduced below) illustrates the initial linking of the primary portable device ("*first user computing device*") with the system. During this process, the vehicle link table 300 is updated with the device ID 304 of PHN1 that is received from the device at step 506. (Ex. PA-1, [0126].)



FIG. 5

Ex. PA-1, Fig. 5

As discussed above in claim 1, the table 300 is stored in server storage 146 ("*server system*"). (Ex. PA-1, [0052].) Therefore, "*the server system is further configured to: receive, from the first user computing device, an identifier* [device ID] *of the first user computing device.*" (Ex. C, ¶¶193-195.)

> *[3.1] upon receiving, from the first user computing device, the command and the identifier of the second user computing device, authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data.*

As discussed in claim limitation [1.8], Tokunaga discloses that the "*server system*" receives the "*command*" along with the "*identifier*" of the second user computing device. Tokunaga further discloses to "*authenticate the first user computing device based on the identifier* [e.g., device ID] *of the first user computing device and the vehicle profile data* [table 300]." As discussed above, the vehicle link table 300 has several data fields ("*vehicle profile data*") including a user ID data

61

field 302 and a device ID data field 304. Entry 312 is for the owner of the vehicle and has the associated user ID (USER 1) and the associated device ID (PH1) for the primary portable device 108 ("*first user computing device*").

| USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
|---------|-----------|-----------|---------------------------|--------------------------|
| 302 | 304 | 306 | 308 | 310 |
| USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

312
314
316
318
320
322
300

FIG. 3

**Ex. PA-1, Fig. 3**

The user ID and the device ID are used to authenticate the owner. Referring to Figure 5, at block 504, the vehicle owner creates a "vehicle owner profile" through a "vehicle owner profile creation user interface" displayed on the primary device 108. This interface allows the owner to enter a user ID/password and the device ID of the primary device 108.

> [A]t block 504, the method 500 includes presenting a **vehicle owner profile creation user interface to create a vehicle owner profile**. In one embodiment, the primary device linking module 202 may present the vehicle owner profile creation user interface that may be utilized by the primary driver to create the vehicle owner profile. The vehicle owner profile allows the vehicle link application 104 to classify the primary driver as the vehicle owner and as an administrator to the vehicle 102. In one embodiment, **the vehicle owner profile creation user interface may provide capability for the primary driver to create a user account with a <u>user ID and password</u> associated with the primary driver and may manually or automatically input the <u>device ID</u> of the primary portable device 108 within the vehicle owner profile**. In one embodiment, the primary device linking module

202 may send a command signal to the externally hosted server infrastructure 106 to send (e.g., transmit) a linking signal to the primary portable device 108 through the communication device(s) 148 that links the primary portable device 108 to the vehicle 102. In an alternate embodiment, the primary device linking module 202 may send a command signal to the TCU 120 of the vehicle 102 to send the linking signal to the primary portable device 108.

(Ex. PA-1, [0125].)



FIG. 5

Ex. PA-1, Fig. 5

Following creation of the vehicle owner profile, the vehicle link table 300 is updated with the user ID/password and the device ID at block 506.

At block 506, the method 500 includes **updating the vehicle link table 300 with the primary portable device ID**. In one embodiment, the primary device linking module 202 may store the vehicle owner profile within the vehicle data link repository 150 and may **create an entry on the vehicle link table 300 with one or**

> more records that are associated to the primary driver and/or the primary
> portable device 108.

(Ex. PA-1, [0126].)

The system 100 then uses the user ID and the device ID for authentication of the primary device 108. For example, as discussed for claim 1, the device ID field 304 is used to authenticate the owner's portable device 108 by matching the received device ID with those stored in table 300.

> If the primary driver is the driver of the vehicle 102, the primary device linking
> module 202 may additionally communicate a command signal to the
> communication device 138 of the primary portable device 108 to send the device
> ID of the primary portable device 108 along with a respective vehicle accessing
> signal or vehicle enabling signal to the TCU 120 of the vehicle 102. Upon receipt
> of the respective vehicle accessing signal or vehicle enabling signal that includes
> the device ID of the primary portable device 108, **the primary device linking**
> **module 202 may query the vehicle link table 300 to determine if a**
> **corresponding record exists under the device ID field that includes the device**
> **ID of the primary portable device 108**.

(Ex. PA-1, [0074], *see also* [0046].)

If the device ID received from the owner's device 108 matches with the data of the table 300, the device is authenticated.

> In one embodiment, **if the primary device linking module 202 retrieves the**
> **record that includes the device ID of the primary portable device 108, the**
> **primary device linking module 202 may send a command signal to the TCU**
> **120 to send (e.g., transmit) a permission signal to the primary portable device**
> **108.** In an alternate embodiment, if the primary device linking module 202 retrieves
> the record that includes the device ID of the primary portable device 108, the
> primary device linking module 202 may send a command signal to the externally
> hosted server infrastructure 106 to send the permission signal to the primary
> portable device 108 through the communication device(s) 148. **The permission**

64

signal may provide the primary portable device 108 with permanent and unlimited accessing privileges to the vehicle 102 to unlock and lock all of the locations of the vehicle 102 that may include, but are not limited to, the locks of doors, compartments, trunk, hood, and the like of the vehicle 102 without any restrictions with respect to time or usage (time or usage restrictions).

(Ex. PA-1, [0075].)

This authentication is performed by the "primary device linking module 202." The linking module 202 is part of the vehicle link application 104. (Ex. PA-1, [0057, Fig. 2.) The vehicle link application 104 resides on the storage 146 of the "*server system*." (Ex. PA-1, [0056].)



**Ex. PA-1, Fig. 1**



FIG. 2

**Ex. PA-1, Fig. 2**

Furthermore, Tokunaga recognizes the importance of authentication during the linking

process and discloses a validation procedure that occurs during the process of linking the *"second user computer device"* with the vehicle, i.e., after receiving the *"command and the identifier of the second user computing device"* from the first user computing device.

> In some embodiments, **the secondary device linking module 204 may further validate the one or more authorized users <u>before completing</u> the linking** of the one or more secondary portable devices 110. In particular, upon creation of the record(s) associated with the one or more authorized users on the vehicle link table 300, the secondary device **linking module 204 may require <u>validation from the primary portable device 108</u>** in order link the one or more secondary portable devices 110 to the vehicle 102.

(Ex. PA-1, [0090].)

Accordingly, Tokunaga discloses, *"the server system is further configured to: . . . upon receiving, from the first user computing device, the command and the identifier* [device ID] *of the second user computing device, authenticate the first user computing device based on the identifier* [device ID] *of the first user computing device and the vehicle profile data* [data of table 300][.]"

### 4.    Dependent Claim 4

*[4.0]. The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to remove the vehicle control permission from the second user computing device; and*

As discussed above in claim 1, the vehicle owner is able to control authorizations for secondary devices 110 via his primary device 108 using the vehicle link application 104.

> In an exemplary embodiment, the one or more secondary portable devices 110 may be linked to the vehicle 102 and may be provided with **a level of vehicle accessing privileges and vehicle enabling privileges as determined by the primary driver** to allow the one or more authorized users to access (e.g., unlock/lock one or locations of the vehicle 102) and/or enable (e.g., enable/disable one or more ignition

modes of the vehicle 102) the vehicle 102 through their respective linked secondary
portable devices 110.

(Ex. PA-1, [0029], *see also*, [0080].)

The vehicle owner has administrative privileges to determine the level of access and
enablement for all secondary users.

> In an exemplary embodiment, as described in more detail below, when the primary
> portable device 108 is linked to the vehicle 102 the primary device linking module
> 202 may communicate a command signal to the control unit 130 of the linked
> primary portable device 108 to grant the primary portable device 108 with
> administrative privileges that include privileges for granting a level of accessing
> the vehicle 102 and a level of enabling of the vehicle 102 to one or more authorized
> users through their respective secondary portable devices 110.

(Ex. PA-1, [0064], *see also* [0131].)

The system 100 includes a "vehicle administration user interface" that is displayed on the
touch screen 142 of the primary device 108 and is used by the vehicle owner to set the accessing
and enabling privileges of the secondary devices 110.

> Linking of the at least one secondary portable device 110 to the vehicle 102 and
> granting privileges to the at least one secondary portable device 110 by the vehicle
> link application 104 will now be discussed in more detail. With reference again to
> FIG. 2, in one embodiment, once the primary driver is provided with administrative
> privileges through his or her primary portable device 108, the primary device
> linking module 202 may communicate a linking signal to the secondary device
> linking module 204 that includes data associated with the primary portable device
> 108. Upon receipt of the linking signal, the secondary device linking module 204
> may send a command signal to the control unit 130 of the primary portable device
> 108 and/or the head unit 114 of the vehicle 102 to present a **vehicle administration**
> **user interface to the primary driver through the touch screen display 142 of**
> **the primary portable device 108** and/or the display device 118 of the vehicle 102.

> The **vehicle administration user interface may be initialized by the primary driver** at any time per his or her choosing and provides a means to designate one or more additional persons as one or more authorized users by granting vehicle accessing permissions and/or vehicle enabling permissions to one or more secondary portable devices 110.

(Ex. PA-1, [0080].)

The "vehicle administrative user interface" provides varying levels of permissions ranging from "level 1: full permission," to "no privileges granted." These privilege levels for the secondary users are stored in the vehicle link table 300 in data fields 308 and 310.

> In one embodiment, the **plurality of enabling levels** may include usage based vehicle enabling levels and time based vehicle enabling levels that may be reflected in one or more designated levels (e.g., **levels 1-3**). The **usage based vehicle accessing privileges may be set by the primary driver** to allow the one or more respective authorized users to enable or disable one or more ignition modes of the vehicle 102 (e.g., an ACC mode, a battery ON/OFF mode, an engine ON/OFF mode) that are determined by the primary driver and classified as predetermined ignition modes of the vehicle 102. The one or more predetermined ignition modes of the vehicle 102 may be set by the primary driver through the authorized user addition user interface. For example, the primary driver may set one or more predetermined ignition modes of the vehicle as a battery ON/OFF mode of the vehicle 102 so that the one or more secondary portable devices 110 may only be utilized to enable or disable the battery ON/OFF mode of the vehicle 102.

(Ex. PA-1, [0083], *see also*, [0085].)

‑300

| | 302 | 304 | 306 | 308 | 310 |
|---|---|---|---|---|---|
| | USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
| 312 | USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| 314 | USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| 316 | USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| 318 | USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| 320 | USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| 322 | USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

FIG. 3

**Ex. PA-1, Fig. 3**

The vehicle owner is also able to grant temporary permissions, such as "Temp 30 Day Access" or "Temp 3 Hour Access." (Ex. PA-1, Fig. 3, [0084].)

Tokunaga makes clear that the vehicle owner is explicitly given administrative privileges to determine the level of access and enablement for all secondary users "at any time per his or her choosing" and that different levels of permissions can be set. (Ex. PA-1, [0080], Fig. 3.) Therefore, a POSA would have understood that the vehicle owner could change the permissions for a secondary device 110 at least between the disclosed options in Figure 3. (Ex. C, ¶157.) Changing User 3's enabling privilege 310 from "level 2" (as shown in table 300) to the lesser option of "no privileges granted" is a "*remov*[al] [of] *the vehicle control permission* [level 2 permissions] *from the second user computing device*." Tokunaga discloses that privilege levels are input through the "vehicle administration user interface" that is displayed on the touch screen 142 of the primary device 108. (Ex. PA-1, [0080].) (Ex. C, ¶157.)

Therefore, Tokunaga discloses, "*wherein the first user computing device is further configured to: receive* [e.g., finger taps on touch screen 142], *via the user interface, a command* [e.g., to change permission level] *to remove the vehicle control permission from the second user computing device*[.]" (Ex. C, ¶¶152-158.)

69

*[4.1] transmit, to the server system, the removal command and the identifier of the second user computing device;*

As discussed in claim limitation [1.7], the vehicle owner's inputs into the "vehicle administration user interface" shown on the primary device 108 are transmitted to the server infrastructure 106. (Ex. PA-1, [0088].) Therefore, the above-discussed *"removal command*[s]" are transmitted to the server infrastructure 106 by the primary device 108, along with the device ID of the secondary device 110, so that the server infrastructure 106 knows which entry to modify in the vehicle link table 300.

> At block 606, the method 600 includes updating the vehicle link table 300 with the device ID(s) of the one or more secondary portable devices 110 and/or the user ID(s) associated with the one or more respective authorized users. In one or more embodiments, upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users and link their respective secondary portable devices 110 to the vehicle 102, **the secondary device linking module 204 may communicate respective data to the externally hosted server infrastructure 106 to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users**. The secondary device linking module 204 may additionally populate one or more records under the user ID field 302 and the **device ID field 304** on the vehicle link table 300 associated with the respective additional entries with the user ID(s) that are associated with the one or more authorized users, and/or the device ID(s) that are associated with their one or more respective secondary portable devices 110.

(Ex. PA-1, [0141].) (Ex. C, ¶159.)

As further discussed in claim limitation [1.7], the secondary device linking module 204 is a module of the vehicle link application 104, which is hosted on the primary device 108. (Ex. PA-1, [0056].) Therefore, Tokunaga discloses, *"wherein the first user computing device is further configured to: . . . transmit, to the server system, the removal command and the identifier of the*

second user computing device[.]"

> *[4.2] wherein the server system is further configured to remove the vehicle control permission from the second user computing device.*

As discussed in claim limitation [1.10], the server infrastructure 106 hosts the vehicle link table 300 and maintains the data fields. Tokunaga discloses the externally hosted server infrastructure 106 updates the vehicle link table 300 when the secondary device linking module 204 communicates respective data input by the vehicle owner into the vehicle administration user interface. (Ex. PA-1, [0088], [0141].)

Therefore, Tokunaga discloses that the server infrastructure 106 is *"configured to remove the vehicle control permission* [e.g., level 2 from User 3] *from the second user computing device* [device 110]" when the vehicle owner makes a change. (Ex. C, ¶¶160-161.)

### 5. Dependent Claim 7

> *[7.0] The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle; and*

Tokunaga discloses that the owner of the vehicle can set "a selection of vehicle accessing and enabling privileges to be granted to the one or more secondary portable devices." (Ex. PA-1, [0142].) The privileges for each secondary portable device 110 are stored in the vehicle link table 300 in data fields 308 and 310.

FIG. 3

**Ex. PA-1, Fig. 3 (Annotated)**

The accessing privileges include the ability to unlock the vehicle doors, trunk, or both. (Ex. PA-1, [0028], [0081], [0096].) The accessing privileges can have different levels of access such as levels 1–3 as well as time-based restrictions such as permanent access or 30-day access. (Ex. PA-1, [0082]-[0083].) The enable privileges include the ability to turn on the vehicle. (Ex. PA-1, [0086].) The level of enable privileges can also have different levels such as the permission to start the engine verse the limited ability to only enable the battery.

As an illustrative example, the primary driver may choose to designate a **spouse** as an authorized user that is granted with a high accessing privilege level and a **high enabling privilege level (e.g., level 1) that provide full accessing and enabling privileges** that allow the use of his or her secondary portable device 110 to **unlock/lock the doors and compartments of the vehicle 102 and/or enable/disable the engine of the vehicle 102 without any restrictions**. The primary driver may also designated a friend as an authorized user that is granted with a lower accessing privilege level and/or enabling privilege level **(e.g., level 2)** that allows the friend to use his or her secondary portable device 110 to restrictively **unlock/lock only the doors** of the vehicle 102 and/or **enable/disable only [ ] a battery ON/OFF ignition mode** of the vehicle 102.

(Ex. PA-1, [0087].)

In one embodiment, the plurality of enabling levels may include usage based vehicle enabling levels and time based vehicle enabling levels that may be reflected

in one or more designated levels (e.g., levels 1-3). **The usage based vehicle accessing privileges may be set by the primary driver to allow the one or more respective authorized users to enable or disable one or more ignition modes of the vehicle 102 (e.g., an <u>ACC mode, a battery ON/OFF mode, an engine ON/OFF mode</u>) that are determined by the primary driver and classified as predetermined ignition modes of the vehicle 102.** The one or more predetermined ignition modes of the vehicle 102 may be set by the primary driver through the authorized user addition user interface. For example, the primary driver may set one or more predetermined ignition modes of the vehicle as a battery ON/OFF mode of the vehicle 102 so that the one or more secondary portable devices 110 may only be utilized to enable or disable the battery ON/OFF mode of the vehicle 102.

(Ex. PA-1, [0083]).

The accessing and enabling privileges that are less than level 1 (full permissions) are restrictions that restrict a vehicle function, such as starting the engine. For example, Fig. 3 shows User 5 has full permissions to access the vehicle but has "NO PRIVILEGES GRANTED" to enable any of the vehicle ignition modes. (Ex. PA-1, [0029].)



| USER ID | DEVICE ID | USER TYPE | ACCESSING PRIVILEGE LEVEL | ENABLING PRIVILEGE LEVEL |
|---------|-----------|-----------|---------------------------|--------------------------|
| USER 1 | PHN 1 | PRIMARY | PERMANENT ADMINISTRATOR | PERMANENT ADMINISTRATOR |
| USER 2 | FOB 2 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |
| USER 3 | PHN 2 | AUTHENTICATED | LEVEL 2: TEMP 30 DAY ACCESS | LEVEL 2: TEMP FULL IGG ON |
| USER 4 | FOB 1 | AUTHENTICATED | LEVEL 3: TEMP 3 HOUR ACCESS | LEVEL 3: TEMP FULL IGG ON |
| USER 5 | PHN 3 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | NO PRIVILEGES GRANTED |
| USER 6 | PHN 4 | AUTHENTICATED | LEVEL 1: FULL PERMANANT ACCESS | LEVEL 1: FULL PERMANANT USE |

FIG. 3

**Ex. PA-1, Fig. 3 (Annotated)**

The primary device 108 is configured to show a "vehicle administration user interface" that allows the owner to set the accessing and enabling privileges for secondary users by providing inputs to the touch screen 142 of the device 108.

73

> In one or more embodiments, upon the **primary driver of the vehicle 102 utilizing the** <u>vehicle administration user interface</u> **to add one or more authorized users of the vehicle 102**, the secondary device linking module 204 may communicate respective data to the externally hosted server infrastructure 106 to **update the vehicle link table 300** with respective additional entries that are associated with the one or more authorized users. With reference back to FIG. 3, the entries associated to the authorized users 314-322 may include records that are populated with the user ID of the secondary user, the device ID of the secondary user (that may be manually or automatically updated), user type designation, **accessing privilege level, and the enabling privilege level**.

(Ex. PA-1, [0088], *see also* [0080].)

> In one embodiment, the secondary device linking module 204 may **present the plurality of accessing levels of the vehicle accessing permissions and the plurality of enabling levels** of the vehicle enabling permissions that may be granted to the one or more secondary portable devices 110 **on the vehicle administration interface to the primary driver**. The **primary driver may provide inputs to the vehicle administration interface to select a respective accessing level and/or enabling level to the one or more respective secondary portable devices 110** to be utilized by the respective one or more authorized users.

(Ex. PA-1, [0142].)

When the owner enters inputs to the touch screen 142 to restrict privileges 308/310 of the secondary users, the primary device 108 (*"first user computing device"*) *"receive*[s], *via the user interface* [vehicle administration interface], *a command to restrict a vehicle function.*"

The above-identified restrictions occur *"while the second user computing device is located in the vehicle*," which is all claim 7 requires. Moreover, Tokunaga does not place any limitations for when the primary device 108 is configured to receive the inputs to the vehicle administration interface (*"restriction command"*). As such, a POSA would have understood that primary device 108 is configured to receive the access/enabling privilege levels 308/310 (*"restriction command"*)

*"while the second user computing device is located in the vehicle,"* as well as at any other time. (Ex. C, ¶¶162-168.)

*[7.1] transmit, to the server system, the restriction command and the identifier of the second user computing device;*

Tokunaga discloses to transmit the access/enabling privilege levels 308/310 (*"restriction command"*) to the server infrastructure 106 (*"server system"*). This transmission also includes a user ID and a device ID for the added secondary user as discussed in claim limitation [1.7].

In one or more embodiments, **upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users of the vehicle 102, the secondary device linking module 204 may communicate respective data to the externally hosted <u>server infrastructure 106</u> to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users.** With reference back to FIG. 3, the entries associated to the authorized users 314–322 may include records that are populated with the **<u>user ID</u>** of the secondary user, the **<u>device ID</u>** of the secondary user (that may be manually or automatically updated), user type designation, **<u>accessing privilege level, and the enabling privilege level</u>**.

(Ex. PA-1, [0088].)

Thus, Tokunaga discloses *"the first user computing device is further configured to: . . . transmit, to the server system, the restriction command and the identifier of the second user computing device* [e.g., using the secondary device linking module 204.]" (Ex. C, ¶169.)

*[7.2] wherein the server system is further configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle.*

As discussed above in claim limitation [7.0], the accessing and enabling privileges restrict vehicle functions while the second user computing device is located in the vehicle. For example,

some secondary users can place the vehicle in accessory (ACC) mode but cannot start the engine. (Ex. PA-1, [0083].) As also discussed above, these restrictions are stored in the data fields 308 and 310 of the table 300, which is stored on the vehicle link data repository 150 of the "*server system*." (Ex. PA-1, [0052]-[0053].)

The table 300 is stored on the "*server system*." The "*server system*" also carries out the verification process for the secondary user device 110. (Ex. PA-1, [0150]-[0151].) Therefore, a POSA would have understood that the "s*erver system is further configured to restrict the vehicle function during operation of the vehicle*" since the permissions 308/310 (which includes restrictions) are defined in the table 300 stored in the data repository 150 of Tokunaga's server system; since the module 204 of the server system links and verifies the secondary device 110, and since the module 204 enables the sending of the signals used to control the vehicle 102. (Ex. C, ¶177.) Moreover, the command signals sent from the primary device 108 to the secondary device 110 (Ex. PA-1, [0151]) originate at the server infrastructure 106. (Ex. PA-1, [0075].) (Ex. C, ¶178.)

Accordingly, Tokunaga discloses, "*wherein the server system is further configured to restrict the vehicle function* [access/enabling privilege levels 308/310] *during operation of the vehicle while the second user computing device* [device 110] *is located in the vehicle* [102.]" (Ex. C, ¶¶170-178.)

### 6. Dependent Claim 8

*[8.0] The vehicle system of claim 7, wherein the server system is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device, the restriction command and the identifier of the second user computing device;*

As discussed above in claim 7, Tokunaga discloses that the vehicle owner, via primary device 108, sets up the access and enabling privileges for a portable device ("*restriction*

*command*") and inputs the user ID and device ID ("*identifier of the second user computing device*") using the "vehicle administration user interface." (Ex. PA-1, [0088].) This "*restriction command*" and "*identifier*" are then communicated to the server infrastructure 106, which receives the data. (Ex. PA-1, [0088].)

Therefore, the "*server system* [(server infrastructure 106)] *is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device* [108], *the restriction command* [access and enabling privileges] *and the identifier* [(device ID] *of the second user computing device* [device 110][.]" (Ex. C, ¶¶179-180.)

> **[8.1] based on the restriction command and the identifier of the second user computing device, update the vehicle profile data to indicate that the vehicle function is restricted when the second user computing device is located in the vehicle; and**

As discussed above in claims 1 and 7, the vehicle link table 300, which is stored on the server infrastructure 106, stores the privilege data 308/310. When the owner adds a new secondary device or edits an existing secondary device 110 via the vehicle administration user interface, the data fields ("*vehicle profile data*") of the table 300 are updated by the server infrastructure 106.

> In one or more embodiments, upon the primary driver of the vehicle 102 utilizing the vehicle administration user interface to add one or more authorized users of the vehicle 102, the secondary device linking module 204 may **communicate respective data to the externally hosted server infrastructure 106 to update the vehicle link table 300 with respective additional entries that are associated with the one or more authorized users.** With reference back to FIG. 3, the entries associated to the authorized users 314-322 may include records that are populated with the **user ID** of the secondary user, the **device ID** of the secondary user (that may be manually or automatically updated), user type designation, **accessing privilege level, and the enabling privilege level.**

(Ex. PA-1, [0088].)

As discussed above in claim 7, the accessing privilege data 308 and the enabling privilege data 310 restrict the secondary device 110 (when set to less than full permission) from controlling certain functionalities of the vehicle 102 when the secondary device 110 is located within the vehicle. (Ex. C, ¶¶181-182.)

*[8.2] transmit, to the vehicle, the updated vehicle profile data, and*

Claim limitation [8.2] is the same as limitation [1.11]. Tokunaga discloses limitation [8.2] for the same reasons discussed above in claim limitation [1.11]. (Ex. C, ¶183.)

*[8.3] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and*

As discussed in claim limitation [1.12], the vehicle is "*configured to: receive, from the server system, the updated vehicle profile data*[.]"

*[8.4] store the updated vehicle profile data.*

Tokunaga also discloses that the vehicle 102 is configured to "*store the updated vehicle profile data.*" Tokunaga discloses to send the table 300 from the data depository 150 to the storage unit 116.

> In an exemplary embodiment, the externally hosted server infrastructure 106 may include a vehicle data link repository 150 that is stored on the storage 146. **The vehicle data link repository 150 may store a vehicle link table** associated with the vehicle link application 104. In alternate embodiments, **the vehicle data link repository 150 may be replicated to the storage unit 116 of the vehicle 102** and/or the memory 134 of the primary portable device 108.

(Ex. PA-1, [0052]; Ex. C, ¶¶184-185.)

### 7.    Dependent Claim 9

*[9.0] The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit vehicle condition data for the vehicle to the server system while the second user computing device is located in or within a*

*threshold distance of the vehicle.*

Tokunaga discloses that vehicle data can be off-boarded from the vehicle 102 to the server infrastructure 106.

> [T]he **vehicle link application 104 additionally enables the primary driver to select one or more types of vehicle data that may be off-boarded from the vehicle 102** and may additionally enable the primary driver and/or the one or more authorized users of the vehicle 102 to provide proper consent through their respective linked portable devices 108, 110 to **off-board the one or more types of vehicle data selected by the primary driver from the vehicle 102 to the externally hosted server infrastructure 106**. In other words, in addition to allowing the primary driver to provide consent through his or her linked primary portable device 108 to enable the vehicle 102 to off-board vehicle data, the vehicle link application 104 also may allow the one or more authorized users to provide their own consent to off-board the vehicle data from the vehicle 102 through their linked secondary portable devices 110.

(Ex. PA-1, [0030], *see also* [0044].)

The vehicle storage unit 116 stores a data log of the vehicle. (Ex. PA-1, [0036].) A provisioning file is used to facilitate the off-boarding of the vehicle data.

> In an exemplary embodiment, **the storage unit 116 may store a <u>provisioning file</u> (e.g., data file(s)) (not shown) that is associated to the vehicle 102.** As described in more detail below, the provisioning file may be created and associated with the vehicle 102 upon linking the primary portable device 108 to the vehicle 102 and granting privileges to the primary portable device 108. Additionally, the provisioning file may be sent (e.g., transmitted) to the vehicle 102 to be stored on the storage unit 116 based on an authentication of the primary driver of the vehicle 102 through the primary portable device 108. In one embodiment, **the provisioning file may include information in the form of a collection of digital data that includes indications of one or more types of vehicle data that are selected by the primary driver to be off-boarded from the vehicle 102.** As will be described,

79

> in one embodiment, the primary driver may utilize the vehicle link application 104
> to create and/or update the provisioning file by selecting the one or more types of
> vehicle data that may be off-boarded from the vehicle 102 after receiving consent
> of terms and conditions from the primary driver of the vehicle 102 and/or one or
> more authorized users of the vehicle 102.

(Ex. PA-1, [0037].)

Tokunaga discloses that the data includes GPS data, points of interest (POI) data, specific

vehicle system data, VIN, and time-stamp data.

> For instance, the vehicle link application 104 may evaluate the provisioning file
> and access the type of vehicle data that is stored on the storage unit 116 that includes
> a selected type of **vehicle data of geolocation information (e.g., GNSS, GPS
> coordinates) associated with the vehicle 102 as provided by the GPS system
> 126.** In another example, the vehicle link application 104 may evaluate the
> provisioning file and access the type of vehicle data that is stored on the storage
> unit 116 that includes a selected type of **vehicle data of POI** information related to
> POIs specifically selected and stored by the primary driver and/or one or more
> authorized users to be used by the vehicle navigation system and/or GPS system
> 126. As will be described in more detail below, the **vehicle link application 104
> may off-board the vehicle data that is stored within the storage unit 116 based
> on the consent provided by the primary driver and/or one or more authorized
> users** that is provided in the form of an acceptance of terms and conditions.

(Ex. PA-1, [0043].)

> In one or more embodiments, the terms and conditions user interface may include
> terms and conditions that are related to the **off-loading of selected types of vehicle
> data based on the provisioning file, as discussed above, that may include** but is
> not limited to **vehicle identification number (VIN), POI information,
> geolocation information, data from the data log of the vehicle 102, and the like**
> that may be packaged in the form of different types of vehicle data and transmitted

through the TCU 120 of the vehicle 102 to the externally hosted server infrastructure 106.

(Ex. PA-1, [0077], *see also,* [0078].)

A POSA would have understood that the off-boarded GPS data is *"vehicle condition data."* This is made clear by claim 11: *"the vehicle condition data include . . . current and historical locations."* (Ex. A, claim 11; Ex. C, ¶¶186-189.)

Accordingly, Tokunaga discloses, *"wherein the updated vehicle profile data includes instructions* [provisioning file] *to transmit vehicle condition data* [GPS data] *for the vehicle to the server system* [server infrastructure 106] *while the second user computing device* (device 110) *is located in or within a threshold distance of the vehicle."*

### 8. Dependent Claim 12

*[12.0] The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit location data for the vehicle's current location to the server system while the second user computing device is located in or within a threshold distance of the vehicle.*

Claim 12 is very similar to claim 9 but requires *"instructions to transmit location data for the vehicle's current location."* The *"vehicle condition data"* of Tokunaga, as identified in claim 9, includes "geolocation information" (GPS). (Ex. PA-1, [0043], [0077]-[0078].) A POSA would have understood the above-identified GPS data including GPS coordinates as being *"location data for the vehicle's current location."* (Ex. C, ¶¶190-192.)

### B.    SNQ 2 – Claims 5–6 and 10–11 are Obvious over Tokunaga in view of Tuukkanen

#### 1.    Dependent Claim 5

*[5.0]. The vehicle system of claim 4, wherein the server system is configured to remove the vehicle control permission by performing operations comprising: receive, from the first user computing device, the removal command and the*

*identifier of the second user computing device;*

Limitation [5.0] is merely the server side of the above-discussed transmission of the removal command and device ID of limitation [4.1]. Therefore, the "*server system*" of Tokunaga is configured to "*receive, from the first user computing device, the removal command and the identifier of the second user computing device*" as discussed in claim 4. (Ex. C, ¶210.)

> *[5.1] based on the removal command and the identifier of the second user computing device, update the vehicle profile data by disassociating the vehicle profile of the vehicle from the second user computing device; and*

As discussed above in claim 4, Tokunaga's "*removal command*" is not a complete disassociation of the second user device from the vehicle profile as required by limitation [5.1]. But, a POSA would have found it obvious to allow the vehicle owner to delete secondary users from the table 300 to "*disassociat*[e] *the vehicle profile* [table 300] *of the vehicle from the second user computing device*" when the vehicle owner no longer wishes to allow that user to use the vehicle. (Ex. C, ¶211.) Tokunaga recognizes granting a user only temporary use rights, such as 3-hour access. (Ex. PA-1, [0082], Fig. 3.) A POSA would have recognized that 3-hour access would be useful for a parking valet or the like. A POSA would have also recognized the practical need to delete the parking valet from the table 300 once the transaction is complete since it is unlikely that valet will ever drive the vehicle in the future. Indeed, if users could not be deleted, the table 300 could become full of prior users that will not access the vehicle again. This would prevent the owner from adding new user due to memory limitations of the computer system. (Ex. C, ¶212.)

An example of this obvious deletion feature is explicitly disclosed in Tuukkanen, which describes "*disassociating the vehicle profile of the vehicle from the second user computing device*." (Ex. C, ¶213.) In one example of Tuukkanen, the "*removal command*" is a request to "*invalidat*[e] . . . *the at least one certificate*." (Ex. PA-3, [0052].) A POSA would have further

understood that the invalidation of the certificate refers to the certificate no longer being usable with the vehicle. Within the context of Tuukkanen, one way of invalidation is to update the certificate listing to remove a certificate via the vehicle interaction client. In the example of Fig. 8A, the user interface 801 allows the owner to update certificates for vehicle A. (Ex. C, ¶213.)



Ex. PA-3, Fig. 8A

When the owner wishes to *"invalidat*[e]*"* a previously created certificate entirely, they can remove the certificate from the list. In another example, the owner may update the certificate for use with a different secondary device. As shown in Fig. 8B, this is done by modifying the "Profile Info," such as by changing the "device info" data field. (Ex. PA-3, [0044], [0084], [0095]-[0096].)

FIG. 8B

840



Ex. PA-3, Fig. 8B

Either of these example actions by the owner results in device ID of the "*second computing device*" being removed ("*disassociat*[ed]") from the "Vehicle 'A' Interaction Client" ("*vehicle profile*"). The changes made by the owner in the vehicle interaction client are processed by the processing platform 107 ("*server system*") and stored in the database(s) 117, 119, or both:

> [T]he processing platform 107 may include and/or have access to one or more **database 119a-119n (also collectively referred to as database 119), which may store, include, and/or have access to various data, for example, from different sources and/or different time periods**[.]

(Ex. PA-3, [0034].)

> In various embodiments, **various data associated with the rights and various users, devices, keys, and the like may be stored at one or more UEs 101, the**

certificates 127, a service provider database 117, a local storage 121 at the vehicle, and the like.

(Ex. PA-3, [0050].)

Therefore, the "*server system*" of Tuukkanen is configured to "*based on the removal command and the identifier of the second user computing device, update the vehicle profile data by disassociating the vehicle profile of the vehicle from the second user computing device*[.] (Ex. C, ¶213.)

A POSA would have found it obvious for the owner in Tokunaga to delete secondary users from the "*vehicle profile*" as taught by Tuukkanen to enable the owner to remove unwanted users from the table 300 thus freeing up space for new users to be added. Tokunaga and Tuukkanen are analogous prior art with both being in the same field of automotive systems that enable a remote device to receive control permissions for vehicle functions and to control the vehicle based on the granted permissions. (Ex. PA-1, Abstract; Ex. PA-3, [0004], [0026].) The combination of Tokunaga and Tuukkanen is nothing more than the combination of known prior-art elements according to known methods to yield predictable results. As discussed above, the combination of Tokunaga and Tuukkanen discloses all elements of claim limitation [5.1]. While Tokunaga is silent regarding the well-known data-deletion function that is disclosed in Tuukkanen, a POSA would have understood that deleting prior users from the table 300 was a known method that performs the same function when combined with Tokunaga as it does separately in Tuukkanen. Therefore, the results of the combination were predictable—the vehicle owner in Tokunaga would now be able to delete prior users from the table 300 to free up space for new users. (Ex. C, ¶214.)

*[5.2] transmit, to the vehicle, the updated vehicle profile data, and*

Claim limitation [5.2] is the same as limitation [1.11]. Tokunaga discloses limitation [5.2] for the same reasons discussed above in claim limitation [1.11]. (Ex. C, ¶215.)

*[5.3] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and*

Claim limitation [5.3] is the same as limitation [1.12]. Tokunaga discloses limitation [5.3] for the same reasons discussed above in claim limitation [1.12]. (Ex. C, ¶216.)

*[5.4] store the updated vehicle profile data.*

As discussed above in claim limitation [1.12], the vehicle of Tokunaga receives the vehicle link table 300 from the server infrastructure 106 for replication in the vehicle storage unit 116. (Ex. PA-1, [0052].) A POSA would have understood that when the vehicle receives the data form the table 300 it is the most recent version of the table, i.e., contains the *"updated vehicle profile data[,]"* which is then stored on the vehicle storage unit 116. Accordingly, Tuukkanen discloses a vehicle configured to *"store the updated vehicle profile data."* (Ex. C, ¶¶217-219.)

### 2. Dependent Claim 6

*[6.0]. The vehicle system of claim 5, wherein, after storing the updated vehicle profile data, the vehicle is further configured to: wirelessly receive, from the second user computing device in proximity to the vehicle, the identifier of the second user computing device;*

Claim limitation [6.0] is very similar to claim limitation [1.13] and that analysis is incorporated herein. As discussed in claim limitation [1.13], Tokunaga discloses that the vehicle 102 is configured to receive a device ID (*"identifier"*) from the portable devices 108/110 using Bluetooth®. (*See, e.g.,* Ex. PA-1, [0041], [0046], [0095].) Claim [6.0] differs by reciting *"from the second user computing device"* as opposed to claim [1.13]'s *"mobile computing device[.]"* Tokunaga also discloses the more specific *"second user computing device."* As discussed above in claim 1, Tokunaga discloses receiving the ID of the secondary portable devices 110 (*"second user computing device"*).

In one embodiment, the secondary device linking module 204 may communicate a command signal to the communication device(s) 140 of the one or more respective **secondary portable devices 110 to send the device ID(s) of the respective devices 110 along with a respective vehicle accessing signal or vehicle enabling signal to the TCU 120 of the vehicle 102**. Upon receipt of the respective vehicle accessing signal or vehicle enabling signal that includes the device ID(s) of the one or more secondary portable devices 110, the secondary device linking module 204 may query the vehicle link table 300 to determine if a corresponding record exists under the device ID field that includes the device IDs of the one or more secondary portable devices 110.

(Ex. PA-1, [0095]; Ex. C, ¶¶220-222.)

Accordingly, Tokunaga discloses "*wirelessly receive, from the second user computing device in proximity to the vehicle, the identifier of the second user computing device*[.]" (Ex. C, ¶¶220-222.)

*[6.1] deny access to the second user computing device based on the identifier of the second user computing device not being included in updated vehicle profile data.*

Claim limitation [6.1] merely claims the well-known principle that an unregistered person cannot use his or her computing device to access a vehicle with which they are not associated. (Ex. C, ¶223.) As discussed above in claim limitation [1.14] Tokunaga's vehicle 102 grants a secondary device 110 privileges to use the vehicle (as defined in table 300) when the received identifier matches the stored identifier. (*see e.g.*, Ex. PA-1, [0095]-[0096].) From this, a POSA would have understood that if the vehicle 102 received a user ID from a device 110 that did not match any stored in the data table 300, the vehicle 102 would deny the device 110 access to the vehicle, i.e., the doors would remain locked. (Ex. C, ¶224-226.) Therefore, a POSA would have found it obvious in view of Tokunaga to "*deny access to the second user computing device based on the*

*identifier of the second user computing device not being included in updated vehicle profile data.*"
(Ex. C, ¶¶227-228.)

### 3. Dependent Claim 10

*[10.0] The vehicle system of claim 9, wherein the server system is further configured to: receive, from the vehicle, vehicle condition data while the second user computing device is located in or within a threshold distance of the vehicle; and*

As discussed above in claim 9, Tokunaga discloses to "*transmit vehicle condition data for the vehicle to the server system.*" Limitation [10.0] merely recites the server side of the transmission. A POSA would have understood that transmitting data includes sending (in this case from the vehicle 102) and receiving (in this case by the server system). Therefore, Tokunaga discloses limitation [10.0] for at least the same reasons discussed in claim 9. (Ex. C, ¶229.)

*[10.1] transmit, to the first user computing device, the vehicle condition data, and*

As discussed in claim 9, Tokunaga recognizes the benefits of off-boarding vehicle data to server infrastructure 106 to be stored in a data file. (Ex. PA-1, [0030], [0037], [0044]). Tokunaga further discloses that the off-boarding of data is at the request of either the primary or secondary devices 108, 110. (Ex. PA-1, [0030]; Ex. C, ¶230.) Tokunaga, however, does not disclose what happens to the "*vehicle condition data*" after it is stored on the server infrastructure 106. That is, there is no explicit disclosure that the data is sent to primary device 108. A POSA would have recognized that in order for the "*vehicle condition data*" to be viewed by the vehicle owner or a secondary user, the data would have to be transmitted to a device with a display, e.g., the device 108 or device 110. (Ex. C, ¶231.)

Tuukkanen discloses the additional step of "*transmit*[ing]*, to the first user computing device, the vehicle condition data*[.]"

> In step 511, a VI client 123 may cause, at least in part, **a transmission of one or more status notifications associated with the vehicle to the one or more users, the master user, the one or more service vendors, or a combination thereof based**, at least in part, on data from one or more sensors at the vehicle. In one embodiment, a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. For example, a VC system 109 may determine that a tire pressure sensor on the vehicle indicates that the associated tire may need servicing. **In one example, a location sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.**

(Ex. PA-3, [0085]; Ex. C, ¶232.)

As explained in paragraph 85 above, the "status notifications" include vehicle location data, which, as discussed in claim 9, is "*vehicle condition data*." A POSA would have understood that in order for the system 100 to transmit data to the master user, the system would transmit the data to a device utilized by the master user such as UE 101. Accordingly, Tuukkanen discloses to "*transmit, to the first user computing device, the vehicle condition data*[.]" (Ex. C, ¶¶438–439.)

A POSA would have found it obvious to configure the server infrastructure 106 and the devices 108, 110 of Tokunaga so that the "*vehicle condition data*" could be viewed on the display 142 of the primary device 108 ("*first user computing device*") as taught by Tuukkanen. (Ex. C, ¶232.) Indeed, storing a data file in a server cannot be the intended end destination for the vehicle data as it would have no utility. The purpose of off-boarding data is to allow an interested person to view it. As such, a POSA would have found it obvious to transmit the data from the server infrastructure 106 to the owner's device 108 ("*first user computing device*") as taught by Tuukkanen so that the owner could view the vehicle data. (Ex. C, ¶233.) Adding the additional step of transmitting the "*vehicle condition data*" from the server infrastructure 106 to the owner's

device 108 is merely combining prior-art elements according to known methods to yield predictable results. A POSA would have understood how to combine Tuukkanen's transmission of vehicle data from the server to the UE 101 in the system of Tokunaga as it is merely the addition of software code. Tokunaga already extensively discloses transmitting data between the server infrastructure 106 and the primary device 108 using a vehicle link application 104. (*See e.g.*, claim limitation [1.5].) Tokunaga just does not explicitly disclose the transmission of this particular type of data (i.e., "*vehicle condition data*"). Since Tokunaga already includes the base infrastructure and programming to transmit data for the server system 106 to the primary device 108, a POSA would have found the combination to be predictable. Furthermore, a POSA would have understood that there was a high likelihood of success in configuring Tokunaga to also transmit "*vehicle condition data*" since Tokunaga already transmits other types of data from the server infrastructure 106 to the primary device 108. (Ex. PA-1, [0048], [0051].) (Ex. C, ¶233.)

> *[10.2] wherein the first user computing device is further configured to: receive, from the server system, the vehicle condition data; and*

This limitation is merely the device side of the transmission of claim limitation [10.1]. Limitation [10.2]. Tuukkanen discloses that the owner's UE 101 ("*first user computing device*") receives the "*vehicle condition data*." (Ex. PA-3, [0085]; Ex. C, ¶¶234, 441.) In one example, the owner is informed when a secondary user moves the vehicle. That is, the owner receives vehicle location data (one example of "*vehicle condition data*").

> In one embodiment, after the vehicle control is transferred to the parking provider at 709, if at 717 the parking provider attempts to move the vehicle from the parking location/facility, then at 719 the VC system 109 may check to verify if the parking provider has the required right to move the vehicle and at 721 moving of the vehicle may be allowed or blocked by the VC system 109. **In either case, at 723 the user may be notified of the attempt to move the vehicle. At 725 the user may confirm**

> to allow the actions (e.g., move the vehicle) by the parking provider and/or
> may change the parking provider's rights at 727.

(Ex. PA-3, [0093]; Ex. C, ¶441.)

In the above example, a POSA would have understood that the processing platform 107 (part of the server system) would have sent the location data to the owner's UE. (Ex. C, ¶442.)

It would have been obvious to configure the device 108 ("*first user computing device*") of Tokunaga to "*receive, from the server system, the vehicle condition data*" as taught by Tuukkanen so that the vehicle owner could view the data as discussed in claim limitation [10.1]. (Ex. C, ¶235.)

### [10.3] display the vehicle condition data.

Tokunaga's device 108 includes a touch screen display 142. (Ex. PA-1, [0045], Fig. 1; 236.) Tuukkanen also discloses a display 801. Fig. 8D of Tuukkanen shows a "request vehicle data" icon on a display of a UE 101. A POSA would have understood selecting that icon would result in the requested vehicle data being shown in the Vehicle Interaction Client on the display of the UE 101. (Ex. C, ¶¶237, 445-447.)

FIG. 8D

880



Ex. PA-3, Fig. 8D

A POSA would have found it obvious to show the *"vehicle condition data"* on Tokunaga's display 142 as taught by Tuukkanen so that the vehicle owner could view the data as discussed in claim limitation [10.1]. (Ex. C, ¶238.)

### 4. Dependent Claim 11

*[11.0] The vehicle system of claim 10, wherein the vehicle condition data include at least one of number of passengers in the vehicle, speeds, <u>current and historical locations</u>, or timestamps associated with the locations.*

Tokunaga discloses that the data includes GPS data, points of interest (POI) data, specific vehicle system data, VIN:

> For instance, the vehicle link application 104 may evaluate the provisioning file and access the type of vehicle data that is stored on the storage unit 116 that includes a selected type of **vehicle data of geolocation information (e.g., GNSS, GPS coordinates) associated with the vehicle 102 as provided by the GPS system**

126. In another example, the vehicle link application 104 may evaluate the provisioning file and access the type of vehicle data that is stored on the storage unit 116 that includes a selected type of **vehicle data of POI** information related to POIs specifically selected and stored by the primary driver and/or one or more authorized users to be used by the vehicle navigation system and/or GPS system 126. As will be described in more detail below, the **vehicle link application 104 may off-board the vehicle data that is stored within the storage unit 116 based on the consent provided by the primary driver and/or one or more authorized users** that is provided in the form of an acceptance of terms and conditions.

(Ex. PA-1, [0043].)

In one or more embodiments, the terms and conditions user interface may include terms and conditions that are related to the **off-loading of selected types of vehicle data based on the provisioning file, as discussed above, that may include** but is not limited to vehicle identification number (VIN), **POI information, geolocation information, data from the data log of the vehicle 102, and the like** that may be packaged in the form of different types of vehicle data and transmitted through the TCU 120 of the vehicle 102 to the externally hosted server infrastructure 106.

(Ex. PA-1, [0077], *see also*, [0078]; Ex. C, ¶239.)

A POSA would have understood that the "geolocation information (e.g., GNSS, GPS coordinates) associated with the vehicle 102 as provided by the GPS system 126" (Ex. PA-1, [0043]) discloses the claimed *"current and historical locations."* (Ex. C, ¶240.) A POSA would have understood that GPS data includes the current location of the vehicle. Moreover, Tokunaga further discloses to store prior GPS data in a provisioning file, which is a data log. (Ex. PA-1, [0077]) A POSA would have understood this to be "historical locations." (Ex. C, ¶240.)

C.   **SNQ 3: Claims 1–13 are Obvious Over Tuukkanen in view of Kleve**

1.   **Independent Claim 1**

*[1.0] A vehicle system comprising:*

93

Tuukkanen discloses, "a system capable of authorizing various access and utilization options at a vehicle via certificates and/or virtual keys." (Ex. PA-3, [0026]; Ex. C, ¶241.)

The system 100 allows an owner of the vehicle to grant access of the vehicle to other users:

As discussed above, an owner of a vehicle; for example, a car, a boat, a plane, a motorbike, etc., may wish to allow other users to access or utilize the vehicle at different times, different locations, and for different reasons. For example, an owner may wish to lend his vehicle to a temporary user (e.g., a family member, a friend, etc.) where the owner may give a key to the vehicle to the temporary user.

(Ex. PA-3, [0026]; Ex. C, ¶242.)

The system 100 includes a vehicle control system 109. (Ex. PA-3, Fig. 1, [0032].) A POSA would have considered the system 100 as disclosing "*a vehicle system*" as it is used to control user access to a vehicle and includes a vehicle control system 109. (Ex. C, ¶¶243-244.)



**Ex. PA-3, Fig. 1**

*[1.1] a vehicle including a locking system configured to lock and unlock the*

*vehicle;*

Tuukkanen describes a vehicle that includes a vehicle control system 109. (Ex. PA-3, [0035].) The vehicle control system 109, which is part of the vehicle, is operable to control vehicle operations and functions, such as accessing and securing the vehicle:

> As vehicle control systems have advanced to include various sensors and applications for **access, security**, safety, performance, etc., a user or an owner of a vehicle may interact with the control system for configuring a broad range of options and settings associated with the **vehicle's access control**, entrainment system, navigation system, performance options, and the like, wherein the options and the settings may be customized for a plurality of users who may have or may need to have access to the vehicle.

(Ex. PA-3, [0027]; Ex. C, ¶245.)

Tuukkanen further discloses granting users "rights for accessing the vehicle." (Ex. PA-3, [0077].) For example, a "certificate provides access to a physical space at the vehicle[.]" (Ex. PA-3, [0040] and [0080].) A POSA would have understood that "accessing the vehicle" means gaining entry into the passenger cabin by opening the vehicle door and that "rights for accessing the vehicle" refers at least in part to the ability to unlock the vehicle doors to gain physical access to the vehicle. (Ex. C, ¶246.) Therefore, a POSA would have understood that Tuukkanen teaches that the vehicle would have included a locking system to enable the described "access to a physical space at the vehicle[.]" (Ex. PA-3, [0040] and [0080]; Ex. C, ¶246.)

It was well-known by the effective filing date of the '931 Patent that vehicles included "*a locking system configured to lock and unlock the vehicle*[.]" This is disclosed, for example, by Kleve. Kleve discloses a vehicle 121 that can be remotely locked and unlocked, i.e., the vehicle 121 includes "*a locking system configured to lock and unlock the vehicle*[.]" (Ex. C, ¶¶248-249.)

> Accordingly, a vehicle user may register one or more devices (nomadic device 103
> and/or personal computer 105) to use the communications system 100 (block 300)
> in order to gain access to various vehicle-based services from the nomadic device
> 103 and/or personal computer 105. Examples of such **vehicle-based services,
> without limitation, may include remote lock and unlock**[.]

(Ex. PA-2, 5:65-6:9.)

It would have been obvious to a POSA prior to the effective filing date to combine the vehicle "remote lock and unlock" of Kleve (Ex. PA-2, 5:65-6:9) with Tuukkanen. (Ex. C, ¶250.) Tuukkanen and Kleve are both in the same field of vehicle control systems that provide vehicle privileges, e.g., vehicle access, to authorize secondary users. A POSA would have understood that Tuukkanen and Kleve are complementary technologies that are combinable. Indeed, Tuukkanen discloses, "[t]he invention is also capable of other and different embodiments, and its several details can be modified in various obvious respects, all without departing from the spirit and scope of the invention." (Ex. PA-3, [0013]; Ex. C, ¶251.)

Tuukkanen discloses granting users "rights for accessing the vehicle." (Ex. PA-3, [0077].) For example, a "certificate provides access to a physical space at the vehicle[.]" (Ex. PA-3, [0040] and [0080].) A POSA would have understood that "accessing the vehicle" means gaining entry into the passenger cabin by opening the vehicle door and that "rights for accessing the vehicle" refers to the ability to unlock the vehicle doors. Kleve, explicitly discloses a "*locking system configured to lock and unlock the vehicle.*" (*See* Ex. PA-2, 5:65-6:9; Ex. C, ¶252.)

A POSA would have found it obvious to include the "locking system" disclosed in Kleve in the vehicle disclosed in Tuukkanen to enable the described functionality of "accessing the vehicle." (Ex. PA-3, [0077].) At the claimed priority date, most passenger vehicles had similar locking systems that prevented actuation of the door latching mechanism either mechanically, electrically, or both, so that lacking the appropriate access device (a key, a code, an electronic key

96

fob, etc.) the door latch may not be actuated. Kleve is just one known example of a locking system that can be remotely operated, which was a well-known technology by 2013. (Ex. C, ¶253.) Therefore, the combination of Tuukkanen and Kleve is merely the combination of a well-known vehicle locking system with a known vehicle that already includes remotely accessing "a physical space at the vehicle." (Ex. PA-3, [0040], [0080].) A POSA would have understood that Kleve's locking system would have been predictively incorporated into Tuukkanen's vehicle with a reasonable expectation of success since it had become routine for passenger vehicles to have locking systems, and in particular electronically actuated locking systems, long before the effective date of the '931 Patent. (Ex. C, ¶253.)

Accordingly, the combination of Tuukkanen and Kleve teaches "*a vehicle including a locking system configured to lock and unlock the vehicle*[.]" (Ex. C, ¶¶245-254.)

> **[1.2] *a database storing vehicle profile data that associates a vehicle profile for the vehicle with at least one mobile device;***

Tuukkanen discloses a database 119 that stores user profiles, certificates, authorization codes, vehicle configuration information, device information, etc.:

> In one embodiment, the processing platform 107 may include and/or have access to one or more database 119a-119n (also collectively referred to as database 119), which may store, include, and/or have access to various data, . . . **user profiles, certificates, authorization codes, vehicle configuration information**, device information, . . . In one embodiment, the processing platform 107 may utilize various programs or algorithms for processing and analyzing various authentication, authorization, security, and the like parameters associated with a user, a user device, a vehicle, and the like.

(Ex. PA-3, [0034]; Ex. C, ¶256.)

FIG. 1



Ex. PA-3, Figure 1

A POSA would have understood the "certificates, authorization codes, vehicle configuration information" as being *"vehicle profile data"* as they are data including information associated with the vehicle. For example, a POSA would have understood that in order to use a certificate or an authorization code to access the vehicle, the certificate or code would need to include information that securely linked the vehicle to the user or the user's device, so that the vehicle would respond to this certificate by allowing such access. If this was not the case, then simply having a certificate or code that authenticated a user, but did not link that user to any particular vehicle, would not allow that user to access a particular vehicle, and, conversely, if the vehicle were to respond to any certificate that authenticated a user but was not specific to that particular vehicle, the system would effectively allow anyone with any sort of authentication certificate or code to access the vehicle. (Ex. C, ¶257.)

Tuukkanen also discloses a *"vehicle profile."* Figure 8 illustrates a user interface (UI) 801

of a vehicle interaction client for vehicle A. (Ex. PA-3, [0095.]) In Figures 8A–8C, the vehicle interaction (VI) client is showing a profile for vehicle A. The vehicle profile of Tuukkanen includes data associated with vehicle A such as certificates 1–N ("*vehicle profile data*") for vehicle A. (Ex. C, ¶258.)

FIG. 8A

800



Ex. PA-3, Fig. 8A

The VI client is an interface for interacting with the vehicle profile (e.g., editing) and enables a master user (vehicle owner) to configure vehicle parameters, such as specifying who has access rights to the vehicle.

> In one embodiment, a VI client 123; for example at a UE 101, at a VC system 109, and the like, **may receive input from a user that may include various configuration parameters for defining various options and features at the vehicle**. For example, the options and features may include one or more rights for accessing the vehicle and/or perform various actions available at the vehicle.

99

(Ex. PA-3, [0037]; Ex. C, ¶259.)

As discussed above, the "*vehicle profile data*" includes certificates. In Tuukkanen, a certificate (also referred to as a virtual key) is a transferable digital file that enables use of the vehicle. Each certificate defines "access rights" and "action rights" for the user associated with that certificate.

> To address, at least these problems, a system 100 of FIG. 1 introduces the capability for authorizing various access and utilization options at a vehicle via **certificates and/or virtual keys**. In the following discussions, certificates and virtual keys may be interchangeably referred to in various examples and embodiments. . . . In various embodiments, a vehicle owner may utilize an application program at the vehicle, on a user device (e.g., a mobile phone), or via a service provider e.g., cloud service) to create one or more **access authorizations/rights** to the vehicle, associate the access rights with one or more certificates, and then provide/transfer the certificates to one or more users and/or service vendors.

(Ex. PA-3, [0027].)

> In one embodiment, the system 100 may utilize certificates 127*a*-127*n* (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations that may be transferred among the UEs 101, a service provider 105, a processing platform 107, a VC system 109, a service vendor, and/or other elements of the system 100 directly and/or via the communication network 113.

(Ex. PA-3, [0036]; Ex. C, ¶260.)

> In one embodiment, the system 100 processes and/or facilitates a processing of one or more configuration parameters for determining one or more rights associated with a vehicle, **wherein the rights include, at least in part, one or more access rights, one or more action rights, or a combination thereof** ... For example, the options and features may include one or more rights for accessing the vehicle and/or

> perform various actions available at the vehicle. In one instance, the rights may
> include an authorization for one or more users to access a vehicle, start its engine,
> move the vehicle, utilize a communication device of the vehicle, and the like.

(Ex. PA-3, [0037].)

Access rights refer to the permissions for gaining access to the vehicle, e.g., unlocking the

doors, whereas action rights define the user's permission to perform vehicle actions, such as

"start[ing] its engine, mov[ing] the vehicle, utiliz[ing] a communication device of the vehicle, and

the like." (Ex. PA-3, [0037].) In another example, the certificate 127 permits or denies a user to

lower a convertible top. (Ex. PA-3, [0041]; Ex. C, ¶261.) The certificate 127 may also "indicate

one or more functional limitations at a vehicle. For example, a certificate may not allow a user to

open various compartments at a vehicle." (Ex. PA-3, [0048]; Ex. C, ¶262.)

The certificate 127 "*associates a vehicle profile for the vehicle with at least one mobile

device*[.]" For example, Figure 8B shows "certificate 2" for secondary user 845. Certificate 2 has

profile information including "user and device info." (Ex. C, ¶263.)

FIG. 8B



Ex. PA-3, Fig. 8B

A POSA would have understood the "device info" to refer to a mobile device associated with user 845. Tuukkanen explains the "device" refers to "a UE 101." (Ex. PA-3, [0096].) A mobile device is one example of a UE. (Ex. PA-3, [0056]; Ex. C, ¶264).

As shown in Figure 8B, certificate 2 associates the vehicle profile of vehicle A with the device. That is, a POSA would have understood that certificate 2 ("*vehicle profile data*"), which is stored in the profile of vehicle A includes data that links ("*associates*") the "*device*" of user 845 to vehicle A. (Ex. C, ¶265.) Therefore, a POSA would have considered Tuukkanen's database 119 to be "*a database*" (Ex. PA-3, [0034],) which stores certificates 127 ("*vehicle profile data*"). The certificates 127 in turn define functional limitations of the vehicle (Ex. PA-3, [0048]) and are assigned to a specific UE 101 (Ex. PA-3, [0062].) Therefore, the certificate 127 "*associates a vehicle profile for the vehicle with at least one mobile device*[.]" (Ex. C, ¶266.)

Accordingly, Tuukkanen discloses "*a database* [119] *storing vehicle profile data* [e.g., certificates 127] *that associates a vehicle profile* [e.g., as shown in Fig. 8b] *for the vehicle* [e.g., vehicle A] *with at least one mobile device* [UE 101][.]" (Ex. C, ¶¶255-266.)

> ***[1.3] a first user computing device that is used by a first user and generates a user interface configured to receive a user input from the first user;***

Tuukkanen discloses user equipment/user devices being utilized by an owner (also referred to as a master user). A POSA would have understood that the vehicle owner of Tuukkanen is "*a first user*" and that his UE, e.g., 101a-101n, is "*a first user computing device that is used by a first user . . . .*"

> As vehicle control systems have advanced to include various sensors and applications for access, security, safety, performance, etc., a user or an owner of a vehicle may interact with the control system for configuring a broad range of options and settings associated with the vehicle's access control, entrainment system, navigation system, performance options, and the like, wherein the options and the settings may be customized for a plurality of users who may have or may need to have access to the vehicle. **In various embodiments, a vehicle owner may utilize an application program at the vehicle, on a user device (e.g., a mobile phone)**[.]

(Ex. PA-3, [0027].)

> In one embodiment, a VI client 123 may transfer or authorization of a certificate to **a user device; for example, to a UE 101**, where a user and/or a service vendor may utilize the user device for accessing a specific vehicle. In one embodiment, the processing platform 107 and/or a service provider 105 may cause the transfer of a certificate.

(Ex. PA-3, [0039]; Ex. C, ¶267.)

FIG. 1



Ex. PA-3, Fig. 1

The UE 101 includes a vehicle interaction client 123a-123n. As explained with reference to Figure 2, the vehicle interaction client 123 includes a user interface module 211 that "*generates a user interface*[.]"

> In one embodiment, the user interface module 211 enables presentation of a graphical user interface for facilitating user input of various configuration parameters. By way of example, the **user interface module 211 generates the interface** in response to application programming interfaces (APIs) or other function calls corresponding to applications, data, parameters, commands, and the like associated with a UE 101, a VI client 123, a VC system 109, and/or other components of the system 100. In one embodiment, the UI 211 may utilize various UI technologies available on a UE 101 for interfacing with the user. For example, **a touch sensitive display**, a detection field (e.g., capacitive, electromagnetic, etc.), audio/video input, and the like.

(Ex. PA-3, [0067]; Ex. C, ¶268.)



Ex. PA-3, Fig. 2

Tuukkanen explicitly discloses the user interface module 211 is a touch screen. (Ex. PA-3, [0067].) A POSA would have understood that the "touch screen" was configured to *receive a user input from the first user.*" Indeed, Tuukkanen discloses "a detection field (e.g., capacitive, electromagnetic, etc.)," which is the component(s) of the touch screen that sense the user's finger to detect user inputs. (Ex. C, ¶269.)

Additionally, Tuukkanen discloses, with respect to FIG. 8B, a user interface 801 for managing certificates. Tuukkanen discloses the user interface 801 may be a touch screen or other type able to receive user inputs. (Ex. PA-3, [0067]; Ex. C, ¶270.)

FIG. 8B

840



Ex. PA-3, Fig. 8B

Accordingly, Tuukkanen discloses, "*a first user computing device* [e.g., UE 101] *that is used by a first user* [the vehicle owner] *and generates a user interface* [user interface module 211 or user interface 801) *configured to receive a user input* [touch screen] *from the first user*." (Ex. C, ¶¶267-271.)

*[1.4] a second user computing device that is used by a second user;*

As discussed above, Tuukkanen discloses a plurality of UE 101a-101n. (Ex. PA-3, [0032].) Tuukkanen further discloses second users, such as a service vendor parking attendant, or a temporary user, that have permission to use the vehicle via a certificate received from the vehicle owner.

> For example, an owner may wish to lend his vehicle to a temporary user (e.g., a family member, a friend, etc.) where the owner may give a key to the vehicle to the temporary user. In another example, the owner may wish to leave the vehicle at a parking facility or at a service vendor facility where he may wish or need to leave

the keys to the vehicle with a potential temporary user, which may require an in-person meeting with the temporary user or leaving the keys at a predefined location. However, the owner may wish to restrict use and access to the vehicle based on who the temporary user may be, a location of the vehicle, a reason for the access/use, a duration of time, etc.

(Ex. PA-3, [0026].)

In one use case scenario, an owner of a vehicle may be on travel and parks his vehicle at a parking facility where he may **transfer a certificate to a service vendor so that the service vendor may service the car, move the car, notify the owner of any issues related to the vehicle or the services, and the like**, wherein **the certificate may be transferred to one or more user devices (e.g., a mobile phone**, a kiosk, a memory tag, etc.) associated with the service vendor.

(Ex. PA-3, [0028]; Ex. C, ¶272.)

A POSA would have considered the service vendor, parking attendant, or temporary user to be "*second user[s]*" and the UE 101 (e.g., a mobile phone) associated with the service vendor, parking attendant, or temporary user to be "*a second user computing device.*" Accordingly, Tuukkanen discloses "*a second user computing device that is used by a second user*[.]" (Ex. C, ¶273.)

*[1.5] a server system configured to communicate with the vehicle and the first user computing device,*

Tuukkanen discloses the system 100 includes service providers 105, associated database 117, a processing platform 107, and associated database 119. (Ex. C, ¶274.)

107

FIG. 1



Ex. PA-3, Fig. 1

Tuukkanen discloses that "one or more entities of the system 100 may interact according to a client-server model with the applications 103 and/or the DC module 115 of the UE 101." (Ex. PA-3, [0059]; Ex. C, ¶275.)

Tuukkanen further discloses that the processing platform 107 is implemented as a server.

In one embodiment, one or more portions of the **processing platform 107** may be implemented in a UE 101, at a computer, **at a server**, and the like. . . . In various embodiments, the **processing platform 107** may be maintained on a **network server** and include a web-service, an applet, a script, an object-oriented application, and the like while operating in connection with one or more sensors and/or devices in a user environment.

(Ex. PA-3, [0034]; Ex. C, ¶276.)

Therefore, a POSA would have understood that the system 100 had a "*server system*" including at least the processing platform 107 and the service providers 105 and their associated

databases 119 and 117. (Ex. C, ¶277.)

Tuukkanen further discloses a communications network 113.

As shown in FIG. 1, in one embodiment, the system 100 includes user equipment (UE) 101*a*-101*n* (also collectively referred to as a UE 101 and/or UEs 101), which may be utilized to execute one or more applications 103*a*-103*n* (also collectively referred to as applications 103) including navigation application, security applications, virtual keys, games, social networking, web browser, media application, user interface (UI), map application, web client, etc. to communicate with other UEs 101, one or more service providers 105*a*-105*n* (also collectively referred to as service provider/providers 105), a processing platform 107, a vehicle control (VC) system 109, one or more satellites 111*a*-111*n* (also collectively referred to as the satellite system 111), and/or with other components of a the system 100 directly and/or over **a communication network 113**.

(Ex. PA-3, [0032]; Ex. C, ¶278.)

The communications network 113 enables communication between the service providers 105, the processing platform 107, the vehicle control system 109, and the UE 101.

In one embodiment, **a communication module 207 enables communication among the UEs 101, the VC system 109, the service provider 105 and other components of the system 100** via one or more proximity-based communication channels (e.g., Bluetooth®, WLAN, etc.) and/or **via a network based (e.g., cellular) session over the communication network 113**. By way of example, the **communication module 207 executes various protocols and data sharing techniques for enabling collaborative execution among the system 100 components via the communication network 113**.

(Ex. PA-3, [0065], *see also*, Ex. PA-3, [0034], [0074], and Fig. 1 showing a communication arrow between the network 113 and the processing platform 107.) (Ex. C, ¶279.)

A POSA would have understood that the vehicle control system 109 is part of the vehicle.

> In one embodiment, the VC system 109 may include various mechanisms for detecting, capturing, and processing data associated with a vehicle and/or a user. For example, the VC system 109 may process various user and vehicle data for controlling various functions of the vehicle. In one embodiment, **the VC system 109 may include a VI client 123 for facilitating an interface between a vehicle, a user, a user device, or a combination thereof.**

(Ex. PA-3, [0035]; Ex. C, ¶280.)

Therefore, the service providers 105 and processing platform 107 *"communicate with the vehicle"* via the VC system 109 and the network 113. (Ex. C, ¶281.)

Tuukkanen also discloses the service providers 105 and processing platform 107 *"communicate with . . . the first user computing device"* (e.g., the owner's UE) via the network. Tuukkanen gives an example of transferring certificates:

> In one embodiment, a **VI client 123 may transfer or authorization of a certificate to a user device; for example, to a UE 101**, where a user and/or a service vendor may utilize the user device for accessing a specific vehicle. In one embodiment, the **processing platform 107 and/or a service provider 105 may cause the transfer of a certificate.**

(Ex. PA-3, [0039].)

A POSA would have understood that "transferring" is one type of communicating. (Ex. C, ¶282.) Accordingly, Tuukkanen discloses *"a server system* [processing platform 107 and the service providers 105] *configured to communicate with the vehicle and the first user computing device*[.]" (Ex. C, ¶283.)

> *[1.6] wherein the first user computing device is further configured to: receive, via the user interface, a command to grant vehicle control permission for the vehicle to the second user computing device; and*

Tuukkanen discloses that a vehicle owner grants vehicle permissions to secondary users

via certificates.

> In various embodiments, **a vehicle owner may utilize an application program at the vehicle, on a user device (e.g., a mobile phone), or via a service provider e.g., cloud service) to create one or more access authorizations/rights to the vehicle, associate the access rights with one or more certificates, and then provide/transfer the certificates to one or more users and/or service vendors.** In various embodiments, a vehicle owner and a service vendor (e.g., a parking facility, a repair shop, a tire shop, a car wash facility, etc.) may already be in possession of various trusted certificates, generated by an authorized service provider, where the owner may, authorize the service provider to associate various access rights with the service vendor certificate without an exchange of a certificate.

(Ex. PA-3, [0027]; Ex. C, ¶284.)

Tuukkanen further discloses, with respect to FIG. 8B, a user interface 801 for managing certificates.

FIG. 8B



Ex. PA-3, Fig. 8B

Tuukkanen discloses the user interface 801 may be a touch screen or other type able to receive user inputs. (Ex. PA-3, [0067].) Using the user interface 801, the owner's UE 101 ("*first user computing device*") receives commands from the owner to grant a secondary user (e.g., user 845) permission to use the vehicle via his or her UE 101 ("*second user computing device*").

> FIG. 8B includes diagram 840 which shows **UI 801** where a user has selected certificate 2 at 841 for viewing details 843. In one embodiment, the certificate 2 may be associated with an image of a user 845. In various embodiments, the details 843 may include profile information including user 845 and associated device information (e.g., a UE 101), time/date, location, duration, etc. that may be associated with the certificate 2. **Further, rights, limitations, actions, etc. may be listed in 847 where the user may select any item for further interaction via options 805, for example, to select, review, modify, and the like.**

112

(Ex. PA-3, [0096]; Ex. C, ¶286.)

Accordingly, Tuukkanen discloses "*wherein the first user computing device* [master user's UE 101] *is further configured to: receive, via the user interface* [UI 801]*, a command to grant vehicle control permission for the vehicle to the second user computing device*[.]" (Ex. C, ¶¶284-287.)

### *[1.7] transmit, to the server system, the command and an identifier of the second user computing device,*

Tuukkanen discloses transmitting the certificates 127 from the owner's UE 101 ("*first user computing device*") to the processing platform 107 and the service provider 105 ("*server system*").

> In one embodiment, the system 100 may utilize **certificates 127a-127n** (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations that **may be transferred among the UEs 101, a service provider 105, a processing platform 107, a VC system 109, a service vendor, and/or other elements of the system 100 directly and/or via the communication network 113.**

(Ex. PA-3, [0036].)

> At 707, **the user may select a parking provider and determine one or more actions and options, rights and the like to associate with the parking provider.** Alternatively, at 703, the user may transfer control of the vehicle to the parking provider at 709. **In one scenario, <u>the user may transfer the various rights and actions to the parking provider via one or more certificates</u> by transferring the certificates to one or more devices associated with the parking provider[.]**

(Ex. PA-3, [0093]; Ex. C, ¶288.)

A POSA would have understood that the owner's UE ("*first user computing device*") would transmit the commanded certificate details, e.g., a secondary user's rights, entered into the UI 801 to the "*server system.*" For example, the owner's selections would be transferred to the database

119 associated with the processing platform 107 where the certificates are stored.

> In one embodiment, the **processing platform 107 may include and/or have access to one or more database 119a-119n (also collectively referred to as database 119), which may store**, include, and/or have access to various data, for example, from different sources and/or different time periods, user information, user profiles, **certificates**, authorization codes, vehicle configuration information, device information, contents, service provider information, service vendor information, and the like.

(Ex. PA-3, [0034]; Ex. C, ¶289.)

The certificate 127 also includes "*an identifier*." Tuukkanen discloses that the details 843 include "associated device information" for the user 845. (Ex. PA-3, [0096]; Ex. C, ¶290.)

FIG. 8B

840



Ex. PA-3, Fig. 8B

A POSA would have understood the "device information" associated with the certificate

to be "*an identifier*." (Ex. C, ¶291.) The owner's UE 101 ("*first user computing device*") is configured to transmit the device information ("*identifier*"), via network 113, to the processing platform 107 for storage in the database 119. (Ex. PA-3, [0034], [0036]; Ex. C, ¶¶292-293.)

Accordingly, Tuukkanen discloses "*wherein the first user computing device* [e.g., owner's UE 101] *is further configured to . . . transmit, to the server system* [e.g., processing platform 107 and database 119], *the command* [e.g., certificate's rights, limitations, or actions] a*nd an identifier* [e.g., device information] *of the second user computing device* [e.g., mobile device of user 845][.]" (Ex. C, ¶¶288-294.)

> *[1.8] wherein the server system is further configured to: receive, from the first*
> *user computing device, the command and the identifier of the second user*
> *computing device;*

As discussed in claim limitation [1.7], Tuukkanen discloses to "*transmit, to the server system, the command and an identifier of the second user computing device*[.]" A POSA would have understood that the act of transmitting includes both sending and receiving. Tuukkanen discloses that the processing platform 107 receives the certificates, which as discussed above, include both the *command* (e.g., the rights, limitations, or actions defined by the owner) and the device information ("*identifier*").

> In one embodiment, the system 100 may utilize certificates 127a-127n (also
> collectively referred to as **certificate/certificates 127**), which may be digital files,
> notes, messages, authorization codes, access/utilization rights, and the like
> associated with various rights and authorizations that **may be transferred among**
> **the UEs 101, a service provider 105, a processing platform 107**, a VC system
> 109, a service vendor, and/or other elements of the system 100 **directly and/or via**
> **the communication network 113**.

(Ex. PA-3, [0036]; Ex. C, ¶295.)

Moreover, Tuukkanen explains that the processing platform 107 "determine[s] an input by

the master user for updating the one or more rights according to the master user input." [Ex. PA-3, 0084]. A POSA would have understood that the processing platform 107 would have to "*receive*" the input in order to determine the input. (Ex. C, ¶296.)

Accordingly, Tuukkanen discloses, "*wherein the server system is further configured to: receive, from the first user computing device, the command and the identifier* [device information] *of the second user computing device*[.]" (Ex. C, ¶¶295-297.)

*[1.9] access the database to retrieve the vehicle profile data;*

As discussed above in claim limitation [1.2], the certificates 127 are "*vehicle profile data*." The database 119, which is associated with the "*server system*" stores the certificates 127.

> In one embodiment, **the processing platform 107 may include and/or have access to one or more database 119a-119n** (also collectively referred to as database 119), which may **store**, include, and/or have access to various data, . . . user profiles, **certificates**, authorization codes, vehicle configuration information, device information contents[.]

(Ex. PA-3, [0034]; Ex. C, ¶298.)

Tuukkanen further discloses to access the database 119 to retrieve the certificate 127 ("*vehicle profile data*") when the certificates 127 are transferred among UE 101a-101n, VC system 109, processing platform 107, and service providers 105a-105n via the communication network 113. (Ex. PA-3, [0036]; Ex. C, ¶¶298-299.)



Ex. PA-3, Fig. 1

Tuukkanen also discloses accessing the database 117 (also part of the "*server system*") to retrieve the certificate.

> In step 609, a VI client 123 may cause, at least in part, **a storing of the one or more rights at the vehicle, at one or more devices**, at the one or more service vendors, or a combination thereof. In various embodiments, **various data associated with the rights and various users, devices, keys, and the like may be associated with and/or stored at one or more UEs 101, the certificates 127, <u>a service provider database 117</u>**, a local storage 121 at the vehicle, and the like. In various embodiments, a master user, a VC system 109, **a service provider 105, and the like may access the stored information for future use associated with the vehicle**, one or more rights, one or more temporary users, and the like.

(Ex. PA-3, [0090]; Ex. C, ¶300.)

Tuukkanen further discloses with respect to FIG. 8A, certificates 803 viewable on the UI 801 of the owner's UE 101. In order for processing platform 107 to update these certificates via

117

UI 801, they would be accessed and retrieved from the database 119. (Ex. C, ¶301.)

FIG. 8A

800



Ex. PA-3, Fig. 8A

Accordingly, Tuukkanen discloses, "*wherein the server system is further configured to: . . . access the database* [117/119] *to retrieve the vehicle profile data* [e.g., profile information of certificate 127][.]" (Ex. C, ¶¶302-303.)

> *[1.10] update the vehicle profile data by associating the vehicle profile for the vehicle with the identifier of the second user computing device; and*

As shown in Figure 8B, the "Vehicle 'A' Interaction Client[,]" which is used to display and manage a "*vehicle profile,*" includes associated certificates, such as certificate 2 for the secondary user 845. Certificate 2 includes a data field for "user and device info[.]" (Ex. PA-3, Fig. 8B and [0096].) As discussed above, the "device info" is an "*identifier of the second user computing device*" (e.g., user 845's mobile device). Tuukkanen further discloses that "rights, limitations, actions, etc. may be listed in 847 where the user may select any item for further interaction[.]" (Ex. PA-3, [0096].) Therefore, the data of certificate 2 associates the vehicle profile

118

of vehicle A with the device info (*"identifier"*) of the user 845's computing device (*"second user computing device"*). (Ex. C, ¶304.)

FIG. 8B



Ex. PA-3, Fig. 8B

The UI 801 allows the owner to *"update the vehicle profile data."* For example, the owner may select, review, and modify the data of certificate 2 via the UI 801. (Ex. PA-3, Fig. 8A, [0095].) The UI 801 also allows the owner to "generate new . . . certificates 803." (Ex. PA-3, [0095].) During the creation of a new certificate, the owner updates the "profile info" by associating the vehicle, e.g., vehicle A, with the "device info" for the new user's computing device. (Ex. C, ¶305.)

The UI 801 is just an interface for interacting with the certificates 127, which are stored remotely, such as in database 119. Tuukkanen discloses that the processing platform 107 receives inputs from the owner (or master user) and updates rights of the certificate.

> In one embodiment, the system 100 causes, at least in part, **an updating of the one or more rights based, at least in part, on an input by the master user**. In various embodiments, the processing platform 107, a service provider 105, and/or another component in the system 100 may determine an input by the master user for updating the one or more rights according to the master user input.

(Ex. PA-3, [0044].)

> In either implementation, the **processing platform 107** is configured to, at least, **facilitate processing and analysis of authorization or authentication requests associated with a user, a user device**, a vehicle, and the like. . . . In one embodiment, the **processing platform 107 may process contextual information associated with data presented at a device**, wherein one or more commands, authorizations, authentications, rights, and the like may be determined from the contextual information.

(Ex. PA-3, [0034]; Ex. C, ¶306.)

Therefore, a POSA would have understood that the owner's input to the UI 801 causes the processing platform 107 to update the certificates stored in the database 119 per the owner's input. This includes updating the *"vehicle profile data"* stored in the database 119 to add a new user's "Device Info" (an *"identifier"*) thus associating the vehicle profile with the secondary user's computing device via the identifier. (Ex. C, ¶307.)

Accordingly, Tuukkanen discloses *"wherein the server system* [e.g., processing platform 107] *is further configured to: . . . update the vehicle profile data* [e.g., profile information of certificate 127] *by associating the vehicle profile* [e.g., vehicle A interaction client] *for the vehicle* [e.g., vehicle A] *with the identifier* [e.g., device info] *of the second user computing device* [e.g., user 845's UE 101][.]*"* (Ex. C, ¶¶304-308.)

*[1.11] transmit, to the vehicle the updated vehicle profile data;*

As disclosed above in claim limitation [1.2], Tuukkanen's certificate 127 includes *"vehicle*

*profile data.*" Tuukkanen discloses the certificates 127 are transferred from the processing platform 107 to the VC system 109 of the vehicle and then stored on the vehicle.

> **In one embodiment, the system 100 may utilize certificates 127a-127n** (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations **that may be <u>transferred</u> among** the UEs 101, a service provider 105, **a processing platform 107, a VC system 109,** a service vendor, and/or other elements of the system 100 directly and/or via the communication network 113.

(Ex. PA-3, [0036].)

> In addition, the VI client 123 may be configured to maintain various profile data at the **database 121 where profile data associated with one or more users and/or UEs 101 may be stored** and utilized as well as configured to interact with the sensors 125.

(Ex. PA-3, [0061]; Ex. C, ¶¶309-310.)

A POSA would have understood the term, "transfer," used by Tuukkanen, as referring to both transmitting and receiving. Therefore, Tuukkanen discloses the claimed "*transmit.*" (Ex. C, ¶¶311-313.)

Accordingly, Tuukkanen discloses to "*wherein the server system is further configured to: . . . transmit, to the vehicle the updated vehicle profile data*[.]" (Ex. C, ¶¶309-313.)

> *[1.12] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data;*

A POSA would have understood that Tuukkanen's transferring of certificates among the vehicle control system 109 and the processing platform 107 includes reception of the certificates at the vehicle via the control system 109.

**In one embodiment, the system 100 may utilize certificates 127a-127n** (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations **that may be transferred among the UEs 101, a service provider 105, a processing platform 107, a VC system 109**, a service vendor, and/or other elements of the system 100 directly and/or **via the communication network 113**.

(Ex. PA-3, [0036]; Ex. C, ¶314.)

Indeed, Figure 1 shows the VC system 109 of the vehicle receiving certificates 127 from the UE 101. (Ex. C, ¶315.)

FIG. 1



**Ex. PA-3, Fig. 1**

Accordingly, Tuukkanen teaches *"wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data*[*.*]*"* (Ex. C, ¶¶314-316.)

*[1.13] wirelessly receive, from a mobile computing device in proximity to the*

*vehicle, an identifier of the mobile computing device;*

As discussed above in claim limitations [1.3]-[1.4], the UE 101 are each a *"mobile computing device."* (Ex. PA-3, [0027], [0028].) The UE 101 wirelessly communicates with the VC system 109 of the vehicle such as via the communication network 113 or proximity-based communication channels (e.g., Bluetooth®).

> In one embodiment, a communication module 207 enables communication among the UEs 101, the VC system 109, the service provider 105 and other components of the system 100 via one or more **proximity-based communication channels** (e.g., Bluetooth®, WLAN, etc.) and/or via a network based (e.g., cellular) session over the **communication network 113**. By way of example, the communication module 207 executes various protocols and data sharing techniques for enabling collaborative execution among the system 100 components via the communication network 113.

(Ex. PA-3, [0065].)

> [T]he UEs 101, the VC system 109, the service provider 105, and the processing platform 107 may communicate with each other and the other components of the system 100 using well known, new or still developing protocols. In this context, a protocol includes a set of rules defining how the network nodes within the **communication network 113** interact with each other based on information sent over the communication links.

(Ex. PA-3, [0057], *see also* [0055]; Ex. C, ¶317.)

A POSA would have understood that the "proximity-based communication channels (e.g., Bluetooth®, WLAN, etc.)" have limited range and that UE 101 (*"mobile computing device"*) would have to be *"in proximity to the vehicle"* to enable wireless transmission between the UE 101 and the vehicle. (Ex. C, ¶318.)

Tuukkanen discloses the use of certificates 127 to control a vehicle. As explained above, the master user grants vehicle access to secondary users by creating a certificate 127 for them. The

certificate 127 is then used by the secondary user, e.g., a service vendor, to control some aspects of the vehicle. An example of this is provided in Figure 7, where the master user enables a parking provider 709 to control the vehicle according to a certificate specifically created for the parking provider. (Ex. PA-3, [0093]; Ex. C, ¶319.)

As will be further explained, the secondary user's UE 101 ("*second user computing device*") sends their certificate 127 to the vehicle control system 109 for authentication, which if successful, enables use of the vehicle associated with the VC system 109. The system 100 includes a vehicle interaction client (VI) 123 located in the vehicle control system 109. (Ex. C, ¶¶320-321.)



**Ex. PA-3, Fig. 1**

The vehicle interaction client 123 includes an "authentication module 201 [that] may receive and authenticate one or more certificates for granting access to a VC system 109 and/or a vehicle associated with the VC system 109." (Ex. PA-3, [0062]; Ex. C, ¶322.)



**Ex. PA-3, Fig. 2**

FIG. 1 of Tuukkanen illustrates direct wireless transferring of a certificate 127 between UE 101 and the VC system 109.



**Ex. PA-3, Fig. 1**

[T]he system 100 may utilize certificates 127*a*-127*n* (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various

> rights and authorizations **that may be transferred among the UEs 101, a service**
> **provider 105, a processing platform 107, a VC system 109, a service vendor,**
> **and/or other elements of the system 100 directly and/or via the communication**
> **network 113.**

(Ex. PA-3, [0036]; Ex. C, ¶323.)

This is further explained in the example of Figure 7, where the VC system 109 of the vehicle receives the certificate 127 from the parking provider 709 and checks the certificate to determine permitted rights to perform tasks.

> For example, the parking provider may preform (sic) one or more tasks of options
> 713, for instance, to move the vehicle to a different location, service the vehicle,
> and the like. In one embodiment, at 715, **the VC system 109 may check the**
> **certificates to determine if the parking provider has the required rights to**
> **perform the tasks.**

(Ex. PA-3, [0093]; Ex. C, ¶324.)

As discussed above in claim limitation [1.7], the certificate includes "user and device info," which a POSA would consider to be an "*identifier*." (Ex. PA-3, Fig. 8B, [0096].) Therefore, the VC system 109 of the vehicle wirelessly receives "device info" of the UE 101 when the secondary user sends the certificate 127 to the VC 109 to gain access to the vehicle. (Ex. PA-3, [0039]). Moreover, in the Bluetooth® communication embodiment of Tuukkanen, the VC system 109 would only receive the certificate when the UE was "*in proximity to the vehicle*[4]." (Ex. C, ¶325.)

Accordingly, the combination of Tuukkanen teaches to "*wherein the vehicle is further configured to: . . . wirelessly receive, from a mobile computing device* [UE 101] *in proximity to the vehicle, an identifier* [device information] *of the mobile computing device*[.]" (Ex. C, ¶¶317-

---

[4] In embodiments that utilized the network 113, the vehicle could wirelessly receive the certificate when the UE 101 was in close proximity to the vehicle and also when far way.

326.)

*[1.14] identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier of the mobile computing device with the updated vehicle profile data that stores the identifier of the second user computing device; and*

Tuukkanen discloses a secondary user (e.g., a service provider or friend) who can use a certificate to access an owner's vehicle and control the vehicle. (Ex. PA-3, [0024], [0026], [0040], [0077], claim 13.) Tuukkanen further discloses an authentication module 201 that authenticates certificates.

In one embodiment, an authentication module 201 authenticates users and UEs 101 for interaction with one or more UEs 101, for example, a VC system 109[.] . . . **In one embodiment, the authentication module 201 may receive and authenticate one or more certificates for granting access to a** VC system 109 and/or **a vehicle associated with the VC system 109**.

(Ex. PA-3, [0062]; 327.)



Ex. PA-3, Fig. 2

Tuukkanen is silent regarding how the authentication module 201 authenticates certificates

127 when a secondary user attempts to access the vehicle with his secondary UE 101. Kleve, however, discloses an authentication technique, including matching a received identifier with one stored in a server. (Ex. C, ¶328.) Kleve discloses a nomadic device 103 that can be used to operate a vehicle, such as locking and unlocking the doors.

> Accordingly, a vehicle user may register one or more devices (**nomadic device 103 and/or personal computer 105) to use the communications system 100 (block 300) in order to gain access to various vehicle-based services from the nomadic device 103** and/or personal computer 105. Examples of such vehicle-based services, without limitation, may include **remote lock and unlock**, remote start, vehicle tracking, remote control of vehicle controls (e.g., and without limitation, radio and HVAC), data download, and others.

(Ex. PA-2, 5:67-6:9; Ex. C, ¶329.)

The nomadic device 103 must be registered with the system 100 before it can control the vehicle. The registration process may occur with every use.

> FIG. 3 illustrates a process for registering a user device for use with the system 100 by a vehicle user (e.g., one or more drivers and/or one or more passengers). **The registration process may occur any time the system is used or trying to be used including, but not limited to, before first use and/or with every use of the system.**

(Ex. PA-2, 5:60-65; Ex. C, ¶330.)

Kleve discloses that the nomadic device 103, which can be used to operate a vehicle, can be registered by matching a registration code received from the nomadic device 103 with a registration code stored in a server 101.

> **The server 101 may store a registration code which may be compared to the registration code received by the nomadic device 103 as part of the confirmation process (block 312) to register the nomadic device 103 (block 316). The**

confirmation process may occur at server 101. In some embodiments, the comparison may be made to confirm that the codes are the same.

(Ex. PA-2, 7:47-53; Ex. C, ¶331.)

A POSA would have found it obvious for Tuukkanen's authentication module 201 to authenticate a certificate 127 by comparing the "device info" of the received certificate with the "device info" stored in the vehicle profile as taught by Kleve. (Ex. PA-3, Fig. 8B; Ex. PA-2, 7:47-53.) As modified, the authentication module 201 would match the "*identifier*" of the received certificate with the "*identifier*" of the certificate 127 stored locally on the vehicle or retrievable by the vehicle control system 109. (*See* limitation 1.12 above). (Ex. C, ¶332.)

A POSA would have been motivated to utilize a matching technique as taught by Kleve in Tuukkanen's authentication module 201 for authenticating certificates 127. Tuukkanen already discloses that an authentication module 201 authenticates certificates 127 received from a secondary user's user equipment (UE) when he or she attempts to use the vehicle. (Ex. PA-3, [0062].) But, Tuukkanen is silent regarding the inner workings of the authentication module 201. Kleve is similar to Tuukkanen and allows a user to access a vehicle using a nomadic device 103. (Ex. PA-2, 4:8-10.) Unlike Tuukkanen, however, Kleve explicitly discloses the process used for authenticating the nomadic device 103 as discussed above. It would have been obvious for the authentication module of Tuukkanen to verify certificates using the known technique of Kleve, i.e., by comparing the "device info" of the received certificates 127 with the "device info" stored in the vehicle profile at database 119. (Ex. C, ¶333.) A POSA would have recognized that a match determines that the secondary user's UE 101 ("*second user computing device*") is authorized by the master user to use the vehicle. Similarly, a POSA would have recognized that a mismatch determines that the "*second user computing device*" is not authorized to use the vehicle. This combination would increase the security and reliability of the system described in Tuukkanen by

129

ensuring the secondary user's UE 101 *"second user computing device"* is indeed authorized to access the vehicle. Therefore, utilizing the known matching technique taught by Kleve in the authentication module 201 of Tuukkanen is merely the combination of known prior-art elements according to known methods. (Ex. C, ¶333.)

A POSA would have recognized that Tuukkanen combined with Kleve would have predictably resulted in a matching-based authentication process for authorizing a *"second user computing device"* because no technical incompatibility exists, and both systems already rely on stored device information and received credentials to authenticate mobile devices. Thus, incorporating Kleve's matching logic into Tuukkanen's authentication module would have been obvious and routine to a POSA. (Ex. C, ¶333.)

Accordingly, the combination of Tuukkanen and Kleve teaches to *"wherein the vehicle is further configured to: . . . identify the mobile computing device as the second user computing device by matching the wirelessly-received identifier* [device information] *of the mobile computing device* [UE 101] *with the updated vehicle profile data that stores the identifier of the second user computing device*[.]*" (Ex. C, ¶¶327-334.)

> *[1.15] based on the identification, control the lock system to lock or unlock the*
> *vehicle while the mobile computing device is in proximity to the vehicle.*

As discussed above in claim limitation [1.1], Tuukkanen discloses "the at least one certificate provides access to a physical space at the vehicle[.]" (Ex. PA-3, [0040] and [0080]; *see also* [0027], [0044], and [0077].) A POSA would have understood this to mean gaining entry into the passenger cabin by unlocking and opening the vehicle door, i.e., *"control the lock system to lock or unlock the vehicle"* as disclosed in Kleve. (*See e.g.*, Ex. PA-2, 5:65-6:9; Ex. C, ¶335.) Therefore, the combination of Tuukkanen and Kleve teaches that a secondary user's UE 101 *"mobile computing device"* can be used to *"control the lock system to lock or unlock the vehicle"*

using a validated certificate 127.

As discussed in claim limitation [1.14], the certificate 127 is authenticated ("*identif*[ied]") by the authentication module 201 prior to allowing the user's mobile device to control the vehicle. Therefore, the ability to "*control the lock system*" is "*based on the identification*" of claim limitation [1.14]. (Ex. C, ¶336.)

Regarding the spatial limitation, "*while the mobile computing device is in proximity to the vehicle*[,]" Tuukkanen discloses UE 101 wirelessly communicates with the VC system 109 of the vehicle via Bluetooth® as discussed above in claim limitation [1.13]. (Ex. PA-3, [0065].) Bluetooth® requires the UE 101 be "*in proximity to the vehicle*." Therefore, in the Bluetooth® example, the user would be able to "*control the lock system*" using the certificate "*while the mobile computing device* [UE 101] *is in proximity to the vehicle.*" Moreover, the network 113 embodiment (Ex. PA-3, [0065]) would also function when the UE 101 was "*in proximity to the vehicle*" in addition to functioning at longer distances from the vehicle. (Ex. C, ¶337.)

Accordingly, the combination of Tuukkanen and Kleve teaches, "*wherein the vehicle is further configured to: . . . based on the identification, control the lock system to lock or unlock the vehicle while the mobile computing device* [UE 101] *is in proximity to the vehicle.*" (Ex. C, ¶¶335-338.)

### 2. Dependent Claim 2

*[2.0] The vehicle system of claim 1, wherein the vehicle profile data includes authentication data to authenticate the first user computing device with respect to the vehicle.*

As discussed in claim 1, Tuukkanen discloses an authentication module 201 that authenticates UEs 101.

131

> In one embodiment, an authentication module 201 authenticates users and UEs 101 for interaction with one or more UEs 101, for example, a VC system 109, a processing platform 107, a service provider 105, and the like.

(Ex. PA-3, [0062]; Ex. C, ¶339.)

Tuukkanen discloses that the UEs 101—including the owner's UE (*"first computing device"*)—is authenticated prior to the owner's UE 101 being able to use the configuration module 203 to create or modify another user's rights associated with a vehicle.

> In one embodiment, the **authentication module 201 operates with the configuration module 203 to enable a user to define one or more configuration parameters for determining and/or modifying one or more rights associated with a vehicle**, a UE 101, and the like. Further, the authentication module 201 may further operate in connection with the user interface module 211 for causing rendering of an interface for receiving user input for configuration of one or more rights, one or more certificates, and transferring of the certificates to one or more devices, one or more users, one or more service vendors, and the like.

(Ex. PA-3, [0062]; Ex. C, ¶340.)

In one embodiment of Tuukkanen, "the authentication module 201 may receive and authenticate one or more certificates for granting access to a VC system 109 and/or a vehicle associated with the VC system 109." (Ex. PA-3, 0062.) The certificates include *"authentication data"* such as "authentication codes/keys, security codes, and the like." (Ex. PA-3, [0038]; Ex. C, ¶341.)

As discussed above, the certificates are part of the *"vehicle profile data."* Therefore, Tuukkanen discloses *"wherein the vehicle profile data includes authentication data* [authentication codes/keys, security codes associated with certificates 127] *to authenticate the first user computing device* [master user's UE 101] *with respect to the vehicle."* (Ex. C, ¶342.)

### 3. Dependent Claim 3

*[3.0] The vehicle system of claim 2, wherein the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device; and*

As discussed above in claim 2, Tuukkanen discloses to authenticate the master user (owner) using certificates 127. (Ex. PA-3, [0062].) As also discussed in claim limitation [1.2], the certificates are created on the master user's UE 101 ("*first user computing device*"). (Ex. PA-3, [0027].) As further discussed in claim limitation [1.2], the certificates 127 include "user and device info" ("*an identifier*"). (*See e.g.*, Ex. PA-3, Fig. 8B; Ex. C, ¶¶344-345.)

Tuukkanen discloses to send the certificates from the master user's UE 101 ("*first computing device*") to the service provider 105 and the processing platform 107 ("*server system*") as discussed above in claim limitation [1.2].

> In one embodiment, the system 100 may utilize **certificates 127a-127n** (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations that **may be transferred among the UEs 101, a service provider 105, a processing platform 107, a VC system 109, a service vendor, and/or other elements of the system 100 directly and/or via the communication network 113**.

(Ex. PA-3, [0036]; Ex. C, ¶346.)

Therefore, "*the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device*" when the certificate is transferred from the master user's UE 101 to the processing platform 107 or the service provider 105. (Ex. C, ¶347.)

Additionally, Tuukkanen also discloses authentication of UEs 101 for interaction with other UEs 101, the service provider 105, and the processing platform 107 (collectively "*server*

133

*system")*.

> In one embodiment, **an authentication module 201 authenticates users and UEs 101 for interaction with one or more UEs 101, for example, a VC system 109, a processing platform 107, a service provider 105, and the like**. In one embodiment, the authentication module 201 operates with the configuration module 203 to enable a user to define one or more configuration parameters for determining and/or modifying one or more rights associated with a vehicle, a UE 101, and the like.

(Ex. PA-3, [0062]; Ex. C, ¶348.)

The authentication module 201, which is on the UE 101, is the software module that communicates data from the UE 101 to the processing platform 107 (*"server system"*) to authenticate the UE 101 with the system 100. (Ex. PA-3, [0062].) A POSA would have understood that the authentication module 201 would send data indicating the identity of the owner's UE 101, i.e., an *"identifier,"* to the processing platform, which would then authenticate the UE 101 or not depending on the received data. (Ex. C, ¶349.)

Accordingly, Tuukkanen discloses, *"wherein the server system is further configured to: receive, from the first user computing device, an identifier of the first user computing device*[.]" (Ex. C, ¶¶344-350.)

> *[3.1] upon receiving, from the first user computing device, the command and the identifier of the second user computing device, authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data.*

As disclosed in claim limitations [1.7]-[1.8], Tuukkanen discloses *"upon receiving, from the first user computing device, the command and identifier of the second computing device*[.]"

As discussed in claim limitation [3.0], Tuukkanen further discloses, "*authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data.*"

> In one embodiment, an authentication module 201 authenticates users and UEs 101 for interaction with one or more UEs 101, for example, a VC system 109, … In one embodiment, the authentication module 201 may receive and authenticate one or more certificates for granting access to a VC system 109 and/or a vehicle associated with the VC system 109.

(Ex. PA-3, [0062]; Ex. C, ¶¶351-352.)

Tuukkanen does not explicitly disclose when the authentication of the "*first user computing device*" is performed. (Ex. C, ¶353.)

Kleve also discloses authentication of mobile devices which communicate with a vehicle.

> The authentication sequence may be initiated in the vehicle (block 404). The module 200 may monitor for the receipt or presence of one or more authentication items (block 412). The authentication items may include, but are not limited to, one or more of the following, individually or in combination: 1 vehicle key, 2 or more vehicle keys, voice, one or more codes (e.g., numeric, alphabetic, or alphanumeric), a pattern of maneuvers, or a question and answer process. In some embodiments, the module may monitor that one or more of these authentication items are within the vehicle. As one non-limiting example, the RF module (e.g., a PEPS receiver) may monitor for the presence of at least two programmed vehicle keys. If detected, the vehicle user may be confirmed as authenticated and, further, in the vehicle.

(Ex. PA-2, 8:38-51; Ex. C, ¶354.)

Kleve teaches authenticating the device at every interaction between the device and the system.

> The authentication request may be received in the vehicle 121 by the module 200 (block 400). In some embodiments, the authentication request may not be received

until the registration code(s) is confirmed. In other embodiments, the authentication request may be received at any time. Accordingly, the order of the processes illustrated in FIGS. 3 and 4 is non-limiting and may be modified to best fit the particular implementations of the invention.

(Ex. PA-2, 8:25-32 Ex. C, ¶355.)

A POSA would have found it obvious to modify Tuukkanen's authentication process such that the server system authenticates the master user's UE 101 ("*first user computing device*") at every interaction, as taught by Kleve, to provide robust security and ensure that the "*command*" is indeed from the owner of the vehicle. As modified, the "*server system*" of Tuukkanen would, "*upon receiving, from the first user computing device, the command and the identifier of the second user computing device, authenticate the first user computing device based on the identifier of the first user computing device and the vehicle profile data.*" (Ex. C, ¶356.)

### 4. Dependent Claim 4

*[4.0] The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to remove the vehicle control permission from the second user computing device; and*

As discussed in claim limitation [1.6], Tuukkanen discloses that "a vehicle owner may utilize an application program at the vehicle, on a user device (e.g., a mobile phone), or via a service provider (e.g., cloud service) to create one or more access authorizations/rights to the vehicle[.]" (Ex. PA-3, [0027].) A POSA would have understood that the user device supporting utilization of an application program is "*the first user computing device . . . further configured to: receive, via the user interface, a command*" as discussed above. (Ex. C, ¶357.)

Tuukkanen discloses that the vehicle owner (also called the master user) can remove previously granted permissions to secondary UEs 101 ("*second user computing device*").

In one embodiment, **the system 100 processes and/or facilitates a processing of at least one <u>invalidating request</u> from the master user for invalidating the at least one certificate**. In one example, **a master user may wish to <u>cancel</u> one or more portions of one or more rights** associated with one or more certificates, which may be associated with a vehicle, one or more temporary users, and the like.

In one embodiment, **the system 100 causes, at least in part, an invalidating of the at least one certificate based, at least in part, on the at least one invalidating request**. In one example, the processing platform 107, the service provider 105, and/or a UE 101 may cause invalidating of the one or more certificates, for instance, by transmitting one or more commands/messages to the UEs 101 and/or to the VC system 109

(Ex. PA-3, [0051-0052]; Ex. C, ¶358.)

Figure 6 of Tuukkanen further discloses a flow chart 600 including steps for invalidating a certificate. (Ex. C, ¶359.)

FIG. 6



Ex. PA-3, Fig. 6

At step 611 Tuukkanen discloses the invalidation process.

**In step 611**, a VI client 123 [OR UE per the teaching that 400-600 can be performed by UEs] may process and/or **facilitate a processing of at least one invalidating request from the master user for invalidating the at least one certificate**. In one example, **a master user may wish to <u>cancel one or more portions of one or more rights</u> associated with one or more certificates**, which may be associated with a vehicle, one or more temporary users, and the like. For example, a master user (e.g., an owner) may wish to cancel the rights associated with a certificate and a temporary user so that the one or more rights may be assigned to one or more other temporary users. In one example, a master user may have a scheduling conflict associated with one or more certificates already assigned to one or more temporary users.

(Ex. PA-3, [0091]; Ex. C, ¶360.)

As discussed above in claim 1, the owner controls the certificates though a user interface 801 on a touch screen. The user interface 801 senses inputs that allows the owner to navigate the "Vehicle 'A' Interaction Client" as discussed in claim limitation [1.6]. As shown in Figure 8B, the interface 801 includes a "modify" icon. (Ex. C, ¶361.)

FIG. 8B



Ex. PA-3, Fig. 8B

A POSA would have understood that the owner would select the "modify" icon to remove previously granted rights to the secondary UE 101. The pressing of the modify icon and any subsequent selections to complete the removal process are commands from the owner received by the owner's UE via the user interface 801. (Ex. C, ¶362.)

Accordingly, Tuukkanen teaches "*wherein the first user computing device* [owner's UE] *is further configured to: receive, via the user interface* [801]*, a command to remove the vehicle control permission from the second user computing device* [e.g., user's 845 UE][.]" (Ex. C, ¶¶357-363.)

> *[4.1] transmit, to the server system, the removal command and the identifier of the second user computing device;*

As discussed above in claim limitation [1.7], the owner's entries into the interface 801

139

(embodied as a certificate 127) are transmitted between the UE 101, the vehicle control system 109, the communications network 113, the service providers 105, and the processing platform 107, which, as noted above in claim limitation [1.5], would be understood by the POSA to be a part of the "*server system*," including the service providers 105a-105n and processing platform 107. (Ex. PA-3, [0034], [0036], [0093]; Ex. C, ¶364.)

In fact, Tuukkanen discloses that the "platform 107, the service provider 105, and/or a UE 101 may cause invalidating of the one or more certificates[.]" (Ex. PA-3, [0052].) In order for the platform 107 to "cause [the] invalidating," the platform would have to receive the "*removal command*" from the owner's UE ("*first user computing device*") where the invalidating command originates. (Ex. C, ¶365.)

As further discussed in claim [1.7], the "*identifier of the second user computing device*" is transferred to the "*server system*" in conjunction with the commands generated from the user interface 801. (Ex. C, ¶366.)

Accordingly, Tuukkanen discloses "*transmit, to the server system, the removal command and the identifier of the second user computing device*[.]" (Ex. C, ¶¶364-367.)

> *[4.2] wherein the server system is further configured to remove the vehicle control permission from the second user computing device.*

Tuukkanen discloses that certificates may be invalidated by the processing platform 107 and the service provider 105 ("*server system*").

> In one embodiment, the system 100 causes, at least in part, an invalidating of the at least one certificate based, at least in part, on the at least one invalidating request. In one example, **the processing platform 107, the service provider 105, and/or a UE 101 may cause invalidating of the one or more certificates**, for instance, by transmitting one or more commands/messages to the UEs 101 and/or to the VC system 109.

140

(Ex. PA-3, [0052]; Ex. C, ¶368.)

Tuukkanen explains that "invalidating" a certificate includes "*cancel[ing] one or more portions of one or more rights associated with one or more certificates*[.]" (PA-3, [0051].) A POSA would have understood that "invalidating of the one or more certificates" or "cancel[ing] one or more portions of one or more rights" means to "*remove the vehicle control permission from the second user computing device*" as the certificates define "*vehicle control permission.*" (*See* claim limitation [1.6] above; Ex. C, ¶369.)

Accordingly, Tuukkanen discloses "*wherein the server system is further configured to remove the vehicle control permission from the second user computing device.*" (Ex. C, ¶¶368-370.)

### 5.  Dependent Claim 5

*[5.0] The vehicle system of claim 4, wherein the server system is configured to remove the vehicle control permission by performing operations comprising: receive, from the first user computing device, the removal command and the identifier of the second user computing device;*

Limitation [5.0] is merely the server side of the above-discussed transmission of the removal command and device ID of claim limitation [4.1]. Therefore, the "*server system*" of Tuukkanen is configured to "*receive, from the first user computing device, the removal command and the identifier of the second user computing device*[,]" as discussed in claim 4. (Ex. C, ¶371.)

Accordingly, Tuukkanen teaches "*wherein the server system is configured to remove the vehicle control permission by performing operations comprising: receive, from the first user computing device, the removal command and the identifier of the second user computing device*[.]" (Ex. C, ¶¶371-372.)

*[5.1] based on the removal command and the identifier of the second user computing device, update the vehicle profile data by disassociating the vehicle*

141

*profile of the vehicle from the second user computing device; and*

In one example of Tuukkanen, the *"removal command"* is a request to "invalidat[e] . . . the at least one certificate." (Ex. PA-3, [0052].) A POSA would have further understood that the invalidation of the certificate refers to the certificate no longer being usable with the vehicle. Within the context of Tuukkanen, one way of invalidation is to update the certificate listing to remove a certificate via the vehicle interaction client. In the example of Fig. 8A, the user interface 801 allows the owner to update certificates for vehicle A. (Ex. PA-3, [0095]; Ex. C, ¶373.)

FIG. 8A

800



Ex. PA-3, Fig. 8A

When the owner wishes to "invalidat[e]" a previously created certificate entirely, they can remove the certificate from the list. In another example, the owner may update the certificate for use with a different secondary device. As shown in Fig. 8B, this is done by modifying the "Profile Info," such as by changing the "device info" data field. (Ex. PA-3, [0096]; Ex. C, ¶374.)

FIG. 8B



Ex. PA-3, Fig. 8B

Either of these example actions by the owner results in device ID of the "*second user computing device*" being removed ("*disassociat*[ed]") from the "vehicle 'A' interaction client" ("*vehicle profile*"). As discussed above, the changes made by the owner in the vehicle interaction client are processed by the processing platform 107 ("*server system*") and stored in the database(s) 117, 119, or both:

> [T]he processing platform 107 may include and/or have access to one or more database 119*a*-119*n* (also collectively referred to as database 119), **which may store, include, and/or have access to various data, for example, from different sources and/or different time periods**[.]

(Ex. PA-3, [0034].)

> In various embodiments, **various data associated with the rights and various users, devices, keys, and the like may be stored at one or more UEs 101, the**

certificates **127**, a service provider **database 117**, a local storage 121 at the vehicle, and the like.

(Ex. PA-3, [0050]; Ex. C, ¶¶375-376.)

Therefore, the "*server system*" of Tuukkanen is configured to "*based on the removal command and the identifier of the second user computing device, update the vehicle profile data by disassociating the vehicle profile of the vehicle from the second user computing device*[.]" (Ex. C, ¶377.)

*[5.2] transmit, to the vehicle, the updated vehicle profile data, and*

Claim limitation [5.2] is the same as limitation [1.11]. Tuukkanen discloses claim limitation [5.2] for the same reasons discussed above in claim limitation [1.11]. (Ex. C, ¶378.)

*[5.3] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and*

Claim limitation [5.3] is the same as limitation [1.12]. Tuukkanen discloses claim limitation [5.3] for the same reasons discussed above in claim limitation [1.12]. (Ex. C, ¶379.)

*[5.4] store the updated vehicle profile data.*

As discussed above in claim limitations [1.12] and [5.3], Tuukkanen discloses that the vehicle receives the certificates 127 from the "*server system*." (Ex. PA-3, [0036]; Ex. C, ¶380.)

Tuukkanen discloses that the vehicle includes a vehicle control system 109 and a database 121 for storing received profile data for the UEs 101 ("*computing device[s]*").

In addition, the VI client 123 may be configured to maintain various profile data at the **database 121 where profile data associated with one or more users and/or UEs 101 may be stored** and utilized as well as configured to interact with the sensors 125.

(Ex. PA-3, [0061]; Ex. C, ¶381.)

Therefore, a POSA would have understood that when the vehicle control system 109

receives a certificate from the processing platform 107 or the service provider 105 it is the most recent version of the certificate, i.e., contains the *"updated vehicle profile data,"* which is then stored in database 121. Accordingly, Tuukkanen discloses a vehicle configured to *"store the updated vehicle profile data."* (Ex. C, ¶¶382-383.)

### 6. Dependent Claim 6

*[6.0] The vehicle system of claim 5, wherein, after storing the updated vehicle profile data, the vehicle is further configured to: wirelessly receive, from the second user computing device in proximity to the vehicle, the identifier of the second user computing device;*

Claim limitation [6.0] is very similar to claim limitation [1.13] and the above analysis is incorporated herein. (Ex. C, ¶384.)

As discussed in claim limitation [1.13], the UE 101 wirelessly communicates with the VC system 109 of the vehicle such as via the communication network 113 or a proximity-based communication channel(s) (e.g., Bluetooth®). (Ex. PA-3, [0065]; Ex. C, ¶385.)

Claim [6.0] differs by reciting *"from the second user computing device"* as opposed to claim [1.13]'s *"mobile computing device."* Tuukkanen also discloses the more specific *"second user computing device."* As discussed above, Tuukkanen discloses certificates 127 that allow a *"second user computing device"* privileges to use the vehicle as defined in the *"vehicle profile data."* (Ex. PA-3 [0039], Figs. 8B and 8C.) Figure 1 of Tuukkanen illustrates the transfer of a certificate 127 from UEs 101a-101n to the vehicle control system. (Ex. C, ¶386.)



FIG. 1

**Ex. PA-3, Fig. 1 (Annotated)**

A POSA would have understood Figure 1's label of UE 101a-101n signifies that both the owner's UE as well as a plurality of secondary UEs are able to transfer a certificate 127n to the vehicle control system 109. Indeed, throughout the patent application, Tuukkanen refers to the capability of the UEs to communicate with the vehicle without specifying that it was limited to the owner's UE. (*See, e.g.*, Ex. PA-3, [0032]; Ex. C, ¶387.)

Regarding the temporal limitation, "*after storing the updated vehicle profile data*," Tuukkanen discloses that the vehicle is configured to wirelessly receive the certificate (including the device ID ("*identifier*") at any time, including after the vehicle received and stored "*updated vehicle profile data*," as well as before then. Otherwise, the "*second user computing device*" would not work to operate the vehicle. (Ex. C, ¶388.)

Accordingly, Tuukkanen discloses "[t]*he vehicle system of claim 5, wherein, after storing the updated vehicle profile data, the vehicle is further configured to: wirelessly receive, from the*

*second user computing device in proximity to the vehicle, the identifier of the second user computing device*[.]" (Ex. C, ¶¶384-389.)

Accordingly, Tokunaga discloses "*wirelessly receive, from the second user computing device in proximity to the vehicle, the identifier of the second user computing device*[.]"

> *[6.1] deny access to the second user computing device based on the identifier of the second user computing device not being included in updated vehicle profile data.*

Tuukkanen discloses invalidating/cancelling certificates 127 or portions thereof, as discussed above in claim 4.

> In step 611, a VI client 123 may process and/or facilitate a processing of at least one **invalidating request** from the master user for invalidating the at least one certificate. In one example, a master user may wish to **cancel one or more portions of one or more rights associated with one or more certificates**, which may be associated with a vehicle, one or more temporary users, and the like.

(Ex. PA-3, [0091]; Ex. C, ¶390.)

A POSA would have understood that, if a certificate 127 is invalidated, then a UE 101 ("*second user computing device*") associated with the now-invalidated certificate would lack any access rights. That is, the user's device information would no longer exist in a valid certificate. And, the "*vehicle profile*" would no longer include that device information. (Ex. C, ¶391.)

A POSA would have therefore understood that when a UE 101 associated with a cancelled certificate attempts to access the vehicle, the vehicle would "*deny access to the second user computing device based on the identifier* [device ID] *of the second user computing device not being included in updated vehicle profile data*[.]" (Ex. C, ¶392.)

Tuukkanen, does not give an example of denying access to an invalid certificate, but, Tuukkanen discloses to block a user's requested vehicle-control action (e.g., moving the vehicle)

when there is no certificate granting privileges for the requested action.

> In one embodiment, at 715, **the VC system 109 may check the certificates to determine if the parking provider has the required rights to perform the tasks.** In one embodiment, after the vehicle control is transferred to the parking provider at 709, if at 717 the parking provider attempts to move the vehicle from the parking location/facility, then at 719 the VC system 109 may check to verify if the parking provider has the required right to move the vehicle and **at 721 moving of the vehicle may be allowed or <u>blocked</u> by the VC system 109.**

(Ex. PA-3, [0093]; Ex. C, ¶393.)



Ex. PA-3, Fig. 7

A POSA would have understood that block 721 of Tuukkanen's Fig. 7, as well as Tuukkanen's disclosure of blocking, an attempt to move a vehicle based on the rights specified in

the certificates is to *"deny access to the second user computing device*[.]" A POSA would have understood that Tuukkanen would have similarly blocked a requested vehicle action when the second computing device does not have a valid certificate at all. Accordingly, Tuukkanen teaches to *"deny access to the second user computing device based on the identifier of the second user computing device not being included in updated vehicle profile data."* (Ex. C, ¶¶394-395.)

### 7.  Dependent claim 7

*[7.0] The vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle; and*

As discussed above in claim [1.3], the user interface 801 may be a touch screen that senses the owner's inputs to interact with the user interface 801. As discussed in claim [1.6] this discloses *"receive, via the user interface, a command."* (Ex. C, ¶396.)

Tuukkanen further discloses the owner (master user) may specify rights for secondary users. As discussed in claim 1, the system 100 provides a user interface 801 that allows the owner to establish "rights," "limitations," and "actions" for each certificate. (Ex. C, ¶397.)



Ex. PA-3, Fig. 8C

The "rights" and "limitations" include rights regarding movements of the vehicle, speed limits, geographical constraints, and time-of-use constraints.

In one embodiment, the system 100 determines the one or more configuration parameters based, at least in part, on a location of the vehicle, a duration of time, identity of the one or more users, one or more inputs by a master user of the vehicle, or a combination thereof. **In various embodiments, a master user (e.g., an owner) may define the configuration parameters to include various elements for defining validity of the rights according to, for example, a location of the vehicle, a time of day, day of week, for a specific duration of time, identity of the user who may utilize the rights, and the like.** In one embodiment, the at least one certificate provides access to a physical space at the vehicle, a vehicle movement, one or more options at the vehicle, or a combination thereof. **For example, a user may be authorized to access and utilize a vehicle during the hours of 8:00 AM and 2:00 PM, within a particular geo-graphic location, without access right to the in-vehicle mobile phone or glove compartment,**

> **while the vehicle may not exceed a speed of 50 miles-per-hour (mph), and the like.**

(Ex. PA-3, [0040]; Ex. C, ¶398.)

Therefore, Tuukkanen discloses, "*receive, via the user interface, a command to restrict a vehicle function.*" The above-discussed restrictions, e.g., speed limits and geographical boundaries, occur "*while the second user computing device is located in the vehicle*[.]" (Ex. PA-3, [0098]; Ex. C, ¶¶399-400.)

Moreover, Tuukkanen does not place any restriction on when the owner is able to use the user interface 801 to edit the vehicle interaction client. Therefore, a POSA would have understood that the owner's UE 101 was "*configured to: receive*" inputs from the vehicle owner (via UI 801) commanding restrictions (e.g., a speed limit or geolocation boundary) at anytime—including "*while the second user computing device is located in the vehicle.*" (Ex. C, ¶401.) Claim 7 is an apparatus claim reciting "*configured to*" and does not require any particular sequence of events.

Furthermore, Tuukkanen explicitly discloses an example where the owner utilizes the interface 801 to grant, modify, or deny rights while the secondary user is actively operating the vehicle. In the below example, a secondary user 883 asks the owner for permission to drive outside a previously set geo-location boundary. This clearly occurs when the secondary user 883 and her UE 101 is located in the vehicle. The owner receives the request via his UE 101 and has several options including approving the request, modifying the rights, or requesting more information. (Ex. PA-3, 0042].)

151



**Ex. PA-3, Fig. 8D**

FIG. 8D includes diagram 880 showing the UI 801 which is associated with a VI client for a vehicle "B." In one example, **a rights request/message 881 from a user 883, which is associated with a certificate 4 (885), is presented to a master user, where the master user may have various options in 805 for responding to the request**. For example, the user 883 may request for additional/<u>**modification**</u> of rights associated with the certificate 4 so that the user 883 may be able to move the vehicle "B" outside of a predefined geo-location boundary associated with the certificate 4. In one example, the master user may select in 805 to approve, or request more information from the user 883, or request vehicle "B" data (e.g., does it have enough gas/charge, current location, etc.), and the like.

(Ex. PA-3, [0098].)

In one embodiment, a temporary user may request to have the rights associated with his certificate **modified** so that he may be able to utilize one or more options and features differently than what may have been associated with his certificate.

(Ex. PA-3, [0042]; Ex. C, ¶402.)

A POSA would have considered the owner's modification of the geo-location boundary a "restriction command" because it is still a restriction for the secondary user—albeit less restrictive

152

than the previous restriction. Therefore, the selection of the "approve" icon for a secondary user's modification request is "*receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle*[.]" (Ex. C, ¶403.)

A POSA would have also understood that the owner's failure to "approve" the request in the interface 801 discloses "*a command to restrict a vehicle function while the second user computing device is located in the vehicle*[.]" While Fig. 8D does not illustrate an icon for denying the request, a POSA would have found it obvious for the interface to include such an icon so that the owner could deny the secondary user's request. (Ex. C, ¶404.)

Kleve lends additional support to the obviousness of the interface including an icon to deny a request. Kleve discloses notifications transferred to an authorizing user (such as a private owner of a vehicle) when another user is requesting authorization:

> The notification may also include instructions for the authorizing user to **accept or reject the request. This notification may be received on the module 200 display** (e.g., and without limitation, as a pop-up notification) and/or in the vehicle as a voice notification.

(Ex. PA-2, 10:26-31; Ex. C, ¶405.)

Accordingly, the combination of Tuukkanen and Kleve teaches "*[t]he vehicle system of claim 1, wherein the first user computing device is further configured to: receive, via the user interface, a command to restrict a vehicle function while the second user computing device is located in the vehicle*[.]" (Ex. C, ¶¶396–406.)

*[7.1] transmit, to the server system, the restriction command and the identifier of the second user computing device;*

As discussed in claim limitation [1.7], Tuukkanen discloses transmitting the certificates 127 (which include the device ID) between the UE 101, the vehicle control system 109, the communications network 113, service provider 105, and the processing platform 107, which, as

noted above in claim limitation [1.5], would be understood by the POSA to be a part of the "*server system*" including the service providers 105a-105n and processing platform 107.

> In one embodiment, the system 100 may utilize certificates 127 a-127n (also collectively referred to as certificate/certificates 127), which may be digital files, notes, messages, authorization codes, access/utilization rights, and the like associated with various rights and authorizations that **may be transferred among the UEs 101, a service provider 105, a processing platform 107, a VC system 109, a service vendor, and/or other elements of the system 100 directly and/or via the communication network 113.**

(Ex. PA-3, [0036].)

> At 707, the user may select a parking provider and determine one or more actions and options, rights and the like to associate with the parking provider. Alternatively, at 703, the user may transfer control of the vehicle to the parking provider at 709. **In one scenario, the user may transfer the various rights and actions to the parking provider via one or more certificates by transferring the certificates to one or more devices associated with the parking provider.**

(Ex. PA-3, [0093]; Ex. C, ¶407.)

A POSA would have understood that, in the same way Tuukkanen transmits certificates including user privileges, Tuukkanen also transmits certificates including restrictions of user rights. For example, a certificate can include limitations, such as a speed limit or geo-location boundary. (Ex. PA-3, [0040], [0080], Fig. 8B.) Stated differently, a user might grant privileges to drive the vehicle within a given geographic region or below a specified speed, thus a restriction is just a different form of a privilege. (Ex. C, ¶408.)

Therefore, a POSA would have understood that the owner's UE ("*first user computing device*") would transmit the "*identifier*" and certificate data, e.g., a restriction of the secondary user's rights, entered into the UI 801 to the "*server system*" for the same reasons discussed in claim

154

limitation [1.7]. (Ex. C, ¶409.)

Accordingly, Tuukkanen teaches to *"transmit, to the server system, the restriction command and the identifier of the second user computing device*[.]" (Ex. C, ¶¶407-410.)

**[7.2] wherein the server system is further configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle.**

As discussed with respect to claim limitation [7.0], Tuukkanen discloses to *"receive, . . . a command to restrict a vehicle function"* during operation, e.g., limit vehicle speed, *"while the second user computing device is located in the vehicle*[.]" For example, Tuukkanen discloses various limitations that a master user may place on a certificate:

> In one embodiment, the system 100 determines the one or more configuration parameters based, at least in part, on a location of the vehicle, a duration of time, identity of the one or more users, one or more inputs by a master user of the vehicle, or a combination thereof. **In various embodiments, a master user (e.g., an owner) may define the configuration parameters to include various elements for defining validity of the rights according to, for example, a location of the vehicle, a time of day, day of week, for a specific duration of time, identity of the user who may utilize the rights, and the like. In one embodiment, the at least one certificate provides access to a physical space at the vehicle, a vehicle movement, one or more options at the vehicle, or a combination thereof. For example, a user may be authorized to access and utilize a vehicle during the hours of 8:00 AM and 2:00 PM, within a particular geo-graphic location, without access right to the in-vehicle mobile phone or glove compartment, while the vehicle may not exceed a speed of 50 miles-per-hour (mph), and the like.**

(Ex. PA-3, [0040]; Ex. C, ¶411.)

The restrictions on vehicle speed and geo-location boundaries are dynamic and occur when the vehicle is being operated with the secondary user's UE 101 (*"second user computing device"*)

located within the vehicle. (Ex. C, ¶412.)

As discussed in claim limitation [1.9], Tuukkanen's "*server system*" stores and processes the certificates (including a restriction or limitation defined by the owner) and transfers them to the vehicle. (Ex. PA-3, [0034].) Therefore, the "*server system*" is "*configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle.*" (Ex. C, ¶413.)

Accordingly, Tuukkanen teaches "*wherein the server system is further configured to restrict the vehicle function during operation of the vehicle while the second user computing device is located in the vehicle.*" (Ex. C, ¶¶411-414.)

### 8. Dependent Claim 8

**[8.0] The vehicle system of claim 7, wherein the server system is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device, the restriction command and the identifier of the second user computing device;**

As discussed above in claim limitation [7.1], the owner's UE is configured to receive a restriction command from the owner, such as setting a speed limit for a secondary user, when certificates are created or modified. (Ex. C, ¶415.)

As discussed in claim limitation [1.8], the "*server system*" is configured to receive the certificate data (including the restriction and the device ID) from the owner's UE. (*See e.g.*, Ex. PA-3, [0036].) (Ex. C, ¶416.)

Accordingly, Tuukkanen teaches "*wherein the server system is further configured to restrict the vehicle function by performing operations comprising: receive, from the first user computing device, the restriction command and the identifier of the second user computing device*[.]" (Ex. C, ¶¶415-417.)

156

*[8.1] based on the restriction command and the identifier of the second user computing device, update the vehicle profile data to indicate that the vehicle function is restricted when the second user computing device is located in the vehicle; and*

As discussed in claim limitation [1.10], the owner's input to the UI 801 causes the processing platform 107 to update the certificates 127 stored in the database 119 per the owner's input. This includes updating the *"vehicle profile data"* stored in the database 119 with the restrictions, e.g., speed limits and geo-location boundary. The restrictions, e.g., speed limit and geo-location boundary, restrict vehicle functions *"when the second user computing device is located in the vehicle*[.]" (Ex. C, ¶418.)

Moreover, Tuukkanen does not disclose any time limitations for when the *"server system"* updates the *"vehicle profile data"* following the owner's input in the user interface 801. A POSA would have understood that since the user interface 801 is merely a means for interacting with the certificates 127 that are stored on the server database 119, the changes would occur in real-time as long as the owner's UE was connected to the processing platform 107 via network 113. As such, the *"server system"* is configured to update the *"vehicle profile data"*—including any user restrictions, e.g., speed limit—whenever the owner made a change, including when a *"second user computing device is located in the vehicle*[.]" As discussed above in claim 7, Tuukkanen does not place restrictions on when the owner can make changes to the vehicle interaction client. (Ex. C, ¶419.)

Accordingly, Tuukkanen teaches *"based on the restriction command and the identifier of the second user computing device, update the vehicle profile data to indicate that the vehicle function is restricted when the second user computing device is located in the vehicle*[.]" (Ex. C, ¶¶418-420.)

157

*[8.2] transmit, to the vehicle, the updated vehicle profile data, and*

As discussed above in claim limitation [1.11], Tuukkanen discloses to *"transmit, to the vehicle, the updated vehicle profile data*[.]" (Ex. C, ¶421.)

*[8.3] wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data; and*

As discussed in claim limitation [1.12], the vehicle is *"configured to: receive, from the server system, the updated vehicle profile data*[.]" Accordingly, Tuukkanen discloses *"wherein the vehicle is further configured to: receive, from the server system, the updated vehicle profile data*[.]" (Ex. C, ¶¶422-423.)

*[8.4] store the updated vehicle profile data.*

As discussed in claim limitation [5.4], Tuukkanen discloses storing updated vehicle profile data. Accordingly, Tuukkanen discloses *"store the updated vehicle profile data."* (Ex. C, ¶¶424–425.)

### 9. Dependent Claim 9

*[9.0] The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit vehicle condition data for the vehicle to the server system while the second user computing device is located in or within a threshold distance of the vehicle.*

Tuukkanen discloses that the vehicle includes a plurality of sensors 125, such as location sensors and a speedometer.



FIG. 1

**Ex. PA-3, Fig. 1**

In one embodiment, the VC system 109 may include and/or interface with **sensors 125a-125n** (also collectively referred to as sensors 125) for detecting and analyzing data associated with a vehicle, for example, **location sensors**, speedometer, cameras, microphones, Bluetooth®, WLAN, near field communications (NFC), radio frequency identification (RFID), infrared (IR), and the like. In one embodiment, the sensors 125 may be partially or completely integrated with the VC system 109 or the sensors 125 may be implemented as one or more modules.

(Ex. PA-3, [0035].)

A POSA would have understood that the sensors 125 sense *"vehicle condition data for the vehicle."* Claim 11 lists *"current and historic locations"* as being *"vehicle condition data."* The location sensors sense at least the current location. Therefore, the location sensors sense *"vehicle condition data for the vehicle"* as claimed. (Ex. C, ¶¶426-427.)

Tuukkanen discloses that the vehicle sensor data is sent from the vehicle to the master user (Ex. PA-3, [0085]) and the processing platform 107 (*"server system"*). (Ex. PA-3, [0069], [0085].)

Moreover, as discussed in claim limitation [1.2], the certificates 127 contain *"vehicle profile data,"* including rights and limitations of the user associated with the certificate. Tuukkanen discloses the "limitations" as including restrictions on vehicle speed and geographical boundaries. (Ex. PA-3, [0040], [0080], [0127].)



**Ex. PA-3, Fig. 8C**

In order for the system 100 to enforce the vehicle boundary limitation, the system 100 would know the current location of the vehicle. Therefore, *"vehicle profile data"* related to limitations on vehicle boundary include *"instructions to transmit vehicle condition data"* to the processing platform 107 (*"server system"*) so that the system 100 can compare the location data with the limitation to determine compliance. (Ex. C, ¶¶428-431.)

Furthermore, a POSA would have understood that even if Tuukkanen does not explicitly disclose that the certificates include *"instructions to transmit vehicle condition data,"* the disclosure of sending location data to the processing platform 107 shows the existence of such instructions. (Ex. C, ¶432.)

Therefore, Tuukkanen discloses "*wherein the updated vehicle profile data includes instructions to transmit vehicle condition data for the vehicle to the server system.*"

Regarding the temporal limitation, "*while the second user computing device is located in or within a threshold distance of the vehicle*[.]" Figure 8D shows an example where the user 883 is driving the vehicle and wants to leave the geo-location boundary. (Ex. PA-3, [0098].) Therefore, the "current location," which is real-time data, is being provided while the second user and her UI 101 ("*second computing device*") is "*located in . . . the vehicle.*" (Ex. C, ¶434.)

FIG. 8D

880



Ex. PA-3, Fig. 8D

Accordingly, Tuukkanen teaches "*[t]he vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit vehicle condition data for the vehicle to the server system while the second user computing device is located in or within a threshold distance of the vehicle.*" (Ex. C, ¶¶426-435.)

### 10. Dependent Claim 10

161

*[10.0] The vehicle system of claim 9, wherein the server system is further configured to: receive, from the vehicle, vehicle condition data while the second user computing device is located in or within a threshold distance of the vehicle; and*

As discussed above in claim 9, Tuukkanen discloses to *"to transmit vehicle condition data for the vehicle to the server system."* Limitation [10.0] merely recites the server side of the transmission. A POSA would have understood that transmitting data includes sending (in this case form the vehicle control system 109 or UE 101) and receiving (in this case at the processing platform 107). Therefore, Tuukkanen discloses limitation [10.0] for the same reasons discussed in claim 9. (Ex. C, ¶436.)

*[10.1] transmit, to the first user computing device, the vehicle condition data, and*

Tuukkanen discloses transmitting status notifications associated with a vehicle to the master user, which is the owner of the *"first user computing device[.]"*

> At step 511, a VI client 123 may cause, at least in part, **a transmission of one or more status notifications associated with the vehicle to the one or more users, the master user, the one or more service vendors, or a combination thereof based**, at least in part, on data from one or more sensors at the vehicle. In one embodiment, a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. For example, a VC system 109 may determine that a tire pressure sensor on the vehicle indicates that the associated tire may need servicing. **In one example, a location sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.**

(Ex. PA-3, [0085]; Ex. C, ¶437.)

As explained in paragraph 85 above, the "status notifications" include vehicle location

162

data, which, as discussed in claim 9, is "*vehicle condition data*[.]" A POSA would have understood that in order for the system 100 to transmit data to the master user, the system would transmit the data to a device utilized by the master user such as UE 101. (Ex. C, ¶¶438-439.)

Accordingly, Tuukkanen discloses to "*transmit, to the first user computing device, the vehicle condition data*[.]" (Ex. C, ¶¶437-439.)

> **[10.2] wherein the first user computing device is further configured to: receive, from the server system, the vehicle condition data; and**

As discussed in claim limitation [10.1], the owner's UE 101 ("*first user computing device*") receives the "*vehicle condition data*." In one example, the owner is informed when a secondary user moves the vehicle. That is, the owner receives vehicle location data (one example of "*vehicle condition data*").

> In one embodiment, after the vehicle control is transferred to the parking provider at 709, if at 717 the parking provider attempts to move the vehicle from the parking location/facility, then at 719 the VC system 109 may check to verify if the parking provider has the required right to move the vehicle and at 721 moving of the vehicle may be allowed or blocked by the VC system 109. **In either case, at 723 the user may be notified of the attempt to move the vehicle. At 725 the user may confirm to allow the actions (e.g., move the vehicle) by the parking provider and/or may change the parking provider's rights at 727.**

(Ex. PA-3, [0093]; Ex. C, ¶441.)

In the above example, a POSA would have understood that the processing platform 107 would have sent the location data to the owner's UE. As discussed above, the processing platform 107 stores the certificates and vehicle rights/limitations. Thus, a POSA would have understood that since the notification of vehicle location was being delivered to the owner in conjunction with the request to change the secondary user's limitations that these would come from the same portions of the system 100, which is the processing platform 107 ("*server system*"). (Ex. PA-3,

[0034].) (Ex. C, ¶442.)

Indeed, Figure 8D further discloses that the owner's UE 101 receives location in the "vehicle interaction client" hosted by the processing platform 107. (Ex. PA-3, Fig. 8D, [0098]; Ex. C, ¶443.)

Accordingly, Tuukkanen teaches "*wherein the first user computing device is further configured to: receive, from the server system, the vehicle condition data*[.]" (Ex. C, ¶444.)

*[10.3] display the vehicle condition data.*

Fig. 8D shows a "request vehicle data" icon on a display of a UE 101. A POSA would have understood selecting that icon would result in the requested vehicle data being shown in the Vehicle Interaction Client on the display of the UE 101. (Ex. C, ¶¶445-446.)

Accordingly, Tuukkanen discloses "*display the vehicle condition data*." (Ex. C, ¶¶445-447.)

FIG. 8D

880



Ex. PA-3, Fig. 8D

### 11. Dependent Claim 11

*[11.0] The vehicle system of claim 10, wherein the vehicle condition data include at least one of number of passengers in the vehicle, speeds, <u>current and historical locations</u>, or timestamps associated with the locations.*

Tuukkanen discloses that the *"vehicle condition data include[s] . . . current and historical locations"* as discussed above in claims 9 and 10. (*See e.g.*, Ex. PA-3, [0045].) Accordingly, Tuukkanen teaches *"wherein the vehicle condition data include at least one of number of passengers in the vehicle, speeds, current and historical locations, or timestamps associated with the locations."* (Ex. C, ¶¶448-449.)

### 12. Dependent Claim 12

*[12.0] The vehicle system of claim 1, wherein the updated vehicle profile data includes instructions to transmit location data for the vehicle's current location*

165

> *to the server system while the second user computing device is located in or*
> *within a threshold distance of the vehicle.*

As discussed above in claim 9, Tuukkanen discloses "*wherein the updated vehicle profile data includes instructions to transmit <u>vehicle condition data</u> for the vehicle to the server system.*" (Ex. C, ¶450.)

Claim 12 is very similar to claim 9 but requires "*instructions to transmit <u>location data</u> for the vehicle's current location.*" (Ex. C, ¶451.) As discussed above in claims 9 and 11, Tuukkanen discloses various embodiments wherein a location of a vehicle is transmitted. In one example, a location sensor determines a location of a vehicle, which may be outside of an area permitted by a master user. (Ex. PA-3, [0085].) Tuukkanen also discloses that location data is made available to the service provider 105 and processing platform 107 ("*server system*").

> In one embodiment, **the system 100 causes, at least in part, a transmission of**
> **one or more status notifications** associated with the vehicle to the one or more
> users, the master user, the one or more service vendors, or a combination thereof
> based, at least in part, on data from one or more sensors at the vehicle. In one
> embodiment, a VC system 109, a VI client 123, and/or one or more other
> components of the system 100 may cause for status information from one or more
> sensors of the vehicle to be sent to a master user. For example, a VC system 109
> may determine that a tire pressure sensor on the vehicle indicates that the associated
> tire may need servicing. **In one example, a location sensor of a vehicle may**
> **indicate that location of the vehicle is changing and may be outside the geo-**
> **location boundaries set by the master user.**

(Ex. PA-3, [0045].)

> Location coordinates (e.g., GPS coordinates) can give finer detail as to the location
> of the UE 101 when media is captured. In one embodiment, **GPS coordinates are**
> **stored as context information in the memory 317 and are available to the**

**processing platform 107, the service provider 105,** and/or to other entities of the system 100 via the communication interface 313.

(Ex. PA-3, [0069]; Ex. C, ¶452.)

Therefore, claim 12 is disclosed by Tuukkanen for the same reasons discussed above in claims 9 and 11. (Ex. C, ¶¶452-453.)

### 13. Dependent Claim 13

*[13.0]. The vehicle system of claim 1, wherein the server system is further configured to: receive, from the vehicle, location data of the vehicle while the second user computing device is located in or within a threshold distance of the vehicle;*

As discussed above in claims 9, 11, and 12, Tuukkanen discloses "to transmit location data for the vehicle's current location to the server system while the second user computing device is located in or within a threshold distance of the vehicle." (Ex. PA-3, claim 12.) As previously discussed, (e.g., in claim 10) a POSA would have understood that transmission and reception are part of one act. Accordingly, Tuukkanen teaches *"wherein the server system is further configured to: receive, from the vehicle, location data of the vehicle while the second user computing device is located in or within a threshold distance of the vehicle*[.]" (Ex. C, ¶¶454-455.)

*[13.1] determine that the vehicle is located outside a geographical limitation, the geographical limitation being included in the vehicle profile data; and*

As discussed in claims 9, 11, and 12, Tuukkanen discloses transmitting a location of the vehicle. In one example, a location sensor determines a location of a vehicle which may be outside of an area permitted by a master user:

> In one embodiment, the system 100 causes, at least in part, a transmission of one
> or more status notifications associated with the vehicle to the one or more users,
> the master user, the one or more service vendors, or a combination thereof based,
> at least in part, on data from one or more sensors at the vehicle. In one embodiment,

a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. For example, a VC system 109 may determine that a tire pressure sensor on the vehicle indicates that the associated tire may need servicing. **In one example, a location sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.**

(Ex. PA-3, [0045]; Ex. C, ¶456.)

Further, Tuukkanen discloses location data being generated when the vehicle is being driven. For example, Fig. 8D depicts a user interface displaying a request to a master user to drive the vehicle outside of a geo-location. (Ex. C, ¶457.)



FIG. 8D

Ex. PA-3, Fig. 8D

A POSA would have understood *"vehicle profile data"* to be included in Tuukkanen's certificate 127. Tuukkanen further discloses operating according to parameters associated with a user and utilizing sensor data (e.g., data indicative of a vehicle location).

> In one embodiment, the system 100 causes, at least in part, a transmission of one or more status notifications associated with the vehicle to the one or more users, the master user, the one or more service vendors, or a combination thereof based, at least in part, on data from one or more sensors at the vehicle. In one embodiment, a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. For example, a VC system 109 may determine that a tire pressure sensor on the vehicle indicates that the associated tire may need servicing. **In one example, a location sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.**

(Ex. PA-3, [0045]; Ex. C, ¶458.)

A POSA would have understood Tuukkanen's specifying of rights in a certificate and the alert when a vehicle leaves a specified geo-location to be *"determine that the vehicle is located outside a geographical limitation, the geographical limitation being included in the vehicle profile data[.]"* (Ex. C, ¶¶459-460.)

> *[13.2] transmit, to the first user computing device, alert data that indicates the vehicle is located outside the geographical limitation, and*

As discussed with respect to claim 12, Tuukkanen discloses transmitting vehicle location data in the form of notifications to a user. For example, Tuukkanen discloses:

> In one embodiment, **the system 100 causes, at least in part, a transmission of one or more status notifications associated with the vehicle** to the one or more users, the master user, the one or more service vendors, or a combination thereof based, at least in part, on data from one or more sensors at the vehicle. In one embodiment, a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. . . . **In one example, a location**

sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.

(Ex. PA-3, [0045]; Ex. C, ¶461.)

Further, Tuukkanen discloses location data being generated when the vehicle is being driven. For example, Fig. 8D depicts a user interface displaying a request to a master user to drive the vehicle outside of a geo-location. (Ex. C, ¶462.)



Ex. PA-3, Fig. 8D

Accordingly, Tuukkanen teaches to *"transmit, to the first user computing device, alert data that indicates the vehicle is located outside the geographical limitation*[.]*"* (Ex. C, ¶¶461-463.)

> *[13.3] wherein the first user computing device is further configured to: receive, from the server system, the alert data; and based on the alert data, output a notification indicating that the vehicle is located outside the geographical limitation.*

As discussed in claim limitation [10.1], the *"first user computing device"* receives the *"alert data"* *"from the server system."* Tuukkanen further discloses outputting notifications to users

relating to vehicle location:

> **In one embodiment, the system 100 causes, at least in part, a transmission of one or more status notifications associated with the vehicle to the one or more users**, the master user, the one or more service vendors, or a combination thereof based, at least in part, on data from one or more sensors at the vehicle. In one embodiment, a VC system 109, a VI client 123, and/or one or more other components of the system 100 may cause for status information from one or more sensors of the vehicle to be sent to a master user. For example, a VC system 109 may determine that a tire pressure sensor on the vehicle indicates that the associated tire may need servicing. **In one example, a location sensor of a vehicle may indicate that location of the vehicle is changing and may be outside the geo-location boundaries set by the master user.**

(Ex. PA-3, [0045]; Ex. C, ¶464.)

Accordingly, Tuukkanen teaches "*wherein the first user computing device is further configured to: receive, from the server system, the alert data; and based on the alert data, output a notification indicating that the vehicle is located outside the geographical limitation.*" (Ex. C, ¶¶464-465.)

## XII.    Conclusion

For the reasons given above, reexamination of claims 1–13 of the '931 Patent is requested.

Respectfully submitted,

Dated: December 16, 2025

/ Kyle G. Konz /
Kyle G. Konz  (Reg. No. 68,910)
**Brooks Kushman P.C.**
150 W. Second St., Suite 400N
Royal Oak, Michigan 48067-3846
Phone: 248-358-4400
Fax: 248-358-3351

*Attorney for Ford*

171