# EXHIBIT Q

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764
Customer No. 22,852

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re *Ex Parte* Reexamination of: | ) |
| U.S. Patent No. 10,862,764 | ) |
| Issued: December 8, 2020 | ) Group Art Unit: To Be Assigned |
| Named Inventor: Christopher P. Ricci | ) Examiner: To Be Assigned |
| Control Number: To Be Assigned | ) |
| Filed: January 8, 2019 | ) |
| Title:  UNIVERSAL CONSOLE CHASSIS<br>        FOR THE CAR | ) |

**Mail Stop *Ex Parte* Reexam**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REQUEST FOR *EX PARTE* REEXAMINATION

Requester Toyota Motor Corp. respectfully requests *ex parte* reexamination under 35 U.S.C. § 302 and 37 C.F.R. § 1.510 of U.S. Patent No. 10,862,764 ("the '764 patent," Ex. A), assigned to Patent Owner AutoConnect Holdings LLC, per the assignments at reel/frame: 067754/0523. Prior art not cited or applied during prosecution renders issued claims 1-14, 19, and 20 unpatentable under 35 U.S.C. § 103.

The '764 patent is subject to an ongoing *ex parte* reexamination in Reexam No. 90/019,866. That earlier reexamination challenges claims 1-19 of the '764 patent but (unlike the present Request) does not challenge claim 20, which has been asserted by Patent Owner in litigation. Requester would not oppose the Office merging this Request with Reexam No. 90/019,866 to issue

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

and publish a single reexamination certificate for the '764 patent after addressing the challenges

in this Request. *See* 37 C.F.R. § 1.565; MPEP 2283.

As this Request demonstrates, prior art references, including at least *Namburu, Bosch,*

*Smith, Breed, Boling, Holcman,* and *Chtorash,* raise substantial new questions of patentability

("SNQs") with respect to the challenged claims. Indeed, the prior art renders these claims

unpatentable under 35 U.S.C. § 103. Requester thus respectfully requests that the Office grant this

Request for *ex parte* reexamination of the '764 patent and cancel claims 1-14, 19, and 20.

In accordance with 37 C.F.R. § 1.510(b), this Request includes the following:

(1) A statement pointing out each substantial new question of
patentability based on prior patents and printed publications.

(2) An identification of every claim for which reexamination is
requested, and a detailed explanation of the pertinency and manner
of applying the cited prior art to every claim for which
reexamination is requested. For each statement of the patent owner
and accompanying information submitted pursuant to [37 C.F.R.]
§ 1.501(a)(2) which is relied upon in the detailed explanation, the
request must explain how that statement is being used to determine
the proper meaning of a patent claim in connection with the prior
art applied to that claim and how each relevant claim is being
interpreted. If appropriate, the party requesting reexamination may
also point out how claims distinguish over cited prior art.

(3) A copy of every patent or printed publication relied upon or
referred to in paragraph (b) (1) and (2) of this section accompanied
by an English language translation of all the necessary and
pertinent parts of any non-English language patent or printed
publication.

(4) A copy of the entire patent including the front face, drawings,
and specification/claims (in double column format) for which
reexamination is requested, and a copy of any disclaimer,
certificate of correction, or reexamination certificate issued in the
patent. All copies must have each page plainly written on only one
side of a sheet of paper.

(5) A certification that a copy of the request filed by a person other
than the patent owner has been served in its entirety on the patent

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

owner at the address as provided for in [37 C.F.R.] § 1.33(c). The name and address of the party served must be indicated. If service was not possible, a duplicate copy must be supplied to the Office.

(6) A certification by the third party requester that the statutory estoppel provisions of 35 U.S.C. [§] 315(e)(1) or 35 U.S.C. [§] 325(e)(1) do not prohibit the requester from filing the *ex parte* reexamination request.

## Attachments

(1) Certificate of Service on Patent Owner.
(2) Information Disclosure Statement Form PTO/SB/08.

## Exhibits

Ex. A: U.S. Patent No. 10,862,764 to Christopher P. Ricci ("the '764 patent")
Ex. B: Patent Prosecution History of U.S. Patent No. 10,862,764
Ex. C: Declaration of Dr. Kevin C. Almeroth
Ex. D: Request for *Ex Parte* Reexamination of U.S. Patent 10,862,764 (Feb. 26, 2025) – Reexam No. 90/019,866
Ex. E: Order Granting Request for *Ex Parte* Reexamination of U.S. Patent 10,862,764 (April 28, 2025) – Reexam No. 90/019,866
Ex. F: Office Action in *Ex Parte* Reexamination of U.S. Patent 10,862,764 (May 28, 2025) – Reexam No. 90/019,866
Ex. G: CV of Dr. Kevin C. Almeroth

## Prior Art Exhibits

PA-1: U.S. Pat. App. Pub. No. 2011/0137490 A1 to Bosch ("*Bosch*")
PA-2: U.S. Pat. App. Pub. No. 2010/0222939 A1 to Namburu et al. ("*Namburu*")
PA-3: U.S. Pat. No. 6,603,405 B2 to Smith ("*Smith*")
PA-4: U.S. Pat. App. Pub. No. 2007/0109111 A1 to Breed ("*Breed*")
PA-5: U.S. Pat. App. Pub. No. 2011/0093159 A1 to Boling et al. ("*Boling*")
PA-6: U.S. Pat. App. Pub. No. 2010/0017126 A1 to Holcman et al. ("*Holcman*")
PA-7: U.S. Pat. No. 6,429,773 B1 to Schuyler ("*Schuyler*")
PA-8: U.S. Pat. App. Pub. No. WO 2009/073806 A2 to Chutorash et al. ("*Chutorash*")
PA-9: Bosch Automotive Electrics and Automotive Electronics, Systems and Components, Networking and Hybrid Drive, 5th Ed. (2007)
PA-10: U.S. Pat. App. Pub. No. 2012/0254948 A1 to Kleve et al.
PA-11: U.S. Pat. No. 4,670,852 to Masaki et al.
PA-12: U.S. Pat. No. 7,303,041 B2 to Stuve

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

## Table of Contents

I.    RELATED PROCEEDINGS ................................................................................ 1

    A.    Certification Regarding Statutory Estoppel ........................................... 1

    B.    Other Proceedings ................................................................................ 1

    C.    Request for Expedited Reexamination ................................................... 1

II.    IDENTIFICATION OF CLAIMS THAT SHOULD BE REEXAMINED ..................... 2

III.    OVERVIEW OF THE '764 PATENT AND ITS PROSECUTION HISTORY .............. 2

    A.    '764 Patent Disclosure ........................................................................ 2

    B.    Claims 1-14, 19, and 20 of the '764 Patent ............................................. 4

    C.    '764 Patent Prosecution History ........................................................... 8

    D.    Level of Ordinary Skill in the Art ......................................................... 9

IV.    CLAIM CONSTRUCTION ............................................................................ 10

V.    IDENTIFICATION OF PRIOR ART AND SUBSTANTIAL NEW QUESTIONS
    OF PATENTABILITY .................................................................................. 10

    A.    Identification of Prior Art ................................................................... 10

    B.    Substantial New Questions of Patentability .......................................... 12

        1.    *Namburu* in combination with *Bosch* raises an SNQ for claims 1,
            6, 7, 9-13, and 19. ................................................................. 14

        2.    *Namburu* in combination with *Bosch* and *Smith* raises an SNQ for
            claims 2 and 3. ..................................................................... 16

        3.    *Namburu* in combination with *Bosch* and *Breed* raises an SNQ for
            claims 4, 5, and 14. ............................................................... 18

        4.    *Namburu* in combination with *Bosch* and *Boling* raises an SNQ for
            claim 8 ................................................................................ 20

        5.    *Namburu* in combination with *Bosch*, *Breed*, and *Holcman* raises
            an SNQ for claim 20. ............................................................. 21

        6.    *Chutorash* in combination with *Holcman* raises an SNQ for claims
            1, 4, and 20 ........................................................................... 23

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

VI.    CLAIMS 1-14, 19, AND 20 OF THE '764 PATENT ARE UNPATENTABLE ........... 26

A.    Ground 1: *Namburu* in combination with *Bosch* renders obvious claims 1, 6, 7, 9-13, and 19. ........................................................................................ 26

1.    *Namburu* ...................................................................................... 26

2.    *Bosch* ............................................................................................. 29

3.    Independent Claim 1 ..................................................................... 31

4.    Claim 6: The vehicle system according to claim 1, wherein the communication network is a wireless system operable to communicate inside and outside the vehicle. ............................................ 46

5.    Claim 7: The vehicle system according to claim 1, wherein the vehicle control system is configured to communicate through the communication network to a server positioned outside the vehicle. ........ 48

6.    Claim 9: The vehicle system according to claim 7, wherein the server comprises stored data, the stored data comprises data associated with one or more users or associated with one or more vehicles, and the stored data being exchanged and accessible by a plurality of authorized vehicles or authorized users. ............................... 50

7.    Claim 10: The vehicle system according to claim 1, wherein the communication network is a wide area communication network configured to allow the vehicle control system to communicate outside the vehicle, the communication network is one or more of the following: cellular communication network, satellite telephone communication network, and wireless wide area network. .................... 53

8.    Claim 11: The vehicle system according to claim 1, wherein the device is a mobile device, the mobile device configured to be permanently or removably positioned inside the vehicle. ....................... 54

9.    Claim 12: The vehicle system according to claim 1, wherein the device is configured to receive user input either through touch input, interface buttons, or gesture capture. ............................................... 55

10.    Claim 13: The vehicle system according to claim 1, wherein the device comprises device data, the device data is data used in conjunction with the device, and the device data including one or more of the following: multimedia data, preferences data, bioinformatics, and data associated with a user of the device. ................. 55

11.    Claim 19: The vehicle system according to claim 1, further comprising: a storage system configured to store system data, the

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

system data being data needed for the vehicle control system to control the vehicle ................................................................................. 56

B.    Ground 2: *Namburu* in combination with *Bosch* and *Smith* renders obvious claims 2 and 3. ................................................................................. 59

    1.    *Smith* ................................................................................. 59

    2.    Claim 2: The vehicle system according to claim 1, wherein: the plurality of sensors comprises vehicle sensors and non-vehicle sensors, the vehicle sensors are sensors associated with the vehicle configured to provide information to the vehicle control system that determine or provide information about an environment in which the vehicle is operating, and the non-vehicle sensors are sensors not associated with the vehicle configured to provide information to the vehicle control system............................................... 61

    3.    Claim 3: The vehicle system according to claim 2, wherein the non-vehicle sensor information is controlled by third parties and includes at least one of weather tracking data, user health tracking data, maintenance data of the vehicle. ....................................... 64

C.    Ground 3: *Namburu* in combination with *Bosch* and *Breed* renders obvious claims 4, 5, and 14................................................................................. 65

    1.    *Breed* ................................................................................. 65

    2.    Claim 4: The vehicle system according to claim 1, wherein: said vehicle system comprises a plurality of predefined areas, the plurality of predefined areas comprises a first predefined area, the plurality of sensors comprises a first sensor, the first sensor is positioned in the first predefined area, and the first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device ................................................................................. 68

    3.    Claim 5: The vehicle system according to claim 4, wherein the first sensor is a vehicle sensor, and the vehicle sensor is configured to provide information to the vehicle control system that determines or provides information about an environment in which the vehicle is operating................................................................................. 74

    4.    Claim 14: The vehicle system according to claim 4, wherein the plurality of predefined areas comprises a second predefined area, the plurality of sensors comprises a second sensor, the second sensor is positioned in the second predefined area, and the second predefined area is located outside the vehicle and is configured to

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

collect and send information about the second predefined area to at least one of the vehicle control system or device. ................................... 74

D.    Ground 4: *Namburu* in combination with *Bosch* and *Boling* renders obvious claim 8. ........................................................................................ 76

    1.    *Boling* ............................................................................................... 76

    2.    Claim 8: The vehicle system according to claim 7, wherein the server is a cloud computing system or cloud storage unit configured to permit the vehicle control system to gain access to further computing capabilities or storage. .................................................. 78

E.    Ground 5: *Namburu* in combination with *Bosch*, *Breed*, and *Holcman* renders obvious claim 20. ................................................................... 82

    1.    *Holcman* ........................................................................................... 82

    2.    Claim 20: The vehicle system according to claim 4, wherein at least one of the plurality of predefined areas is defined by geo-fencing ................................................................................................ 84

F.    Ground 6: *Chutorash* in combination with *Holcman* renders obvious claims 1, 4, and 20. ................................................................................. 85

    1.    *Chutorash* ......................................................................................... 85

    2.    Independent Claim 1 ........................................................................ 92

    3.    Claim 4: The vehicle system according to claim 1, wherein: said vehicle system comprises a plurality of predefined areas, the plurality of predefined areas comprises a first predefined area, the plurality of sensors comprises a first sensor, the first sensor is positioned in the first predefined area, and the first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device. ............................................................................................ 105

    4.    Claim 20: The vehicle system according to claim 4, wherein at least one of the plurality of predefined areas is defined by geo-fencing ................................................................................................ 108

VII.    CONCLUSION ...................................................................................................... 112

vii

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

## I. RELATED PROCEEDINGS

### A. Certification Regarding Statutory Estoppel

As required by 37 C.F.R. § 1.510(b)(6), Requester certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not prohibit Requester from filing the instant request for *ex parte* reexamination.

### B. Other Proceedings

Patent Owner has asserted the '764 patent in the following district court litigations:

| Name | Number | Court | Filed |
|---|---|---|---|
| *AutoConnect Holdings LLC v. Toyota Motor Corp. et al.* | 2:24-cv-00802 | EDTX | Oct. 3, 2024 |
| *AutoConnect Holdings LLC v. General Motors LLC* | 2:24-cv-00877 | EDTX | Oct. 30, 2024 |
| *AutoConnect Holdings LLC v. Ford Motor Co.* | 1:24-cv-01327 | D. Del | Dec. 6, 2024 |

The '764 patent is also the subject of *Ex Parte* Reexamination No. 90/019,866. *See* Ex. D, Ex. E. At the time of filing of this Request, claims 1-19 of the '764 patent have been rejected in a non-final Office Action dated May 28, 2025, under different grounds than those proposed in this Request. Ex. F.

### C. Request for Expedited Reexamination

Due to the ongoing nature of the above-identified lawsuits, Requester respectfully urges that, pursuant to 35 U.S.C. § 305, this Request be granted and reexamination be conducted not only with "special dispatch," but also with "priority over all other cases" in accordance with M.P.E.P. § 2261.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

## II.     IDENTIFICATION OF CLAIMS THAT SHOULD BE REEXAMINED

Under 37 C.F.R. § 1.510(b)(2), Requester respectfully requests *ex parte* reexamination of claims 1-14, 19, and 20 of the '764 patent and the issuance of a reexamination certificate cancelling these claims.

## III.     OVERVIEW OF THE '764 PATENT AND ITS PROSECUTION HISTORY

### A.     '764 Patent Disclosure

The '764 patent broadly relates to an interconnected vehicle ecosystem linking a vehicle's systems (e.g., a vehicle control system and vehicle sensors) to other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶53. Independent claim 1, the sole independent claim, recites:

> 1. A vehicle system, comprising:
>
> a **vehicle**;
>
> a **communication network**;
>
> a **vehicle control system**;
>
> a power control module;
>
> a **device** configured to communicate with the **vehicle control system**, the device connected to the power control module and attached to the vehicle; and
>
> a **plurality of sensors** configured to **communicate via the communication network** with the **vehicle control system** and the **device**, wherein
>
> wherein the **vehicle control system** is configured to use computing capability of the **device**.

Ex. A, 28:2-14. Exemplary embodiments of the claim features are shown below in Figure 2, including **device 212** (e.g., "a mobile telephone, a mobile computer, or other type of computing system or device that is either permanently located in or temporarily associated with the automobile 104"), **vehicle control system 204** (e.g., a part of vehicle system 200 that "may consist of hardware and/or software that conduct various operations for or with the vehicle 104,"

2

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

such as "providing information to the user, receiving input from the user, and controlling the functions or operation of the vehicle 104"), **communication network 224** (e.g., "any type of wireless or wired communication system that may be included within the vehicle 104 or operable to communicate outside the vehicle 104," including both "a local area communication capability and a wide area communication capability"), and "**one or more sensors 236/242**, which are either associated with the vehicle 104 or communicate with the vehicle 104," such as "**vehicle sensors 242**" and "**non-vehicle sensors 236**." Ex. A, 9:64-11:40, Fig. 2; Ex. C, ¶54.



*Fig. 2*

The specification describes "areas associated with a vehicle or conveyance 104" including "a first zone 108," which "may be inside vehicle 104." Ex. A, 9:42-52. The specification further describes defining an area based on the range of vehicle sensors, such as "second zone 112," which "may be delineated by line 120" and that "is created by a range of one or more sensors associated with the vehicle 104." Ex. A, 9:53-57. The "area 112 is exemplary of the range of those sensors and what can be detected by those sensors associated with the vehicle 104." *Id.* The specification further describes an "area 116," which is the "rest of the environment

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

[that] includes all space beyond the range of the sensors." Ex. A, 9:58-63. The **first zone 108**,

**second zone 112**, and **area 116** are shown below in annotated Fig. 1. Ex. A, Fig. 1; Ex. C, ¶55.



**B.    Claims 1-14, 19, and 20 of the '764 Patent**

This Request concerns claims 1-14, 19, and 20, of which claim 1 is the sole independent

claim. Each of the challenged claims is reproduced below:

1. A vehicle system, comprising:

a vehicle;

a communication network;

a vehicle control system;

a power control module;

a device configured to communicate with the vehicle control system, the device connected to the power control module and attached to the vehicle; and

a plurality of sensors configured to communicate via the communication network with the vehicle control system and the device, wherein

wherein the vehicle control system is configured to use computing capability of the device.

2. The vehicle system according to claim 1, wherein:

the plurality of sensors comprises vehicle sensors and non-vehicle sensors,

the vehicle sensors are sensors associated with the vehicle configured to provide information to the vehicle control system that determine or provide information about an environment in which the vehicle is operating, and

the non-vehicle sensors are sensors not associated with the vehicle configured to provide information to the vehicle control system.

3. The vehicle system according to claim 2, wherein

the non-vehicle sensor information is controlled by third parties and includes at least one of weather tracking data, user health tracking data, maintenance data of the vehicle.

4. The vehicle system according to claim 1, wherein:

said vehicle system comprises a plurality of predefined areas, the plurality of predefined areas comprises a first predefined area,

the plurality of sensors comprises a first sensor,

the first sensor is positioned in the first predefined area, and

the first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

5. The vehicle system according to claim 4, wherein

the first sensor is a vehicle sensor, and

the vehicle sensor is configured to provide information to the vehicle control system that determines or provides information about an environment in which the vehicle is operating.

6. The vehicle system according to claim 1, wherein

the communication network is a wireless system operable to communicate inside and outside the vehicle.

7. The vehicle system according to claim 1, wherein

the vehicle control system is configured to communicate through the communication network to a server positioned outside the vehicle.

8. The vehicle system according to claim 7, wherein

the server is a cloud computing system or cloud storage unit configured to permit the vehicle control system to gain access to further computing capabilities or storage.

9. The vehicle system according to claim 7, wherein

the server comprises stored data,

the stored data comprises data associated with one or more users or associated with one or more vehicles, and

the stored data being exchanged and accessible by a plurality of authorized vehicles or authorized users.

10. The vehicle system according to claim 1, wherein

the communication network is a wide area communication network configured to allow the vehicle control system to communicate outside the vehicle, the communication network is

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

one or more of the following: cellular communication network, satellite telephone

communication network, and wireless wide area network.

11. The vehicle system according to claim 1, wherein

the device is a mobile device, the mobile device configured to be permanently or

removably positioned inside the vehicle.

12. The vehicle system according to claim 1, wherein

the device is configured to receive user input either through touch input, interface

buttons, or gesture capture.

13. The vehicle system according to claim 1, wherein

the device comprises device data, the device data is data used in conjunction with the

device, and

the device data including one or more of the following: multimedia data, preferences

data, bioinformatics, and data associated with a user of the device.

14. The vehicle system according to claim 4, wherein

the plurality of predefined areas comprises a second predefined area,

the plurality of sensors comprises a second sensor,

the second sensor is positioned in the second predefined area, and

the second predefined area is located outside the vehicle and is configured to collect and

send information about the second predefined area to at least one of the vehicle control system or

device.

19. The vehicle system according to claim 1, further comprising:

a storage system configured to store system data, the system data being data needed for

the vehicle control system to control the vehicle.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

20. The vehicle system according to claim 4, wherein

at least one of the plurality of predefined areas is defined by geo-fencing.

**C.    '764 Patent Prosecution History**

During prosecution, the Examiner initiated an interview with the Applicant, with the

interview summary stating: "Discussed issues related to claims. Applicant will file amended

claims per our discussion." Ex. B, 130. The Applicant subsequently filed a preliminary

amendment, canceling all of the then-pending claims and introducing new claims that ultimately

issued in the '764 patent. Ex. B, 131-137. In addition to the claim amendments, the Applicant

provided remarks in which it, "For explanatory reasons only and per Examiner Patel's request,"

presented annotations to the claim that issued as claim 1. *Id.* at 137. Those "annotations"

provided in the Applicant's remarks are presented below:

> Claim 21:    A vehicle 104 system, comprising:
> a vehicle 100
> a communication network 224;
> a vehicle control system 204;
> a power control module 560;
> a device 212 configured to communicate with the vehicle control system, the device
> connected to the power control module and attached to the vehicle; and
> a plurality of sensors configured to communicate via the communication network with the
> vehicle control system 204 and the device, wherein
> wherein the vehicle control system 204 is configured to use computing capability of the
> device (par. 0073).

Ex. B, 137 (highlighting added). The highlighted portion of the remarks above indicates that

paragraph [0073] of the specification was considered relevant by the Applicant to the claim

clause, "wherein the vehicle control system 204 is configured to use computing capability of the

device." Paragraph [0073] of the as-filed specification is presented below:

8

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

> [0073]  The device or user interface 212 can receive input or provide information to a user 216. The user 216 may thus interact with the vehicle control system 204 through the interface or device 212.  Further, the device 212 may include or have access to device data 220.  The device data 220 can be any type of data that is used in conjunction with the device 212, including, but not limited to, multimedia data, preferences data, bioinformatics, data associated with the user 216, or other types of data.  The data may be stored in a device data 220 as a storage system similar to that described in conjunction with system data 208.

Ex. B, 42. The Applicant thus represented to the Examiner that paragraph [0073] of the as-filed specification is pertinent to the above-highlighted claim clause regarding the vehicle control system using "computing capability of the device," including the paragraph's discussion of a user interacting with the vehicle control system 204 through the device 212 and the device 212 including data such as "preferences data, bioinformatics, [and] data associated with the user 216." *Id.*

In allowing the claims, the Examiner stated that "it has not been shown or reasonably suggested by the prior art of record to have . . ." followed by a recitation of each claim element of claim 1. Ex. B, 175-180. The applicant subsequently filed an IDS, but no further reasons for allowance were provided by the Examiner. Ex. B, 222-224, 236-242. The prior art considered by the Examiner did not include any of the prior art references relied on in this Request. After issuance, the patentee requested and obtained a certificate of correction that revised the priority information in the specification but did not revise the claims. Ex. A, 36; Ex. B, 282.

### D.    Level of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSITA") at the time the application leading to the '764 patent was filed would have had at least a four-year undergraduate degree in computer science, electrical engineering, automotive engineering, or a closely related field and at least one

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

year of experience in the field of vehicle systems. Ex. C, ¶¶35-37, 59. More education can

supplement practical experience and vice versa. *Id.* Requester's expert exceeded this by 2011. *Id.*

## IV.    CLAIM CONSTRUCTION

Except for the similar claim terms "at least one of" (claims 3, 4, 14, and 20) and "one or

more" (claims 9, 10, and 13), no other claim terms of the '764 patent require construction

because the claims encompass the prior-art mappings provided below under any reasonable

construction. Ex. C ¶60.

The '764 patent states that "[t]he phrases 'at least one,' 'one or more,' and 'and/or' are

open-ended expressions that are both conjunctive and disjunctive in operation. For example, each

of the expressions 'at least one of A, B and C,' 'at least one of A, B, or C,' 'one or more of A, B,

and C,' 'one or more of A, B, or C' and 'A, B, and/or C' means A alone, B alone, C alone, A and

B together, A and C together, B and C together, or A, B and C together." Ex. A, 5:18-25. The

phrases "at least one of" and "one or more" should be construed accordingly. Ex. C, ¶61.

## V.    IDENTIFICATION OF PRIOR ART AND SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

### A.    Identification of Prior Art

Each asserted reference relied upon in this Request and identified in the table below was

filed and/or published before November 16, 2011, the earliest alleged priority date for the '764

patent.

| Prior Art References |
| --- |
| U.S. Pat. App. Pub. No. 2011/0137490 A1 to Bosch et al. ("*Bosch*") (Ex. PA-1), filed December 2, 2010, and published June 9, 2011, is prior art under pre-AIA §§102(a) and 102(e). |

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

| Prior Art References |
|---|
| U.S. Pat. App. Pub. No. 2010/0222939 A1 to Namburu et al. ("*Namburu*") (Ex. PA-2), filed February 27, 2009, and published September 2, 2010, is prior art under pre-AIA §§102(a), 102(b), and 102(e). |
| U.S. Pat. No. 6,603,405 to Smith ("*Smith*") (Ex. PA-3), filed December 5, 2000, and published August 5, 2003, is prior art under pre-AIA §§102(a), 102(b), and 102(e). |
| U.S. Pat. App. Pub. No. 2007/0109111 A1 to Breed et al. ("*Breed*") (Ex. PA-4), filed November 22, 2006, and published May 17, 2007, is prior art under pre-AIA §§102(a), 102(b), and 102(e). |
| U.S. Pat. App. Pub. No. 2011/0093159 A1 to Boling et al. ("*Boling*") (Ex. PA-5), filed August 3, 2010, and published April 21, 2011, is prior art under pre-AIA §§102(a) and 102(e). |
| U.S. Pat. App. Pub. No. 2010/0017126 A1 to Holcman et al. ("*Holcman*") (Ex. PA-6), filed December 15, 2008, and published Jan 21, 2010, is prior art under pre-AIA §§102(a), 102(b), and 102(e). |
| U.S. Pat. App. Pub. No. 2009/073806 A2 to Chutorash et al. ("*Chutorash*") (Ex. PA-8), filed December 4, 2008, and published June 11, 2009, is prior art under pre-AIA §§ 102(a), 102(b), and 102(e). |

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

These prior art documents are listed on a form PTO/SB/08 filed concurrently herewith along with copies of the listed references.

Claims 1-14, 19, and 20 of the '764 patent are unpatentable under 35 U.S.C. § 103 based on the following proposed grounds of rejection:

| | Proposed Grounds |
|---|---|
| 1 | *Namburu* in combination with *Bosch* renders obvious claims 1, 6, 7, 9-13, and 19. |
| 2 | *Namburu* in combination with *Bosch* and *Smith* render obvious claims 2 and 3. |
| 3 | *Namburu* in combination with *Bosch* and *Breed* render obvious claims 4, 5, and 14. |
| 4 | *Namburu* in combination with *Bosch* and *Boling* render obvious claim 8. |
| 5 | *Namburu* in combination with *Bosch*, *Breed*, and *Holcman* render obvious claim 20. |
| 6 | *Chutorash* in combination with *Holcman* renders obvious claims 1, 4, and 20. |

**B.    Substantial New Questions of Patentability**

For a substantial new question of patentability (SNQ) to be present, "it is only necessary that: (A) an item of information raises a[n] SNQ regarding at least one claim, i.e., the teaching of the item of information is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and (B) the same question of patentability as to the claim has not been decided by the Office in an earlier concluded examination or review of the patent, decided in a final holding of invalidity (after all appeals) by

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

a federal court in a decision on the merits involving the claim, or raised to or by the Office in a

pending reexamination or supplemental examination of the patent." M.P.E.P. § 2816.02(I).

Moreover, an SNQ of patentability is present "unless the same question of patentability

has already been: (A) decided in a final holding of invalidity by a federal court in a decision on

the merits involving the claim, after all appeals; (B) decided in an earlier concluded examination

or review of the patent by the Office; or (C) raised to or by the Office in a pending reexamination

or supplemental examination of the patent." M.P.E.P. § 2816.02(I) (emphasis omitted); *see also*

*In re Vivint, Inc.*, 14 F.4th 1342, 1349 (Fed. Cir. 2021). "For example, the same question of

patentability may already have been decided if the Office has previously considered, in an earlier

concluded examination or review of the patent, the same question of patentability based on the

same prior art." M.P.E.P. § 2816.02(I) (citing *In re Recreative Techs. Corp.*, 83 F.3d 1394 (Fed.

Cir. 1996)).

Each proposed rejection in this Request presents a distinct SNQ of patentability that was

not previously considered by the Office and that a reasonable examiner would consider to be

important in deciding whether the claims are patentable. As noted above with respect to the

prosecution history of the patent, the prosecution Examiner did not consider any of the prior art

relied on in this Request. Moreover, the proposed rejections in this Request are different from the

bases of rejection in co-pending Reexamination No. 90/019,866. The only reference in this

Request overlapping with that co-pending Reexamination is *Chutorash*, and that reference is

used herein in a different context in a proposed obviousness ground for claim 20 (which, unlike

in the present Request, was not addressed or challenged in the co-pending EPR).

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

1.    ***Namburu* in combination with *Bosch* raises an SNQ for claims 1, 6, 7, 9-13, and 19.**

As explained below in Section VI.A, *Namburu* discloses systems and methods for remote management of a vehicle. Ex. PA-2, ¶[0001]. The vehicle communicates with a "remote device," which "may be any suitable interface device providing an interactive interface to allow a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130." Ex. PA-2, ¶[0027]. The remote device may be a "remote console 110," which can be a cellular phone, PDA, or "any other suitable handheld device that may remotely and securely manage operations of a vehicle." Ex. PA-2, ¶[0040]. The remote console may be "communicatively coupled to a vehicle processing system" that "resid[es] within the vehicle 130" and may be attached to the vehicle through "a docking station or the like." Ex. PA-2, ¶[0029].

*Namburu*'s "vehicle processing system" (e.g., on-board vehicle computer) "may be located on the interior front dash or any suitable location within the vehicle and may include a microprocessor or the like to manage the receiving, handling, storing, calculating, manipulating, or sending of information to/from the remote device." Ex. PA-2, ¶[0035]. The remote console "may wirelessly communicate with the vehicle processing system utilizing RF signals, Bluetooth, or via any applicable type of signal or other suitable method including routing signals through the remote server 120." Ex. PA-2, ¶[0029]. Figure 1 below shows the remote console 110, remote server 120, and vehicle 130. Ex. PA-2, ¶[0027], Fig. 1.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 1

*Namburu* also discloses a variety of vehicle sensors such as "sensors detecting external temperature, sunlight, and other environmental conditions" outside the vehicle. Ex. PA-2, ¶[0067]. *Namburu* further discloses that components of the vehicle's systems, such as an exhaust sensor, are "coupled to a processor 220" of the vehicle processing system "to analyze performance data including any data related to or generated by a vehicle system." Ex. PA-2, ¶[0036].

*Bosch* discloses a vehicle docking station for a "mobile interface for controlling a plurality of vehicle functions in a motor vehicle" that may be "in the form of a mobile telephone and/or PDA." Ex. PA-1, Abstract, ¶¶[0002], [0028]. The docking station provides power to the mobile interface that can "charge the energy store of the interface." Ex. PA-1, ¶[0053]; *see also* ¶[0079] (stating the "energy store 12" (e.g., battery) of the interface is connected to "contacts 18 for charging via a docking station"). The docking station may also provide data connectivity between the mobile interface and vehicle, being "designed such that where the interface is connected to the docking station the wireless data interchange in the interface and in the

15

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

controller are deactivated, with the docking station undertaking the task of connecting interface and controller for the purpose of data interchange." Ex. PA-1, ¶[0053].

As shown in annotated Figure 4 below, *Bosch* depicts a **docking station 20** for an **interface 2** that includes a **power connection 22** to the vehicle's **controller 1**. Ex. PA-1, ¶¶[0093]-[0094], Fig. 4.



As additionally explained below in Section VI.A, a POSITA would have been motivated to combine the teachings of *Namburu* and *Bosch*, thus rendering obvious the challenged claims. This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claims 1, 6, 7, 9-13, and 19 are patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

        2.       **Namburu in combination with Bosch and Smith raises an SNQ for claims 2 and 3.**

As explained below in Section VI.B, a POSITA would have been motivated to combine the teachings of *Namburu* and *Bosch*. A POSITA would have further combined the teachings of

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

these references with *Smith*, which discloses "a method and apparatus for receiving weather forecast information in a vehicle and using that information to warn a vehicle operator of a future weather hazard with respect to the specific vehicle's intended direction of travel." Ex. PA-3, 1:6-12. This weather information is provided from sensors outside of a vehicle. As shown below in annotated Figure 1, a weather center 101 receives weather-related information from various sources, including radar, temperature, wind, and other data sources 102-105 (e.g., "regional weather stations that provide air and pavement temperature, humidity, and other measurements."). Ex. PA-3, 3:21-38, Fig. 1. The weather center may also receive weather information from vehicle sensors, including temperature sensors. Ex. PA-3, 4:58-61.



FIG. 1

Vehicles 107-109 receive "weather hazard information from the weather center 101 pertaining to [each] vehicle's current and/or future predicted location." Ex. PA-3, 3:49-63. The vehicles may receive weather hazard information through a device installed in the vehicle or through an operator's cellular phone. Ex. PA-3, 3:60-63, 5:5-10 (stating the weather warnings can be received by the vehicle through an Internet interface or "at a cellular telephone 207 associated with the vehicle operator.").

17

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claims 2 and 3 are patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

> 3.     *Namburu* **in combination with** *Bosch* **and** *Breed* **raises an SNQ for claims 4, 5, and 14.**

As explained below in Section VI.C, a POSITA would have been motivated to combine the teachings of *Namburu* and *Bosch*. A POSITA would have further combined the teachings of these references with *Breed*, which discloses a variety of vehicle safety systems including a laser radar (lidar) system that scans a vehicle's environment by projecting laser beams outward from the vehicle and analyzing reflections of the lasers to identify nearby objects and to facilitate the vehicle's avoidance of such objects. Ex. PA-4, ¶¶[0242]-[0264], [0281]-[0286], [0521], [0620]-[0621], Figs. 21-25.

For example, as shown below in annotated Figures 22A and 22B, *Breed* discloses a laser radar system mounted at the four corners of a vehicle above the headlights and taillights. Ex. PA-4, ¶[0282], Figs. 22A, 22B. The laser radar system includes laser radar units 260 and 261, which "have a scan angle of approximately 150 degrees." *Id.*



Fig. 22A



Fig. 22B

*Breed*'s lidar system can image and identify all sensed objects in a "field of interest to the vehicle," which is "the field where all objects with which the vehicle can potentially collide reside." Ex. PA-4, ¶[0249]. Once an object has been identified, the potential for collision is assessed by a vehicle "control module, control unit or processor," which may activate vehicle

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

countermeasures such as a system alerting a driver of the object or a vehicle control system that alters the travel direction of the vehicle to avoid collision. Ex. PA-4, ¶¶[0250], [0521], [0621].

This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claims 4, 5, and 14 are patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

### 4. *Namburu* in combination with *Bosch* and *Boling* raises an SNQ for claim 8.

As explained below in Section VI.D, a POSITA would have been motivated to combine the teachings of *Namburu* and *Bosch*. A POSITA would have further combined the teachings of these references with *Boling*, which discloses a system for transmitting vehicle data through an information network and storing it in a database, including a "system for accessing vehicle data through a vehicle diagnostics data bus, transmitting the vehicle data to a central data server, and monitoring inventories of vehicles for vehicle financing entities based on the vehicle data." Ex. PA-5, ¶¶[0002], [0005]-[0010]. The vehicle information can be obtained, for example, through a "vehicle monitoring device 10" connected to the vehicle's "OBD interface connector 20," which is connected to the vehicle's "on-board diagnostics processor 22" (e.g., in the vehicle's on-board computer system). Ex. PA-5, ¶¶[0003], [0006], [0015], Fig. 1. The vehicle data may be transmitted over a wireless communication network 24 (e.g., a cellular network, ¶[0017]) to a "central vehicle data server 26" that may be either "multiple collocated server computers" or a **"cloud computing"** system comprising "multiple server computers distributed anywhere within the network 34." Ex. PA-5, ¶[0018]. These features of *Boling*'s system are shown in Figure 1 below. Ex. PA-5, Fig. 1, ¶¶[0015]-[0018].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



*FIG. 1*

This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claim 8 is patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

> **5.    *Namburu* in combination with *Bosch*, *Breed*, and *Holcman* raises an SNQ for claim 20.**

As explained below in Section VI.E, a POSITA would have been motivated to combine the teachings of *Namburu*, *Bosch*, and *Breed*. A POSITA would have further combined the

21

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

teachings of these references with *Holcman*, which discloses the use of geofencing for tracking the location of a vehicle within a predefined area. Specifically, *Holcman* discloses an apparatus and methods for wirelessly tracking assets such as vehicles, including through the use of a "dynamic creation of a GeoFence area in a wireless system." Ex. PA-6, ¶¶[0001], [0002]. *Holcman* explains that "GeoFence tracking is the monitoring of movement of targets such as personal assets, vehicles or personnel within a defined geographic boundary" such that when an "assigned target" moves into or out of a geographic boundary, an alert is created. Ex. PA-6, ¶[0002]. *Holcman* further states that "[a] GeoFence boundary is generally referenced to a fixed location." Ex. PA-6, ¶[0003].

In an exemplary use case, "a user driving to a restaurant can park his car outside the restaurant and activate the GeoFence device 1000, setting the dynamic GeoFence area relative to the instant reference point that's created by activating the GeoFence device 1000." Ex. PA-6, ¶[0024]. *Holcman* notes that the "characteristics of the dynamic GeoFence" may be "predefined" and may be "created without the need for the user to determine his present location or for him to define the perimeter of his dynamic GeoFence area." Ex. PA-6, ¶[0024]. Once the geofence is created, "if the car (i.e., the first tracked device) moves outside the dynamic GeoFence area, an alert message is sent to the GeoFence device 1000 (in the user's possession) to alert the user that his car has moved." Ex. PA-6, ¶[0024].

This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claim 20 is patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

**6.     *Chutorash* in combination with *Holcman* raises an SNQ for claims 1, 4, and 20.**

As explained below in Section VI.F, a POSITA would have been motivated to combine the teachings of *Chutorash* and *Holcman*. *Chutorash*[1] discloses a vehicle integrating a portable device with vehicle systems to provide "improved user interface features and/or connectivity features." Ex. PA-8, Abstract, ¶[0004]. Annotated Figure 1 shows a vehicle 100 that includes various subsystems integrated with a vehicle control system 106. Ex. PA-8, ¶[0046], Fig. 1.



FIG. 1

---

[1] The proposed invalidity grounds for *Chutorash* for claims 1 and 4 are consistent with the invalidity analysis for this reference in co-pending Reexamination No. 90/019,866. The co-pending Reexamination, unlike the present Request, does not address claim 20, which depends from claims 1 and 4 and which has been asserted in the concurrent district court litigation against Requester.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

As shown below in annotated Figure 3, a portable electronic device 116 "may

communicably couple to vehicle control system 106 via a wired or wireless connection" and

"may attach to or physically rest in a holder 302 configured to hold portable electronic device

116 and provide a physical connection (e.g., a power charging connection, a communication link

connection, etc.) to vehicle control system 106." Ex. PA-8, ¶[0050], Fig. 3. Through this

connection, information may be "transmitted between portable electronic device 116 and vehicle

control system 106." *Id*. For example, "vehicle control system 106 can provide information to

[the] portable electronic device 116 for additional processing." *Id*.



FIG. 3

*Chutorash*'s vehicle control system 106 "is capable of accessing data" from portable

electronic devices 116 and other remote sources 117. Ex. PA-8, ¶[0051], Fig. 4. The vehicle

control system 106 includes a communication device 120 for establishing communications with

various devices. Ex. PA-8, ¶¶[0052]-[0058]. Moreover, the vehicle control system 106 can

"interface with" and "utilize features and data" of the portable electronic device 116, which can

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

be a mobile phone, a personal digital assistant (PDA), a media player, a personal navigation

device (PND), a pager, or various other remote data sources. Ex. PA-8, ¶¶[0068], [0073], [0075].

The "processing system of portable device 116 may be configured to process information, files,

streams, or signals provided from vehicle control system 106 to portable device 116." Ex. PA-8,

¶[0094].

　　　　As shown in Figure 7 below, the vehicle control system 106 is configured to leverage the

computing capabilities of the portable device 116 by utilizing various modules and components

702-732 of the device. Ex. PA-8, ¶¶[0075]-[0091], Fig. 7. The vehicle system also provides two-

way interface control, where the "vehicle touch screen 742 may be used to provide touch screen

features to portable device 116." Ex. PA-8, ¶[0092].



FIG. 7

　　　　*Chutorash*'s vehicle system implements a communication network using multiple data

transmission methods, including both wired and wireless communication protocols. For example,

the vehicle control system 106 can communicate with components and device through "a

25

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

wireless communication link such as with a Bluetooth communications protocol, an IEEE 802.11 protocol . . . a cellular phone protocol . . . or any other suitable wireless technology," and/or through "wired communication link such as with USB technology . . . serial or parallel port technology, or any other suitable wired link." Ex. PA-8, ¶[0053]. The vehicle system further includes a vehicle data bus 1002 for communications between components. Ex. PA-8, ¶[0101].

*Chutorash*'s vehicle control system 106 also communicates with "vehicle subsystems 1004, 1006," which include sensors such as "a wheel speed sensor, a transmission, a GPS receiver, a compass, a light sensor, a rain sensor, a seating sensor, an occupancy sensor, an oxygen sensor, an impact sensor, a speed sensor, an emergency system, an air bag system, a gyroscope, a breathalyzer," and others. Ex. PA-8, ¶[0101]. The information from these vehicle subsystems "can be received at an interface communicably coupling the subsystem to the vehicle control system," and the vehicle control system 106 "may be configured to communicate" the information "to a portable electronic device brought into the vehicle." *Id.*

This combination raises an SNQ at least because a reasonable examiner would consider these references' disclosures to be important in deciding whether claim 20 is patentable, and because the combination was not cited or applied by the Examiner during prosecution of the '764 patent.

## VI.   CLAIMS 1-14, 19, AND 20 OF THE '764 PATENT ARE UNPATENTABLE

### A.   Ground 1: *Namburu* in combination with *Bosch* renders obvious claims 1, 6, 7, 9-13, and 19.

#### 1.   *Namburu*

*Namburu* discloses methods and systems for remote management of a vehicle. Ex. PA-2, ¶[0001]. The vehicle communicates with a "remote device," which "may be any suitable interface device providing an interactive interface to allow a user to manage the operation and

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

view diagnostic information regarding various systems in the vehicle 130." Ex. PA-2, ¶[0027].

The remote device may be a "remote console 110," which can be a cellular phone, PDA, or "any other suitable handheld device that may remotely and securely manage operations of a vehicle." Ex. PA-2, ¶[0040]. The remote console may be "communicatively coupled to a vehicle processing system" that "resid[es] within the vehicle 130" and may be attached to the vehicle through "a docking station or the like." Ex. PA-2, ¶[0029]. The "vehicle processing system" (e.g., on-board vehicle computer) "may be located on the interior front dash or any suitable location within the vehicle and may include a microprocessor or the like to manage the receiving, handling, storing, calculating, manipulating, or sending of information to/from the remote device." Ex. PA-2, ¶[0035]. The remote console "may wirelessly communicate with the vehicle processing system utilizing RF signals, Bluetooth, or via any applicable type of signal or other suitable method including routing signals through the remote server 120." Ex. PA-2, ¶[0029]. Figure 1 below shows the remote console 110, remote server 120, and vehicle 130. Ex. PA-2, ¶[0027], Fig. 1; Ex. C, ¶64.



27

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

The remote console can "provide secure, personalized access to a vehicle's systems via a remote interface, such as via a remote server." Ex. PA-2, ¶[0046]. The user may perform a variety of operations in the vehicle including logging into and activating the system; checking the status of various systems in the vehicle such as a "fuel reading, an odometer reading, and other standard dashboard features"; and controlling numerous vehicle functions such as remotely starting the vehicle, locking or unlocking doors, and remotely updating vehicle software. Ex. PA-2, ¶[0046]; Ex. C, ¶65.

*Namburu* also discloses a variety of vehicle sensors such as "sensors detecting external temperature, sunlight, and other environmental conditions" outside the vehicle. Ex. PA-2, ¶[0067]. *Namburu* further discloses that components of the vehicle's systems, such as an exhaust sensor, are "coupled to a processor 220" of the vehicle processing system "to analyze performance data including any data related to or generated by a vehicle system." Ex. PA-2, ¶[0036].

*Namburu* is analogous art to the '764 patent, which as previously noted, relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶67. *Namburu* is from the same field of endeavor as the claimed invention, since like the '764 patent, it "relates generally to the field of vehicle systems and, more specifically, to methods and systems for remote management of a vehicle." Ex. PA-2, ¶[0001]; Ex. C, ¶67. *Namburu*'s system includes connecting and interfacing numerous vehicle systems and components, including through a remote network interface between a vehicle and a device such as a mobile phone. Ex. PA-2, ¶¶[0027], [0035], [0046]. *Namburu*'s disclosure of a system for connecting and controlling a variety of vehicle systems is also reasonably pertinent to the

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

problems faced by the '764 inventor, who addressed issues relating to connecting and interfacing numerous vehicle systems and user devices, including through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶67.

### 2.  *Bosch*

*Bosch* discloses a "mobile interface for controlling a plurality of vehicle functions in a motor vehicle using a controller connected to the vehicle, having a wireless data interchange with a controller, an input apparatus, and an energy store." Ex. PA-1, Abstract, ¶[0002]. The interface may be "in the form of a mobile telephone and/or PDA." Ex. PA-1, ¶[0028].

*Bosch* further discloses that, "[i]n one particularly preferred embodiment, the system contains a docking station for the interface. The docking station may be designed to charge the energy store of the interface." Ex. PA-1, ¶[0053]; *see also* ¶[0079] (stating the "energy store 12" (e.g., battery) of the interface is connected to "contacts 18 for charging via a docking station"); Ex. C, ¶69. The docking station may also "be designed such that where the interface is connected to the docking station the wireless data interchange in the interface and in the controller are deactivated, with the docking station undertaking the task of connecting interface and controller for the purpose of data interchange." Ex. PA-1, ¶[0053].

As shown in annotated Figure 4 below, *Bosch* depicts a **docking station 20** for an **interface 2** that includes a **power connection 22** to the vehicle's **controller 1**. Ex. PA-1, ¶¶[0093]-[0094], Fig. 4; Ex. C, ¶70.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



*Bosch* is analogous art to the '764 patent, which as previously noted, relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶71. *Bosch* is from the same field of endeavor as the claimed invention, since like the '764 patent, it relates to a mobile interface that can connect to, monitor, and control a "plurality of vehicle functions using a controller connected to the vehicle." Ex. PA-1, ¶¶[0002]; Ex. C, ¶71. *Bosch*'s system includes connecting and interfacing numerous vehicle systems and components, including through an interface ("in the form of a mobile telephone and/or PDA") that can be docked with and connected to the vehicle's systems. Ex. PA-1, ¶¶[0028], [0053], [0067]. *Bosch*'s disclosure of a system for connecting and controlling a variety of vehicle systems is also reasonably pertinent to the problems faced by the '764 inventor, who addressed issues relating to connecting and interfacing numerous vehicle systems and user devices, including through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶71.

30

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

### 3.    Independent Claim 1

The combination of *Namburu* and *Bosch* renders obvious each element of claim 1. *Namburu* discloses each element of claim 1 except for the "power control module," which is disclosed by *Bosch*, and a POSITA would have been motivated to incorporate the power control module of *Bosch* into *Namburu*'s vehicle as described below in Claim 1(d). Ex. C, ¶72.

### a.    Claim 1(pre): A vehicle system, comprising:

*Namburu* discloses a vehicle system allowing a user to remotely monitor and control various aspects of a vehicle that includes the vehicle (e.g., vehicle 130) and a "remote device" such as "remote console 110 and/or remote server 120." Ex. PA-2, Abstract, ¶[0001] (stating the patent "relates generally to the field of vehicle systems"), ¶[0027] (describing a vehicle system that "allow[s] a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130."). Figure 1 below shows an exemplary vehicle system including remote console 110, remote server 120, and vehicle 130. Ex. PA-2, ¶[0027], Fig. 1; Ex. C, ¶73.



FIG. 1

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

*Namburu*'s vehicle, modified in view of *Bosch*, also includes a vehicle system. Ex. C, ¶¶73-74.

### b.    Claim 1(a): a vehicle;

*Namburu* discloses a vehicle (e.g., vehicle 130). Ex. PA-2, Abstract, ¶[0027], Fig. 1.



FIG. 1

*Namburu*'s vehicle, modified in view of *Bosch*, is similarly "a vehicle." Ex. C, ¶¶75-76.

### c.    Claim 1(b): a communication network;

*Namburu* discloses a communication network facilitating data transmissions both between the systems within a vehicle and between the vehicle and other devices and systems, such as *Namburu*'s remote console 110 and remote server 120. Ex. PA-2, ¶¶[0027]-[0029]; Ex. C, ¶77. Within the vehicle, *Namburu*'s "vehicle processing system" is "coupled to and may execute operation of at least one vehicle system." Ex. PA-2, ¶[0035]. The components of a vehicle system (e.g., an engine controller, climate control system, or vehicle entertainment systems) are "coupled to a processor 220" of the vehicle processing system, allowing it "to

32

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

analyze performance data including any data related to or generated by a vehicle system." Ex.

PA-2, ¶[0036].

*Namburu*'s communication network also encompasses data transmissions between the

vehicle processing system and remote devices such as remote console 110 and remote server

120. Ex. PA-2, Abstract ("[T]he processor [of an apparatus for remotely managing a vehicle

setting] is in communication with a vehicle processing system operable to execute a vehicle

setting associated with the at least one user profile."). *Namburu*'s vehicle's processing system

includes a "microprocessor or the like to manage the receiving, handling, storing, calculating,

manipulating, or sending of information to/from the remote device," such as *Namburu*'s remote

console 110 or remote server 120. Ex. PA-2, ¶[0035]. *Namburu*'s remote console 110 "may be in

communication with or coupled to a vehicle 130," including by "wirelessly communicat[ing]

with the vehicle processing system utilizing RF signals, Bluetooth, or via any applicable type of

signal or other suitable method including routing signals through the remote server 120." Ex.

PA-2, ¶[0029]. The remote console can also "communicate with the vehicle through any

conventional communication layer, with or without remote server 120 directly involved in the

communication." Ex. PA-2, ¶[0039]. The remote console itself may be a cellular phone, which a

POSITA would understand to have its own cellular networking capabilities. Ex. PA-2, ¶[0040].

*Namburu*'s vehicle may also include "an integrated cellular phone system." Ex. PA-2, ¶[0035].

This is consistent with the '764 patent's description of a "communication network" as "a

collection of communication components capable of one or more of transmission, relay,

interconnect, control, or otherwise manipulate information or data from at least one transmitter to

at least one receiver." Ex. A, 4:59-5:17. The '764 patent further notes that a "communication

network" may span multiple communication systems and protocols, including "a range of

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

systems supporting point-to-point to broadcasting of the information or data" that "may include wired and/or wireless network having a pre-set to an ad hoc network structure." Ex. A, 4:59-5:17. The communication network 224 described in the '764 patent, for example, encompasses both "a local area communication capability" (e.g., a Bluetooth wireless system, an 802.11G wireless system, or a CAN bus in the vehicle) and a "wide area communication capability" (e.g., a cellular or wireless WAN communication system). Ex. A, 10:45-64.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a communication network. Ex. C, ¶¶77-80.

### d.    Claim 1(c): a vehicle control system;

*Namburu* discloses a vehicle control system. For example, as discussed above, *Namburu* discloses a "vehicle processing system" that "may be located on the interior front dash or any suitable location within the vehicle and may include a microprocessor or the like to manage the receiving, handling, storing, calculating, manipulating, or sending of information to/from the remote device." Ex. PA-2, ¶[0035]. The vehicle processing system is "coupled to the vehicle" and "may further be coupled to and may execute operation of at least one vehicle system." *Id.* Exemplary vehicle systems to which the vehicle processing system is connected "include, but are not limited to, an engine controller, a climate control system, an integrated cellular phone system, a sound system (radio), a global positioning system (GPS) receiver, and a video entertainment center (such as a DVD player)." *Id.*

34

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

A "vehicle system"[2] connected to the vehicle processing system may have one or more

components coupled to a processor "to analyze performance data including any data related to or

generated by a vehicle system." Ex. PA-2, ¶[0036]. For example, "an exhaust system may

provide a sensor to measure the percentage of gas (e.g., emissions related gas, carbon dioxide) in

the exhaust. The performance data, such as level of carbon dioxide, for example, may be utilized

for diagnostics and/or adjustment of the vehicle's systems." Ex. PA-2, ¶[0036]. The

"performance data may also be stored so that a user or a third party may analyze the performance

data at a later time." Ex. PA-2, ¶[0036].

The vehicle may include one or more processors coupled to the vehicle's system

components. Ex. PA-2, ¶[0035]. In the exemplary embodiment of the vehicle processing system

shown below in annotated Figure 2B, a single central processor 240 is "coupled to multiple

components 250 in the vehicle." Ex. PA-2, ¶[0037], Fig. 2A-C; Ex. C, ¶83.

---

[2] Namburu uses the phrase "vehicle system" in a narrower context compared to the broader

"vehicle system" recited in claim 1. Ex. C, ¶82, n.1. As discussed above for claim 1(pre),

Namburu discloses a "vehicle system" as claimed in the '764 patent (which comprises, e.g., a

vehicle, communication network, vehicle control system, device, and plurality of sensors), and

that vehicle system includes the narrower "vehicle system" expressly discussed in Namburu (*see*,

*e.g.*, Ex. PA-2, ¶[0036] ("A vehicle system may include at least one or several components 210

to perform a specified function for the vehicle.")).

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



**FIG. 2B**

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle control system. Ex. C, ¶¶81-84.

### e.    Claim 1(d): a power control module;

*Namburu* discloses a docking station in its vehicle for connecting the vehicle to a remote console 110 that is "communicatively coupled to a vehicle processing system," where the docking station "serve[s] as a place of attachment for the remote console 110." Ex. PA-2, ¶[0029]. *Namburu* does not expressly describe whether its docking station provides electrical power to the remote console, which may be a cellular phone, PDA, or "any other suitable handheld device that may remotely and securely manage operations of a vehicle." Ex. PA-2, ¶[0040]; Ex. C, ¶85.

*Bosch* discloses a docking station in a vehicle for a "mobile interface for controlling a plurality of vehicle functions in a motor vehicle." Ex. PA-1, Abstract, ¶[0002]. The interface may be "in the form of a mobile telephone and/or PDA." Ex. PA-1, ¶[0028]. *Bosch*'s docking station is "designed to charge the energy store" (e.g., battery) "of the interface." Ex. PA-1, ¶[0053]; *see also* ¶[0079] (stating the "energy store 12" of the interface is connected to "contacts 18 for charging via a docking station"); Ex. C, ¶86. The docking station may also "be designed such that where the interface is connected to the docking station the wireless data interchange in

36

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

the interface and in the [vehicle] controller are deactivated, with the docking station undertaking

the task of connecting interface and [vehicle] controller for the purpose of data interchange." Ex.

PA-1, ¶[0053].

As shown in annotated Figure 4 below, *Bosch* depicts a **docking station 20** for an

**interface 2** that includes a **power connection 22** to the vehicle's **controller 1**. Ex. PA-1,

¶¶[0093]-[0094], Fig. 4; Ex. C, ¶87.



Modifying *Namburu*'s vehicle docking station for the remote console to incorporate the

electrical charging apparatus and capabilities of *Bosch*, such as the exemplary docking station 20

with power connection 22 described above, would yield a "power control module" within the

vehicle system. Ex. C, ¶88. The '764 patent broadly defines a "module" as "any known or later

developed hardware, software, firmware, artificial intelligence, fuzzy logic, or combination of

hardware and software that is capable of performing the functionality associated with that

element." Ex. A, 6:48-52. The patent further provides an exemplary power control module that

can "include a battery, an AC to DC converter, power control logic, and/or ports for

interconnecting the device 212 to an external source of power." Ex. A, 16:64-17:4. *Namburu*'s

37

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

docking station (modified to incorporate the electrical charging capability of *Bosch*) provides an external source of power to *Namburu*'s remote console attached to the docking station and is thus a "power control module." Ex. C, ¶88.

A POSITA would have been motivated to modify the docking station in *Namburu*'s vehicle to incorporate the mobile device charging capabilities of the docking station disclosed in *Bosch*. Ex. C, ¶89. A POSITA would have been modified *Namburu*'s docking station in this manner to obtain the aforementioned benefits of doing so described by *Bosch*, including allowing a user of *Namburu*'s system to charge the battery ("energy store") of the remote console attached to *Namburu*'s vehicle, thereby allowing the remote console to operate within the vehicle for longer than if it ran only on internal battery power. Ex. PA-1, ¶[0053]; Ex. PA-2, ¶[0029]; Ex. C, ¶89. A POSITA would also have understood that allowing the docking station to charge *Namburu*'s remote console would allow the battery life of the remote console to last longer when the remote console is removed from the vehicle than if the docking station did not provide a power charging capability. Ex. C, ¶89.

Modifying *Namburu*'s docking station in this manner would have been well within a POSITA's capability, requiring only routine skill, knowledge, and standard vehicle production and manufacturing techniques. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-417, 421 (2007); Ex. C, ¶90. It would also have combined prior art methods according to known methods to yield predictable results. *KSR*, 550 U.S. at 416-417, 421; Ex. C, ¶90. A POSITA would have made the combination with a reasonable expectation of success, as the use of docking stations and other electrical charging apparatuses within a vehicle to power and recharge the battery of a portable device was well known and ubiquitous in the art and industry by 2011. *See, e.g.*, Ex. PA-7, 8:48-9:9 (*Schuyler*, a patent from 2002, disclosing a vehicle control system including "port 77," which

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

is "provided for vehicle owners to directly plug in a portable cell phone 79" where the port "provides power and electrical communication between a vehicle's on-board computer system 81 and the portable cell phone 79."); Ex. C, ¶90.

*Namburu*'s vehicle, modified in view of *Bosch*, includes "a power control module." Ex. C, ¶¶85-91.

### f. Claim 1(e): a device configured to communicate with the vehicle control system, the device connected to the power control module and attached to the vehicle; and

*Namburu* discloses a device (e.g., a "remote console") configured to communicate with a vehicle control system (e.g., the "vehicle processing system"). The remote console may be "any suitable interface device providing an interactive interface to allow a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130," such as a cellular phone or PDA. Ex. PA-2, ¶¶[0027], [0040]. The remote console "may be in communication with or coupled to a vehicle 130," including being "communicatively coupled to" a vehicle control system (e.g., the "vehicle processing system") within the vehicle. Ex. PA-2, ¶[0029]. As noted above, *Namburu*'s vehicle control system ("vehicle processing system") includes a processor to "manage the receiving, handling, storing, calculating, manipulating, or sending of information to/from the remote device," such as the remote console 110. Ex. PA-2, ¶[0035]. The vehicle processing system is further coupled to components of vehicle systems such that it can control "operation of at least one vehicle system," and the processing system can exchange "vehicle settings/preferences which corresponds to the operation of the vehicle and associated vehicle system(s)" with the remote console. Ex. PA-2, ¶[0035]. Figure 1 below shows an exemplary vehicle system including remote console 110 (depicted in a detached state from the vehicle), remote server 120, and vehicle 130. Ex. PA-2, ¶[0027], Fig. 1; Ex. C, ¶92.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 1

*Namburu*'s device (remote console) may be attached to the vehicle through a docking station. Ex. PA-2, ¶[0029] ("[T]he vehicle 130 may also provide a docking station or the like to serve as a place of attachment for the remote console 110."). As discussed above for claim 1(d), a POSITA would have been motivated to modify *Namburu*'s docking station to incorporate the electrical charging capabilities of *Bosch*'s docking station such that the docking station and associated electrical connectivity capabilities constitute a "power control module" providing electrical power to *Namburu*'s attached remote console. Ex. C, ¶93. When *Namburu*'s remote console 110 is docked in *Namburu*'s modified docking station, and thereby attached to the vehicle, the remote console 110 is thus attached to the power control module. Ex. C, ¶93.

*Namburu*'s vehicle, modified in view of *Bosch*, includes "a device configured to communicate with the vehicle control system, the device connected to the power control module and attached to the vehicle." Ex. C, ¶¶92-94.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

g.    **Claim 1(f): a plurality of sensors configured to communicate via the communication network with the vehicle control system and the device, wherein**

*Namburu* discloses a plurality of sensors in the vehicle. For example, *Namburu* states that "several sensors may be present in a vehicle, such as $O_2$ sensors and mass air flow (MAF) sensors, which may provide diagnostic data to the processors in the various automotive systems." Ex. PA-2, ¶[0004]. *Namburu* further discloses a vehicle system that includes "one or several components 210 to perform a specified function for the vehicle" such as an exhaust sensor measuring the percentage of gas in the vehicle's exhaust. Ex. PA-2, ¶[0036]. *Namburu* also discloses "sensors detecting external temperature, sunlight, and other environmental conditions" outside the vehicle. Ex. PA-2, ¶[0067].

*Namburu*'s plurality of sensors are configured to communicate via the communication network with the vehicle control system. As noted above, the '764 patent's claimed "communication network" encompasses communication networks both within and outside the vehicle, including internal vehicle data networks such as a CAN bus. Ex. A, 4:59-5:17, 10:45-64. *Namburu* discloses that the "components 210 of a system," which include vehicle sensors such as an exhaust sensor, are "coupled to a processor 220" of the vehicle processing system "to analyze performance data including any data related to or generated by a vehicle system." Ex. PA-2, ¶[0036]. *Namburu* further discloses that one or more processors can be "coupled to" a "single or multiple components 210 in the vehicle," as well as that the processors "may also be coupled to one another to allow data communication between the processors." Ex. PA-2, ¶[0036]. For example, "a first processor retrieving performance data from an exhaust system may provide the performance data to a second processor managing a fuel injection system." Ex. PA-2, ¶[0036]. Moreover, in an embodiment where a single processor is coupled to multiple

41

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

components (e.g., sensors) in the vehicle, "communication of diagnostic data may be simplified." Ex. PA-2, ¶[0037]. In the exemplary embodiment of the vehicle processing system shown below in annotated Figure 2B, a single central processor 240 is "coupled to multiple components 250 in the vehicle," with vehicle components including sensors. Ex. PA-2, ¶¶[0036]-[0037], Fig. 2A-C; Ex. C, ¶96.



*FIG. 2B*

*Namburu* thus discloses vehicle sensors that communicate with the vehicle control system (*Namburu*'s "vehicle processing system") over a communication network, including by being communicatively "coupled to" the vehicle processing system. Ex. PA-2, ¶¶[0035]-[0038]. A POSITA would have understood, for example, that vehicle components (and their associated electronic control units) conventionally transmit and receive data from on-board vehicle computers through a vehicle's Controller Area Network (CAN) bus. *See generally* Ex. PA-9 at 92-105 (describing the CAN data bus as "the standard system in the automotive sector"); Ex. PA-10, ¶[0044] (describing a vehicle microprocessor "in communication with a vehicle data bus that provides access to various vehicle modules" that can be "a CAN bus"); Ex. C, ¶97. Indeed, vehicles with CAN bus networks have been in mass production since the early 1990s. Ex. PA-9

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

at 92 ("In 1991 the CAN bus (Controller Area Network) was the first bus system to be introduced to a motor vehicle in mass production.").

*Namburu*'s plurality of sensors are also configured to communicate via the communication network with a device (e.g., *Namburu*'s remote console). As discussed above, the remote console "may wirelessly communicate with the vehicle processing system utilizing RF signals, Bluetooth, or via any applicable type of signal or other suitable method including routing signals through the remote server 120." Ex. PA-2, ¶[0029]. The vehicle sensors (coupled to the vehicle processing system) also provide data to the remote console. Ex. C, ¶98. For example, *Namburu*'s remote device "may warm up, defrost, and control other climate control settings for the user" based on user vehicle climate control preferences determined by "[u]tilizing sensors detecting external temperature, sunlight, and other environmental conditions." Ex. PA-2, ¶[0067].

Additionally, *Namburu*'s Figure 7, annotated below, depicts an exemplary flow diagram of a method for remotely managing a vehicle with a remote device (e.g., a remote console). Ex. PA-2, ¶¶[0058]-[0066], Fig. 7; Ex. C, ¶99.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



**FIG. 7**

As shown in the flow chart above, the remote device (e.g., remote console) can "query the vehicle for a current state in step 800." Ex. PA-2, ¶[0066]. The vehicle state information may include outdoor temperature information (Ex. PA-2, ¶[0066]), such as the data obtained from *Namburu*'s vehicle "sensors detecting external temperature" (Ex. PA-2, ¶[0067]). In response to receiving the query from the remote console, the "vehicle may respond to the query by sending the requested data to the remote device in step 810." Ex. PA-2, ¶[0066]. The vehicle sensor data is thus sent from the vehicle to the remote console. Ex. C, ¶100.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a "plurality of sensors configured to communicate via the communication network with the vehicle control system and the device vehicle control system." Ex. C, ¶¶95-101.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

h.    **Claim 1(g): wherein the vehicle control system is configured to use computing capability of the device.**

*Namburu*'s vehicle control system (e.g., the "vehicle processing system") is configured to use computing capability of the device (e.g., *Namburu*'s "remote console") in several ways. Ex. C, ¶102. For example, *Namburu* discloses using the remote console to update the software of the vehicle processing system and to perform advanced processing of vehicle data. Ex. PA-2, ¶¶[0032], [0047] (describing remote console 110 functionality including "connect[ing] to the vehicle's processing system [to] perform software updates, execute advanced data-processing, and complete other advanced tasks."). This processing constitutes a vehicle control system using the computing capability of a device. Ex. C, ¶102.

Moreover, as explained above regarding the prosecution history of the '764 patent, the Applicant during prosecution represented to the Examiner that paragraph [0073] of the as-filed '764 specification relates to the claim clause, "the vehicle control system is configured to use computing capability of the device." Ex. B, 131-137. Paragraph [0073] describes a user interacting with the '764 patent's vehicle control system through the device, as well as the device including user data such as "preferences data, bioinformatics, [and] data associated with the user 216." Ex. B, 42.

*Namburu*'s vehicle processing system similarly uses the computing capability of the remote console to identify and authenticate users attempting to access, monitor, and control vehicle systems. Ex. PA-2, ¶[0030]. The remote console, for example, "may receive an identification (ID) code allowing verification of a user's authority to operate systems in the vehicle 130." *Id.* Such user verification "may occur when a match exists between an ID code received and a stored ID code corresponding to a particular user," with ID information including user biometrics, an RFID tag, a user-entered code, or any other "suitable security method." *Id.*

45

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

Once the remote console receives the user's ID code and authenticates the user, "the user may view or manage systems in the vehicle 130." *Id.* The remote console can also transmit user profile and preference data to the vehicle. *Id.*, ¶[0031]. *Namburu*'s disclosure of the remote console allowing the user to access and control the vehicle's systems, as well as to provide user preference data to the vehicle, constitutes the vehicle control system using the computing capability of the device. Ex. C, ¶104; Ex. B, 42, 131-137.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle "wherein the vehicle control system is configured to use computing capability of the device." Ex. C, ¶¶102-105.

> **4.      Claim 6: The vehicle system according to claim 1, wherein the communication network is a wireless system operable to communicate inside and outside the vehicle.**

As discussed above for claim 1(b), *Namburu* discloses a vehicle communication network encompassing a variety of data transmission systems and methods, including a communication system allowing *Namburu*'s remote console to "wirelessly communicate with the vehicle processing system utilizing RF signals, Bluetooth, or via any applicable type of signal or other suitable method including routing signals through the remote server 120." Ex. PA-2, ¶[0029]. The remote console can also "communicate with the vehicle through any conventional communication layer, with or without remote server 120 directly involved in the communication." Ex. PA-2, ¶[0039]. The remote console itself may be a cellular phone, which a POSITA would understand to have its own cellular networking capabilities. Ex. PA-2, ¶[0040]. *Namburu*'s vehicle may also include "an integrated cellular phone system." Ex. PA-2, ¶[0035].

A POSITA would have understood that *Namburu*'s wireless communication systems and methods in the vehicle, including Bluetooth and a cellular phone system, are "a wireless system operable to communicate inside and outside the vehicle." Ex. C, ¶¶106-107. A POSITA would

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

have understood, for example, that a remote console (e.g., cellular phone) attached to the vehicle via *Namburu*'s docking station would be able to wirelessly communicate with receivers both within the vehicle (e.g., communicating with the vehicle processing system via Bluetooth, Ex. PA-2, ¶[0029]) and outside of the vehicle (e.g., communicating to a Bluetooth receiver outside of the vehicle but within Bluetooth range). Ex. C, ¶107. *Bosch*, for example, discloses the use of a Bluetooth "wireless data interchange" for a vehicle that "may advantageously have a range of between 5 m and 1 km, particularly advantageously between 10 m and 300 m. Wireless data interchange with a controller integrated in the vehicle is thus also possible from outside the vehicle." Ex. PA-1, ¶¶[0011], [0067].

Similarly, a POSITA would have understood that a remote console using a cellular network would communicate with an external system (e.g., remote server 120) both from within the vehicle (e.g., when the remote console is docked to the vehicle) and from outside the vehicle over the cellular network. Ex. PA-2, ¶[0029] (describing the remote console "routing signals through the remote server 120" to the vehicle processing system), ¶[0034] ("the remote console 110 may communicate directly with the vehicle 130 or via a remote server 120."), ¶[0039] (the remote console "may communicate with the vehicle through any conventional communication layer, with or without remote server 120 directly involved in the communication."); Ex. C, ¶108. Cellular communication networks were a "conventional communication layer" (Ex. PA-2, ¶[0039]) at least by November 2011, and a POSITA would have additionally understood that *Namburu*'s remote console could have communicated with the vehicle, for example, by communicating with *Namburu*'s "integrated cellular phone system." Ex. PA-2, ¶[0035]; Ex. C, ¶108. A cellular communication network is thus another wireless system "operable to communicate inside and outside the vehicle." Ex. C, ¶108.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the communication network is a wireless system operable to communicate inside and outside the vehicle." Ex. C, ¶¶106-109.

5.     **Claim 7: The vehicle system according to claim 1, wherein the vehicle control system is configured to communicate through the communication network to a server positioned outside the vehicle.**

As discussed above for claims 1(b) and 6, *Namburu* discloses a vehicle system including a communication network that allows the vehicle control system (e.g., *Namburu*'s "vehicle processing system") to communicate through the communication network to a server (e.g., remote server 120) positioned outside the vehicle. *Namburu* Figure 1 below shows an exemplary vehicle system including remote console 110 (depicted in a detached state from the vehicle), remote server 120, and vehicle 130. Ex. PA-2, ¶[0027], Fig. 1; Ex. C, ¶110.



*Namburu*'s remote server 120 is a "remote device" that provides "an interactive interface to allow a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130." Ex. PA-2, ¶[0027]. The remote server may be "any conventional

computer or network system as will be familiar to one of skill in the art. The remote server 120

may include various elements such as memory (e.g., random access memory (RAM), read-only

memory (ROM)), one or more processing resources such as a central processing unit (CPU),

network ports for communicating with external devices, input and output (I/O) devices (e.g., a

keyboard, a mouse, a video display), or the like." Ex. PA-2, ¶[0028]. A POSITA would have

understood that the "remote server 120," which can be a "remote server" or a "conventional

computer" such as a personal computer, is "positioned outside the vehicle." Ex. C, ¶111.

*Namburu*'s vehicle processing system communicates with remote server 120, for

example, to "receive" or "provide the vehicle settings/preferences which corresponds to the

operation of the vehicle and associated vehicle system(s)." Ex. PA-2, ¶[0035]. A user of the

remote server can access the vehicle by "launching the remote server interface" and logging in

"with a username and/or password to validate the privilege to access" the vehicle information.

Ex. PA-2, ¶[0059].

As discussed above for claim 6, *Namburu* discloses a communication network

encompassing wireless communication systems such as a cellular communication network and

Bluetooth. Ex. C, ¶113. For example, a POSITA would understand that *Namburu*'s vehicle

processing system could communicate with remote server 120 through a cellular network, which

was conventional by November 2011, and it could alternatively communicate to the remote

server via Bluetooth if the remote server is in Bluetooth range of the vehicle. Ex. C, ¶113.

Moreover, *Namburu*'s remote console 110 and remote server 120 may both be used to

communicate with the vehicle processing system. *See, e.g.,* Ex. PA-2, ¶[0029] (describing the

remote console "routing signals through the remote server 120" to the vehicle processing

system), ¶[0034] ("the remote console 110 may communicate directly with the vehicle 130 or via

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

a remote server 120."), ¶[0039] (the remote console "may communicate with the vehicle through any conventional communication layer, with or without remote server 120 directly involved in the communication."); Ex. C, ¶113. In one alternative embodiment, *Namburu* discloses that "the vehicle 130 may communicate with the remote server 120 directly without communication via the remote console 110," such as in the event of an "operational failure of the remote console 110," allowing a user to "access the remote server 120 (e.g., via a web console) and information stored thereon to remotely manage vehicle operations." Ex. PA-2, ¶[0033]. Each of these methods and options for communicating between *Namburu*'s vehicle processing system and remote server 120 are examples of a vehicle control system communicating with a remote server outside the vehicle over a communication network. Ex. C, ¶113.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the vehicle control system is configured to communicate through the communication network to a server positioned outside the vehicle." Ex. C, ¶110-114.

> **6.    Claim 9: The vehicle system according to claim 7, wherein the server comprises stored data, the stored data comprises data associated with one or more users or associated with one or more vehicles, and the stored data being exchanged and accessible by a plurality of authorized vehicles or authorized users.**

As discussed above for claim 7, *Namburu* discloses a server (e.g., remote server 120) in communication with the vehicle control system (e.g., vehicle processing system). Ex. C, ¶115. *Namburu*'s remote server 120 comprises stored data associated with one or more users and one or more vehicles. For example, *Namburu* discloses that its remote server is a "remote device" that provides "an interactive interface to allow a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130." Ex. PA-2, ¶¶[0027]. The remote server is "operable to" perform several functions, including to receive, store, and utilize

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

"any form of information, intelligence, or data related to systems/operations of a vehicle such as an automobile." Ex. PA-2, ¶[0027]; *see also* ¶[0033] ("[A] user may access the remote server 120 (e.g., via a web console) and information stored thereon to remotely manage vehicle operations."). The remote server may include "various elements such as memory (e.g., random access memory (RAM), read-only memory (ROM))" for storing the data. Ex. PA-2, ¶[0028].

The data that can be stored in *Namburu*'s remote server includes "data associated with one or more users or associated with one or more vehicles" such as user profile data including "any information/data related to the vehicle or vehicle system(s) associated with an individual user or vehicle occupant." Ex. PA-2, ¶[0031]. A driver, for example, can "create a user profile to store all vehicle settings and data related to any vehicle system corresponding specifically to the driver, including vehicle settings preferred by the driver." *Id.* The profile data can be "stored and executed separately from a user profile corresponding to a front passenger, for example." *Id.* Different individuals may be assigned separate ID codes, "thereby allowing the selection of a particular user profile matching the individual." *Id.* Such data is stored in the remote server "in various suitable forms such as by way of look-up tables." Ex. PA-2, ¶[0062].

The stored data on *Namburu*'s remote server 120 is exchanged and accessible by a plurality of authorized users and authorized vehicles. Ex. C, ¶117. For example, *Namburu*'s remote server can transfer the aforementioned user profile data to a vehicle, thus making the stored data "exchanged" and "accessible by" multiple users of the vehicle. Ex. PA-2, ¶[0031]. The stored server data also includes user ID information, such as a "stored ID code corresponding to a particular user" that is compared to a user's provided ID information to authenticate the user to access the vehicle's systems. Ex. PA-2, ¶[0030]. Users can remotely log into the remote server interface, for example, by entering a user's ID and password to view and

51

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

change vehicle settings. Ex. PA-2, ¶[0059], *see also* ¶[0033] ("a user may access the remote

server 120 (e.g., via a web console) and information stored thereon to remotely manage vehicle

operations."). Users may have separate accounts with different permission levels, such as an

administrative account for a parent and a "sub-user" account with more limited privileges (e.g., a

child). Ex. PA-2, ¶[0062].

Given *Namburu*'s disclosure of a web console allowing users to log into the remote

server to access a vehicle's systems, a POSITA would understand that the data of multiple users

would be stored in the remote server such that it is exchanged with (and accessible to) those

users. Ex. C, ¶118. For example, a POSITA would understand that, in order to provide

*Namburu*'s described functionality regarding the use of multiple user accounts (including a

primary and a sub-user account) and to be able to authenticate the log-in credentials of each

account, *Namburu*'s system includes the data for multiple users, which can be stored, accessed,

and exchanged within the server. Ex. C, ¶118. At a minimum, a POSITA would have found it

obvious to store the data for multiple user accounts within the remote server to allow the system

to more efficiently and quickly access the stored information, as well as to make that data

accessible to multiple users. Ex. C, ¶118.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the

server comprises stored data, the stored data comprises data associated with one or more users or

associated with one or more vehicles, and the stored data being exchanged and accessible by a

plurality of authorized vehicles or authorized users." Ex. C, ¶¶115-119.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

       7.      **Claim 10: The vehicle system according to claim 1, wherein the communication network is a wide area communication network configured to allow the vehicle control system to communicate outside the vehicle, the communication network is one or more of the following: cellular communication network, satellite telephone communication network, and wireless wide area network.**

As discussed above for claim 1(b) and claim 6, *Namburu* discloses a vehicle communication network that includes a wide-area communication network allowing the vehicle control system (e.g., "vehicle processing system") to communicate outside the vehicle. Ex. C, ¶120. For example, *Namburu*'s vehicle processing system can communicate with (e.g., send data to/from) a remote server 120. *See, e.g.*, Ex. PA-2, ¶[0027] (*Namburu*'s remote server 120 providing "an interactive interface to allow a user to manage the operation and view diagnostic information regarding various systems in the vehicle 130."), ¶[0029] (describing the remote console "routing signals through the remote server 120" to the vehicle processing system), ¶[0033] (disclosing that "vehicle 130 may communicate with the remote server 120 directly without communication via the remote console 110," such as in the event of an "operational failure of the remote console 110," allowing a user to "access the remote server 120 (e.g., via a web console) and information stored thereon to remotely manage vehicle operations."); ¶[0034] ("the remote console 110 may communicate directly with the vehicle 130 or via a remote server 120."), ¶[0039] (the remote console "may communicate with the vehicle through any conventional communication layer, with or without remote server 120 directly involved in the communication."); Ex. C, ¶120.

*Namburu*'s vehicle includes a cellular communication network (e.g., a "wide area communication network configured to allow the vehicle control system to communicate outside the vehicle"). Ex. C, ¶121. For example, *Namburu*'s vehicle includes "an integrated cellular phone system." Ex. PA-2, ¶[0035]. *Namburu*'s remote console 110, which as noted above can

53

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

transmit data to/from the remote server 120 in addition to the vehicle processing system, can be a cellular phone that a POSITA would understand has its own networking capabilities. Ex. PA-2, ¶[0040]; Ex. C, ¶121. As noted above, cellular communication networks were a "conventional communication layer" (Ex. PA-2, ¶[0039]) at least by November 2011, and a POSITA would have understood that the communications between *Namburu*'s remote server 120 and the vehicle processing system would occur via a cellular network, either through the vehicle's "integrated cellular phone system" (Ex. PA-2, ¶[0035]) or the cellular network of the remote console (Ex. PA-2, ¶[0040]). Ex. C, ¶121.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system with a "wide area communication network configured to allow the vehicle control system to communicate outside the vehicle, the communication network is one or more of the following: cellular communication network, satellite telephone communication network, and wireless wide area network."). Ex. C, ¶¶120-122.

8.    **Claim 11: The vehicle system according to claim 1, wherein the device is a mobile device, the mobile device configured to be permanently or removably positioned inside the vehicle.**

As discussed above for claim 1, *Namburu*'s device (e.g., remote console 110) is a mobile device such as a cellular phone. Ex. PA-2, ¶[0040]. *Namburu*'s remote console is configured to be attached to the vehicle via a docking station. Ex. PA-2, ¶[0029] (stating the docking station of vehicle 130 "serve[s] as a place of attachment for the remote console 110."). A POSITA would understand that *Namburu*'s docking station would at least allow the remote console to be removably positioned inside the vehicle. Ex. C, ¶123. A POSITA would have further known that such docking stations for mobile phones in vehicles, which were ubiquitous in the automotive

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

industry and well known in the art, would also provide for permanent attachment to the vehicle if desired. Ex. C, ¶123.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the device is a mobile device, the mobile device configured to be permanently or removably positioned inside the vehicle." Ex. C, ¶¶123-124.

9.    **Claim 12: The vehicle system according to claim 1, wherein the device is configured to receive user input either through touch input, interface buttons, or gesture capture.**

As discussed above in claim 1(e), *Namburu* discloses a device (e.g., remote console). Ex. C, ¶125. The device may be a cellular phone, PDA, or "any other suitable handheld device that may remotely and securely manage operations of a vehicle." Ex. PA-2, ¶[0040]. *Namburu*'s remote console may include "a touch screen" display 410, which a POSITA would understand receives user input through touch input, and a "keypad" to "allow a user to input data or make selections, which a POSITA would understand receives user input through interface buttons. Ex. PA-2, ¶[0040]; Ex. C, ¶125. Both touch screen displays and keypads on cellular phones were conventional and well known in the art by November 2011. Ex. C, ¶125.

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the device is configured to receive user input either through touch input, interface buttons, or gesture capture." Ex. C, ¶¶125-126.

10.    **Claim 13: The vehicle system according to claim 1, wherein the device comprises device data, the device data is data used in conjunction with the device, and the device data including one or more of the following: multimedia data, preferences data, bioinformatics, and data associated with a user of the device.**

As discussed above in claim 1(e), *Namburu* discloses a device (e.g., remote console 110). Ex. C, ¶127. *Namburu*'s remote console includes memory storing user data such as "any

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

information related to the operation of a vehicle including vehicle settings/preferences, user profiles or the like." Ex. PA-2, ¶[0044]. The remote console thus includes "data used in conjunction with the device" including user preferences data, bioinformatics, and information associated with a user of the device. Ex. C, ¶127. For example, *Namburu*'s remote console transmits "user profile data to the vehicle," including "any information/data related to the vehicle or vehicle system(s) associated with an individual user or vehicle occupant." Ex. PA-2, ¶[0031]. For example, "a driver may create a user profile to store all vehicle settings and data related to any vehicle system corresponding specifically to the driver, including vehicle settings preferred by the driver." *Id.* This user profile data relating to driver preferences constitutes the claimed "preferences data" as well as "data associated with a user of the device." Ex. C, ¶127.

*Namburu*'s remote console further includes device data relating to user bioinformatics. Ex. C, ¶128. For example, the remote console identifies a user seeking to access the vehicle's systems by comparing "an ID code received" by the remote console with "a stored ID code corresponding to a particular user." Ex. PA-2, ¶[0030]. The user ID code may be based on user "biometrics" (bioinformatics) "such as voice or face recognition." *Id.*

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system "wherein the device comprises device data, the device data is data used in conjunction with the device, and the device data including one or more of the following: multimedia data, preferences data, bioinformatics, and data associated with a user of the device." Ex. C, ¶129.

> 11.    **Claim 19: The vehicle system according to claim 1, further comprising: a storage system configured to store system data, the system data being data needed for the vehicle control system to control the vehicle.**

In describing an example of system data that is "needed for the vehicle control system to control the vehicle," the '764 patent describes a "storage system 208 that stores system data" that

56

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

"may be any type of data needed for the vehicle control system 204 to control effectively the vehicle 104," such as the data "described in conjunction with FIG. 8." Ex. A, 10:7-11. Figure 8 of the '764 patent relates to user data such as user identification information and user preference data such as settings for a user's seat position, steering wheel position, and climate system, as shown below. Ex. A, 22:49-24:18, Fig. 8.



| User | ID | Area | Zone | Settings | Health Data | Gestures | Safety Paramters |
|------|-----|------|------|----------|-------------|----------|-----------------|
| User 1 | Features 1 | 1 | 1 | 1, 2, 3, 4 | X, Y | 1, 2, 3 | X,Y |
| | Features 1 | 1 | 2 | 1, 2 | X, Y | 3, 4, 5 | X,Y |
| | Features 1 | 2 | 3 | 1, 2 | X, Y | 3, 4, 5 | X,Y |
| User 2 | Features 2 | 2 | 3 | 1, 2, 3, 4, 5 | Z | 1, 2, 3 | X,Y |
| | Features 2 | 2 | 4 | | Z | 8,9,7 | X,Y |
| | Features 2 | 3 | 7 | 5, 7, 9 | Z | 8,9,7 | X,Y |

*FIG. 8*

Thus, user profile data (e.g., settings for a user's preferred vehicle settings) is an example of the claimed data "needed for the vehicle control system to control the vehicle." Ex. C, ¶¶130-131.

*Namburu* similarly discloses a vehicle system including a storage system that stores system data needed for the vehicle control system to control the vehicle. For example, *Namburu*'s vehicle processing system stores information received from a remote device (e.g., remote console). Ex. PA-2, ¶[0035] (the vehicle processing system including a "microprocessor

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

or the like to manage the receiving, handling, **storing**, calculating, manipulating, or sending of information to/from the remote device.") (emphasis added). The data received from the remote console and stored by the vehicle processing system includes "user profile data," which is "any information/data related to the vehicle or vehicle system(s) associated with an individual user or vehicle occupant," such as preferred user settings for various vehicle systems. Ex. PA-2, ¶[0031]. The stored data may also include vehicle performance data, such as data relating to the vehicle's exhaust system, "so that a user or a third party may analyze the performance data at a later time." Ex. PA-2, ¶[0036].

*Namburu* further discloses a "preference data base device" that may be "stored by components of the vehicle, such as a hard drive of an in-dash console or any other suitable component." Ex. PA-2, ¶[0048]. The user preference database stores information relating to user profiles and preferences (Ex. PA-2, ¶[0049]), including data relating to user preferences for seat position settings and climate settings (Ex. PA-2, ¶[0050]), and may include "memory 530" that is "utilized to store the preference database 510 and user profiles 520" (Ex. PA-2, ¶[0053]).

*Namburu*'s vehicle system[3] also includes storage in devices such as in the remote console 110 and the remote server 120. For example, the remote console 110 includes "memory" used "to store any information related to the operation of a vehicle including vehicle settings/preferences, user profiles or the like." Ex. PA-2, ¶[0044]. That user profile data is transmitted to the vehicle processing system. Ex. PA-2, ¶[0031]. The remote server 120 similarly includes computer memory for storing vehicle information, including user profile information. Ex. PA-2, ¶¶[0027]-[0028], [0033].

---

[3] The "vehicle system" of claim 1 comprises, among other things, a "device." Ex. A, claim 1.

58

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

*Namburu*'s vehicle, modified in view of *Bosch*, includes a vehicle system with "a storage system configured to store system data, the system data being data needed for the vehicle control system to control the vehicle." Ex. C, ¶¶130-135.

**B.    Ground 2: *Namburu* in combination with *Bosch* and *Smith* renders obvious claims 2 and 3.**

**1.    *Smith***

*Smith* discloses "a method and apparatus for receiving weather forecast information in a vehicle and using that information to warn a vehicle operator of a future weather hazard with respect to the specific vehicle's intended direction of travel." Ex. PA-3, 1:6-12. As shown below in annotated Figure 1, a weather center 101 receives weather-related information from various sources, including radar, temperature, wind, and other data sources 102-105 (e.g., "regional weather stations that provide air and pavement temperature, humidity, and other measurements."). Ex. PA-3, 3:21-38, Fig. 1; Ex. C, ¶136. The weather center may also receive weather information from vehicle sensors, including temperature sensors. Ex. PA-3, 4:58-61.



FIG. 1

Vehicles 107-109 receive "weather hazard information from the weather center 101 pertaining to [each] vehicle's current and/or future predicted location." Ex. PA-3, 3:49-63. The

59

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

vehicles may receive weather hazard information through a device installed in the vehicle or through an operator's cellular phone. Ex. PA-3, 3:60-63, 5:5-10 (stating the weather warnings can be received by the vehicle through an Internet interface or "at a cellular telephone 207 associated with the vehicle operator.").

*Smith* is analogous art to the '764 patent, which as previously noted, relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶138. *Smith* is from the same field of endeavor as the claimed invention, since like the '764 patent, it relates to sending information to (and receiving information from) vehicle systems, including doing so through a device within the vehicle such as a vehicle operator's cellular phone. Ex. PA-3, 1:6-12, 3:21-63, 4:51-5:11; Ex. C, ¶138. *Smith*'s system includes connecting and interfacing numerous vehicle systems and components, including collecting and transmitting vehicle information (e.g., GPS location data and temperature and speed information from vehicle sensors) to a weather center and receiving weather hazard information from the weather center to provide to a vehicle operator. *Id.*

*Smith*'s disclosure of a system for interfacing a vehicle with a remote weather center to obtain and provide weather information is also reasonably pertinent to the problems faced by the '764 inventor, who addressed issues relating to connecting and interfacing numerous vehicle systems (including vehicle sensors) and user devices (e.g., a cellular phone) with other devices and systems, including through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. PA-3, 3:21-63, 4:51-5:11; Ex. C, ¶139.

60

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

2. **Claim 2: The vehicle system according to claim 1, wherein: the plurality of sensors comprises vehicle sensors and non-vehicle sensors, the vehicle sensors are sensors associated with the vehicle configured to provide information to the vehicle control system that determine or provide information about an environment in which the vehicle is operating, and the non-vehicle sensors are sensors not associated with the vehicle configured to provide information to the vehicle control system.**

As discussed above in Ground 1, the combination of *Namburu* and *Bosch* renders obvious claim 1. Ex. C, ¶140.

Moreover, as discussed above for claim 1(f), *Namburu* discloses a plurality of sensors. Ex. C, ¶141. *Namburu*'s plurality of sensors include "[vehicle] sensors associated with the vehicle configured to provide information to the vehicle control system that determine or provide information about an environment in which the vehicle is operating." Ex. C, ¶141. For example, *Namburu*'s vehicle processing system is "coupled to and may execute operation of at least one vehicle system," including controlling "a climate control system" based on "climate control system settings." Ex. PA-2, ¶¶[0031], [0035]-[0038]. *Namburu*'s vehicle further includes vehicle "sensors detecting external temperature, sunlight, and other environmental conditions," which provide data used by the vehicle processing system to control the climate in the vehicle based on the user's "climate control settings." Ex. PA-2, ¶[0067]; *see also* ¶[0039] (*Namburu*'s remote console providing user preference data "to the vehicle" (e.g., vehicle processing system)), ¶¶[0048]-[0049] (describing storing user profiles (including user preferences) in "components of the vehicle, such as a hard drive of an in-dash console or any other suitable component.").

*Smith* describes a plurality of sensors including non-vehicle sensors (e.g., sensors that are not associated with the vehicle) providing weather tracking data to a vehicle control system. For example, as shown below in annotated Figure 1, *Smith*'s weather center 101 receives weather-related information from various sources, including radar, temperature, wind, and other data

61

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

sources 102-105 (e.g., "regional weather stations that provide air and pavement temperature, humidity, and other measurements."). Ex. PA-3, 3:21-38, Fig. 1; Ex. C, ¶142. A POSITA would have understood that *Smith*'s "data sources," which include regional weather stations providing data measurements, comprise "non-vehicle sensors" providing that weather data to the weather center. Ex. C, ¶142.



FIG. 1

*Smith* further discloses that the weather center receives weather information from various vehicle sensors, including temperature sensors. Ex. PA-3, 4:58-61. With respect to a particular vehicle, a POSITA would have understood that temperature sensors on <u>other</u> vehicles would constitute a "non-vehicle sensor," since they are sensors not associated with that particular vehicle. Ex. C, ¶143.

Vehicles 107-109 receive "weather hazard information from the weather center 101 pertaining to [each] vehicle's current and/or future predicted location," such as through an operator's cellular phone. Ex. PA-3, 3:49-6, 5:5-10. That cellular phone is coupled to a "microprocessor 202" in the vehicle, which a POSITA would understand is part of an on-board computer (e.g., a "vehicle control system") that connects to and controls a variety of other

vehicle systems including a vehicle map display 201, GPS receiver 203, location transmitter 204, speaker 205, vehicle sensors 206, and an internet interface 208. Ex. PA-3, 4:51-5:21; Ex. C, ¶144.

The '764 patent corroborates this understanding of the term "non-vehicle sensors," describing them as "any type of sensor that isn't currently associated with the vehicle," such as "sensors in a traffic system operated by a third party that provides data to the vehicle control system 204." Ex. A, 11:26-40. The non-vehicle sensors can also "be other types of sensors which provide information about the distant environment 116 or other information about the vehicle 104 or the environment 100." *Id.* Such sensors can be operated by third parties and provide information to the vehicle control system such as "weather tracking data." *Id.*

A POSITA would have been motivated to modify *Namburu*'s vehicle in view of *Smith* (in addition to *Bosch*) to incorporate *Smith*'s capability of receiving weather data from remote data sources into *Namburu*'s vehicle. Ex. C, ¶146. A POSITA would have done so, for example, to provide a vehicle operator with the beneficial real-time, location-specific information regarding potential weather hazards in the vehicle's intended direction of travel provided by *Smith*'s system (Ex. PA-3, 1:6-11, 2:15-51), as opposed to generalized weather information broadcast to all vehicles regardless of the recipient vehicle's location (*e.g.,* Ex. PA-3, 1:14-44). Ex. C, ¶146.

A POSITA would have had a reasonable expectation of success in modifying *Namburu*'s vehicle, including its vehicle processing system and remote console, to incorporate *Smith*'s transmitted weather information and provide relevant weather information to a vehicle operator. Ex. C, ¶147. Modifying *Namburu*'s vehicle to include this functionality would have been well within a POSITA's capability, requiring only routine skill, knowledge, and standard vehicle production and manufacturing techniques by using familiar elements and known methods to

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

achieve a predictable result. *KSR*, 550 U.S. at 416-417, 421 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); Ex. C, ¶147. The modification would require using conventional vehicle components (e.g., cellular data networks and GPS systems) for their known and intended purposes. Ex. C, ¶147. For example, like *Smith*'s vehicle, *Namburu*'s vehicle can access a cellular data network that allows the vehicle to send and receive data to remote computers and systems, such as through the *Namburu* vehicle's "integrated cellular phone system" (Ex. PA-2, ¶[0035]) and/or the remote console (e.g., a cellular phone) (Ex. PA-2, ¶[0040]). Ex. C, ¶147. *Namburu*'s vehicle is also equipped with a GPS system that a POSITA would understand is capable of determining the vehicle's location and providing that location to, e.g., a remote weather center (as disclosed by *Smith*) to obtain location-specific weather information. Ex. PA-2, ¶[0035] (*Namburu*'s vehicle processing system being coupled to vehicle systems including "a global positioning system (GPS) receiver.").

    *Namburu*'s vehicle, modified in view of *Bosch* and *Smith*, includes a vehicle system "wherein the plurality of sensors comprises vehicle sensors and non-vehicle sensors, the vehicle sensors are sensors associated with the vehicle configured to provide information to the vehicle control system that determine or provide information about an environment in which the vehicle is operating, and the non-vehicle sensors are sensors not associated with the vehicle configured to provide information to the vehicle control system." Ex. C, ¶¶140-148.

        **3.**     **Claim 3: The vehicle system according to claim 2, wherein the non-vehicle sensor information is controlled by third parties and includes at least one of weather tracking data, user health tracking data, maintenance data of the vehicle.**

    As discussed above for claim 2, the combination of *Namburu*, *Bosch*, and *Smith* includes a vehicle system with non-vehicle sensors. Ex. C, ¶149.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

The non-vehicle sensor information disclosed by *Smith* includes weather tracking data controlled by third parties. For example, *Smith* discloses that the weather center 101 providing weather hazard information to vehicles "may charge a fee for weather hazard reporting services" to vehicle users "on a monthly or transaction basis, thus providing a commercially beneficial arrangement." Ex. PA-3, 3:49-4:14. A POSITA would have understood that the weather center's requirement of payment in exchange for providing its weather information means that the weather center is operated by one or more third parties relative to vehicle users. Ex. C, ¶150. *Smith* further discloses that its vehicles may receive weather information from "multiple weather centers" (which a POSITA would understand could be owned or operated by different third parties) where "each vehicle can transmit to the nearest weather center based on its location." Ex. PA-3, 4:65-67. *Smith* similarly discloses other third-party providers of services or information in its system, including "one or more trip planning web sites 106" coupled to the weather center that "allow vehicle operators to pre-register with the system and to optionally file trip plans." Ex. PA-3, 3:39-42.

*Namburu*'s vehicle, modified in view of *Bosch* and *Smith*, includes a vehicle system "wherein the non-vehicle sensor information is controlled by third parties and includes at least one of weather tracking data, user health tracking data, maintenance data of the vehicle." Ex. C, ¶¶149-151.

### C.    Ground 3: *Namburu* in combination with *Bosch* and *Breed* renders obvious claims 4, 5, and 14.

#### 1.    *Breed*

*Breed* discloses a variety of vehicle systems including "vehicle safety systems, accident avoidance or elimination systems for vehicles, anticipatory sensing for vehicles, blind spot detection, automatic vehicle control, intelligent cruise control and vehicle navigation." Ex. PA-4,

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

¶[0013]. One of *Breed*'s vehicle safety systems is a laser radar (lidar) system that scans a vehicle's environment by projecting laser beams outward from the vehicle and analyzing reflections of the lasers to identify nearby objects and to facilitate the vehicle's avoidance of such objects. Ex. PA-4, ¶¶[0242]-[0264], [0281]-[0286], [0521], [0620]-[0621], Figs. 21-25.

For example, as shown below in annotated Figures 22A and 22B, *Breed* discloses a laser radar system mounted at the four corners of a vehicle above the headlights and taillights. Ex. PA-4, ¶[0282], Figs. 22A, 22B; Ex. C, ¶¶152-153. The laser radar system includes laser radar units 260 and 261, which "have a scan angle of approximately 150 degrees." *Id.*



Fig. 22A

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



Fig. 22B

The laser radar units have variable divergence angles depending on the distance of an object that may be illuminated by the system, with a higher divergence angle used for nearby objects and a lower divergence angle used for more distance objects (e.g., 50 to 200 meters). Ex. PA-4, ¶[0282]. The lidar system may be used to image and identify all objects in a "field of interest to the vehicle," which is "the field where all objects with which the vehicle can potentially collide reside." Ex. PA-4, ¶[0249]. Once an object has been identified, the potential for collision is assessed by a vehicle "control module, control unit or processor," which may activate vehicle countermeasures such as a system alerting a driver of the object or a vehicle control system that alters the travel direction of the vehicle to avoid collision. Ex. PA-4, ¶¶[0250], [0521], [0621].

*Breed* is analogous art to the '764 patent, which as previously noted, relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40;

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

Ex. C, ¶155. *Breed* is from the same field of endeavor as the claimed invention, since like the '764 patent, it relates to integrated vehicle systems, including a system for preventing accidents between vehicles that exchanges position data between separate vehicles through a communication system. Ex. PA-4, Abstract, ¶[0013]; Ex. C, ¶155. *Breed*'s vehicle systems further include a variety of integrated vehicle components and sensors in communication with the vehicle's control system, including a lidar system that analyzes the vehicle's environment and communicates with the vehicle's on-board computer to avoid collisions. Ex. PA-4, ¶¶[0249], [0250], [0521], [0621]. *Breed*'s disclosure of these vehicle systems and related data communications is also reasonably pertinent to the problems faced by the '764 inventor, who addressed issues relating to connecting and interfacing numerous vehicle systems (including vehicle sensors) and user devices (e.g., a cellular phone) with external devices and systems, including transmitting information to other systems and devices through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40, Ex. C, ¶155.

> **2.**     **Claim 4: The vehicle system according to claim 1, wherein: said vehicle system comprises a plurality of predefined areas, the plurality of predefined areas comprises a first predefined area, the plurality of sensors comprises a first sensor, the first sensor is positioned in the first predefined area, and the first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device.**

As discussed above in Ground 1, the combination of *Namburu* and *Bosch* renders obvious claim 1. Ex. C, ¶156. The combination of *Namburu*, *Bosch*, and *Breed* further renders obvious claim 4.

> **a.**     ***Breed*'s "Vehicle System" Comprises "a Plurality of Predefined Areas"**

*Breed* discloses a vehicle system including multiple "predefined areas" defined by the range of vehicle sensors in those areas. For example, *Breed* discloses a laser radar (lidar) system

68

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

that scans a vehicle's environment by projecting laser beams outward from the vehicle and

analyzing reflections of the lasers to identify nearby objects and to facilitate the vehicle's

avoidance of such objects. Ex. PA-4, ¶¶[0242]-[0264], [0281]-[0286], [0521], [0620]-[0621],

Figs. 21-25. As shown below in annotated Figures 22A and 22B, *Breed*'s lidar system includes

laser radar units mounted at the four corners of the vehicle above the headlights and tail lights

(e.g., in "predetermined" locations around the periphery of the vehicle and with predetermined

orientations to observe different areas around the vehicle's periphery). Ex. PA-4, ¶[0282], Figs.

22A, 22B; Ex. C, ¶157. The laser radar system includes multiple sensors[4] (e.g. laser radar units

260 and 261), which as shown in Fig. 22B, "have a scan angle of approximately 150 degrees."

*Id.*

---

[4] Lidar systems meet the '764 patent's broad definition of "sensors" as "a converter or

instrument that measures a physical quantity or quality and converts the measurement into a

signal which can be read, observed, stored, and/or understood by an observer or by another

instrument." Ex. A, 3:54-58; Ex. C, ¶157, n.3. The '764 patent also describes exemplary vehicle

"sensors" that include lidar systems, e.g., "devices for detection [of] objects such as an

electromagnetic radiation emitter/receiver that emits electromagnetic radiation and receives

electromagnetic waves reflected by the object[] to sense objects." Ex. A, 12:33-13:27.



Fig. 22A



Fig. 22B

*Breed*'s lidar sensors (laser radar units) image and identify all objects within a "field of interest to the vehicle," which is "the field where all objects with which the vehicle can potentially collide reside." Ex. PA-4, ¶[0249]. For example, the field of interest for the lidar system may extend out to 500 feet away from the vehicle. *Id. Breed* therefore discloses several "predefined areas" around the periphery of the vehicle that are each defined by the range and field-of-view of a laser radar unit based on *Breed*'s aforementioned disclosure of (1) focusing a laser radar unit's range to cover a particular "field of interest" for the vehicle (e.g., up to 500

70

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

feet); (2) placing each respective laser radar unit at a particular position above an external

vehicle light; and (3) orienting the laser radar units such that the units' 150° scanning ranges

observe different areas around the periphery of the vehicle (*see* Fig. 22B above). Ex. C, ¶158.

> **b.    *Breed*'s "First Sensor" in a "First Predefined Area"**

*Breed* discloses a first sensor (e.g., laser radar unit 260) in a first predefined area (e.g., the

effective range and detection area of the laser radar unit 260), as shown in annotated Fig. 22B

below. Ex. PA-4, ¶¶[0249], [0250], [0282], Figs. 22A, 22B; Ex. C, ¶159.



Fig. 22B

> **c.    *Breed*'s "First Sensor is Configured to Collect and Send Environmental Information About the First Predefined Area to At Least One of the Vehicle Control System or Device"**

As discussed above, *Breed*'s lidar system collects environmental information around the

vehicle, such as the presence and distance of objects that could potentially collide with the

vehicle. Ex. PA-4, ¶¶[0249], [0250], [0282], [0621], Figs. 22A, 22B. *Breed*'s first sensor (laser

radar unit 260) thus collects environmental information about the first predefined area (the

effective range and detection area of the laser radar unit 260). Ex. C, ¶160.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

*Breed* further discloses that the laser radar unit 260, as well as the other laser radar units,

sends the vehicle environmental information to the vehicle control system. Ex. C, ¶161. For

example, *Breed* discloses that, once an object has been identified by the lidar system, the

potential for collision is assessed by a vehicle "control module, control unit or processor," which

may activate vehicle countermeasures such as a system alerting a driver of the object or a

"vehicle control system" that alters the travel direction of the vehicle to avoid collision. Ex. PA-

4, ¶¶[0250], [0521], [0621].

d.        **Motivation to Combine**

A POSITA would have been motivated to modify *Namburu*'s vehicle (as previously

modified based on *Bosch*) to incorporate *Breed*'s laser radar system, including mounting *Breed*'s

laser radar units (e.g., laser radar units 260 and 261) to the four corners of *Namburu*'s vehicle

above the headlights and tail lights. Ex. C, ¶162; Ex. PA-4, ¶[0282]. A POSITA would have

done so, for example, to improve *Namburu*'s vehicle with a system (including by modifying

*Namburu*'s vehicle processing system to interface with and process data received from the lidar

system) for detecting nearby objects and avoiding collisions that could otherwise damage

*Namburu*'s vehicle. Ex. C, ¶162; *see, e.g.*, Ex. PA-4, ¶[0621]. The modified *Namburu* vehicle

system, like *Breed* (as discussed above), would include several lidar sensors and associated

predefined areas around the external periphery of the vehicle that are delimited by the range and

detection area of the lidar sensors. Ex. C, ¶162.

A POSITA would have had a reasonable expectation of success in modifying *Namburu*'s

vehicle to incorporate *Breed*'s lidar system, including by modifying *Namburu*'s vehicle

processing system to interface with the lidar system to, e.g., provide alerts to a driver regarding

nearby road hazards. Ex. PA-4, ¶[0621] (describing a vehicle processor coupled to the lidar

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

system that activates "countermeasures" such as "activation of a driver notification system to alert the driver of the impending collision."); Ex. C, ¶163. Modifying *Namburu*'s vehicle to include this functionality would have been well within a POSITA's capability, requiring only routine skill, knowledge, and standard vehicle production and manufacturing techniques by using familiar elements and known methods to achieve a predictable result. *KSR*, 550 U.S. at 416-417, 421 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); Ex. C, ¶163. The modification would require using conventional vehicle components (e.g., a lidar system for detecting, imaging, and ranging nearby objects) for their known and intended purposes. Ex. C, ¶163. Indeed, as described above, *Namburu*'s vehicle already includes a vehicle control system (e.g., vehicle processing system) configured to receive data from vehicle sensors, and a POSITA would have had a reasonable expectation of success in merely adding additional vehicle sensors to *Namburu*'s vehicle (e.g., lidar sensors) to interface with the vehicle processing system. Ex. C, ¶163.

*Namburu*'s vehicle, modified in view of *Bosch* and *Breed*, includes a vehicle system that "comprises a plurality of predefined areas, the plurality of predefined areas comprises a first predefined area, the plurality of sensors comprises a first sensor, the first sensor is positioned in the first predefined area, and the first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device." Ex. C, ¶¶156-164.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

3.  **Claim 5: The vehicle system according to claim 4, wherein the first sensor is a vehicle sensor, and the vehicle sensor is configured to provide information to the vehicle control system that determines or provides information about an environment in which the vehicle is operating.**

As discussed above for claim 4, *Namburu*'s vehicle (modified in view of *Bosch* and *Breed*) includes a first sensor (e.g., a laser radar unit mounted at the corner of *Namburu*'s vehicle above a headlight or taillight). Ex. C, ¶165. The first sensor is a vehicle sensor, for example, because it is mounted on the vehicle and is configured to provide data to the vehicle control system (e.g., *Namburu*'s vehicle processing system). Ex. C, ¶165. The vehicle sensor (first sensor) is further configured to provide information to *Namburu*'s vehicle processing system that both determines and provides information about an environment in which the vehicle is operating, such as the presence, identity, and range of nearby objects that could potentially collide with *Namburu*'s vehicle. Ex. PA-4, ¶[0621]; Ex. C, ¶165.

*Namburu*'s vehicle, modified in view of *Bosch* and *Breed*, includes a vehicle system "wherein the first sensor is a vehicle sensor, and the vehicle sensor is configured to provide information to the vehicle control system that determines or provides information about an environment in which the vehicle is operating." Ex. C, ¶¶165-166.

4.  **Claim 14: The vehicle system according to claim 4, wherein the plurality of predefined areas comprises a second predefined area, the plurality of sensors comprises a second sensor, the second sensor is positioned in the second predefined area, and the second predefined area is located outside the vehicle and is configured to collect and send information about the second predefined area to at least one of the vehicle control system or device.**

As discussed above for claim 4, *Namburu*'s vehicle (modified in view of *Bosch* and *Breed*) includes a plurality of predefined areas that includes a second sensor positioned in a second predefined area. Ex. C, ¶167. For example, as stated above, a POSITA would have

74

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

modified *Namburu*'s vehicle to include the laser radar units of *Breed*'s lidar system, such as laser radar unit 260 (e.g., a "first sensor") and laser radar unit 261 (e.g., a "second sensor"). Ex. PA-4, ¶[0282]; Ex. C, ¶167. An exemplary second sensor (laser radar unit 261) is shown in *Breed*'s Figure 22B below, with the effective range and detection area of the sensor defining a second predefined area outside the vehicle in which the second sensor is positioned. Ex. PA-4, ¶[0282], Fig. 22B; Ex. C, ¶167.



Fig. 22B

As discussed above for claim 5, the second sensor (e.g., *Namburu*'s vehicle modified to incorporate *Breed*'s laser radar unit 261) is configured to collect and send information about the second predefined area to the vehicle control system (e.g., *Namburu*'s vehicle processing system), such as the presence, identity, and range of nearby objects that could potentially collide with *Namburu*'s vehicle. Ex. PA-4, ¶[0621]; Ex. C, ¶168.

*Namburu*'s vehicle, modified in view of *Bosch* and *Breed*, includes a vehicle system "wherein the plurality of predefined areas comprises a second predefined area, the plurality of sensors comprises a second sensor, the second sensor is positioned in the second predefined area,

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

and the second predefined area is located outside the vehicle and is configured to collect and send information about the second predefined area to at least one of the vehicle control system or device." Ex. C, ¶¶167-169.

### D. Ground 4: *Namburu* in combination with *Bosch* and *Boling* renders obvious claim 8.

#### 1. *Boling*

*Boling* discloses a system for transmitting vehicle data through an information network and storing it in a database, including a "system for accessing vehicle data through a vehicle diagnostics data bus, transmitting the vehicle data to a central data server, and monitoring inventories of vehicles for vehicle financing entities based on the vehicle data." Ex. PA-5, ¶¶[0002], [0005]-[0010]. The vehicle information can be obtained, for example, through a "vehicle monitoring device 10" connected to the vehicle's "OBD interface connector 20," which is connected to the vehicle's "on-board diagnostics processor 22" (e.g., the vehicle's on-board computer system). Ex. PA-5, ¶¶[0003], [0006], [0015], Fig. 1. The vehicle data may be transmitted over a wireless communication network 24 (e.g., a cellular network, ¶[0017]) to a "central vehicle data server 26" that may be either "multiple collocated server computers" or a "cloud computing" system comprising "multiple server computers distributed anywhere within the network 34." Ex. PA-5, ¶[0018]. These features of *Boling*'s system are shown in Figure 1 below. Ex. PA-5, Fig. 1, ¶¶[0015]-[0018].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



*FIG. 1*

*Boling* is analogous art to the '764 patent, which as previously noted, relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶171. *Boling* is from the same field of endeavor as the claimed invention, since like the '764 patent, it relates to sending vehicle information across an information network to remote network locations, including using a cellular communication network. Ex. PA-5, ¶¶[0015]-[0018]; Ex. C, ¶171. *Boling*'s system includes connecting and interfacing numerous vehicle systems and components, including collecting vehicle diagnostic data through a "vehicle

monitoring device" from the vehicle's on-board computer and transmitting that information over

a network to a database. *Id.*

*Boling*'s disclosure of a system for collecting, transmitting, and storing vehicle

diagnostic information over an information network is also reasonably pertinent to the problems

faced by the '764 inventor, who addressed issues relating to connecting and interfacing

numerous vehicle systems (including vehicle sensors) and user devices (e.g., a cellular phone)

with external devices and systems, including transmitting information to other systems and

devices through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. PA-5,

¶¶[0001]-[0004], [0015]-[0018]; Ex. C, ¶172. *Boling*, like the '764 patent, also relates to storing

vehicle information in a cloud storage system, and the patents thus address similar problems and

technological design considerations for transmitting, storing, and accessible vehicle data. Ex. A,

10:65-11:7; Ex. PA-5, ¶[0018]; Ex. C, ¶172.

>  **2.     Claim 8: The vehicle system according to claim 7, wherein the server
>          is a cloud computing system or cloud storage unit configured to
>          permit the vehicle control system to gain access to further computing
>          capabilities or storage.**

As discussed above for claim 7 in Ground 1, *Namburu*'s vehicle (modified in view of

*Bosch*) renders obvious a vehicle control system configured to communicate through a

communication network to a server positioned outside the vehicle. Ex. C, ¶173. For example,

*Namburu* discloses a remote server 120, which is a "remote device" providing "an interactive

interface to allow a user to manage the operation and view diagnostic information regarding

various systems in the vehicle 130." Ex. PA-2, ¶[0027]. The remote server may be "any

conventional computer or network system as will be familiar to one of skill in the art" and "may

include various elements such as memory (e.g., random access memory (RAM), read-only

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

memory (ROM)), [and] one or more processing resources such as a central processing unit

(CPU)." Ex. PA-2, ¶[0028].

A POSITA would have understood (or at least found it obvious) that *Namburu*'s server is

a cloud computing system because such systems were well-known and conventional in the art by

November 2011. Ex. C, ¶174. A POSITA would have also been well aware of using cloud

computing systems to store and access vehicle data, including by permitting a vehicle control

system to gain access to further computing capabilities or storage, and would have understood

that *Namburu*'s remote server does so. Ex. C, ¶174. For example, illustrating that the use of

cloud systems for storing vehicle data was well known, *Boling* discloses a system for collecting

vehicle diagnostic data from an on-board vehicle computer through a "vehicle monitoring device

10" connected to the vehicle's "OBD interface connector 20," which is connected to the

vehicle's "on-board diagnostics processor 22," transmitting that data over a wireless

communication network 24 (e.g., a cellular network), and storing that data in a "central vehicle

data server 26" that may be a "cloud computing" system comprising "multiple server computers

distributed anywhere within the network 34." Ex. PA-5, ¶¶[0005]-[0010], [0015]-[0018], Fig. 1.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



*FIG. 1*

*Boling*'s central vehicle data server (which may be a "cloud computing" system) provides

the vehicle control system (e.g., *Boling*'s on-board vehicle computer including "vehicle

diagnostics processor 22," ¶¶[0003], [0015]) with access to further computing capabilities or

storage. Ex. C, ¶175. For example, *Boling*'s central vehicle data server provides additional data

storage for received vehicle data (e.g., the vehicle's VIN number and location data), as well as

storage of other system data relating to the received vehicle data (e.g., "dealer location data" for

a dealer associated with the vehicle). Ex. PA-5, ¶¶[0005]-[0010]; *see also* ¶¶[0050], [0052],

[0058]. *Boling*'s central vehicle data server also provides additional computing capability for use

on the received vehicle data, such as by processing the received vehicle data to "determine[]

whether the VIN and UIN transmitted from the vehicle monitoring device are both associated

with one and the same lending entity identifier in the database." *Id.*, ¶[0007]. *Boling* thus

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

illustrates that it was both known in the art to use cloud computing systems as servers, as well as that such cloud computing systems would permit a vehicle control system accessing the cloud server to gain access to further computing capabilities or storage. Ex. C, ¶175. For substantially the same reasons, a POSITA would have understood that *Namburu*'s remote server provides its vehicle control system (e.g., *Namburu*'s vehicle processing system) with access to further computing capabilities or storage. *Id.*

Because cloud computing systems were conventional in the art, a POSITA would have thus understood that *Namburu*'s remote server (e.g., a "conventional computer or network system," Ex. PA-2, ¶[0028]) is a cloud computing system. Ex. C, ¶176. A POSITA would have further understood that the implementation of a cloud system for the remote server presents a simple choice between two well-known alternatives, e.g., using a cloud system with geographically distributed computing resources versus a computer server with computing resources located in the same location (*see, e.g.,* Ex. PA-5, ¶[0018] (distinguishing between a "cloud computing" data server with "multiple server computers distributed anywhere within the network," as opposed to "multiple collocated server computers."). Ex. C, ¶176. Either implementation of *Namburu*'s server would have been obvious to a POSITA. Ex. C, ¶176.

*Namburu*'s vehicle, modified in view of *Bosch* and further in view of *Boling*, includes a vehicle system "wherein the server is a cloud computing system or cloud storage unit configured to permit the vehicle control system to gain access to further computing capabilities or storage." Ex. C, ¶¶173-177.

81

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

### E.    Ground 5: *Namburu* in combination with *Bosch*, *Breed*, and *Holcman* renders obvious claim 20.

#### 1.    *Holcman*

*Holcman* discloses an apparatus and methods for wirelessly tracking assets such as vehicles, including through the use of a "dynamic creation of a GeoFence area in a wireless system." Ex. PA-6, ¶¶[0001], [0002]. *Holcman* explains that "GeoFence tracking is the monitoring of movement of targets such as personal assets, vehicles or personnel within a defined geographic boundary" such that when an "assigned target" moves into or out of a geographic boundary, an alert is created. Ex. PA-6, ¶[0002]. *Holcman* further states that "[a] GeoFence boundary is generally referenced to a fixed location." Ex. PA-6, ¶[0003].

*Holcman*'s Figure 1 is an "exemplary flow diagram illustrating asset tracking." Ex. PA-6, ¶[0011], Fig. 1.



FIG.1

*Holcman* states that the flow diagram shown in Fig. 1 can be used to track, for example, a vehicle. Ex. PA-6, ¶[0024]. In an exemplary use case, "a user driving to a restaurant can park his

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

car outside the restaurant and activate the GeoFence device 1000, setting the dynamic GeoFence

area relative to the instant reference point that's created by activating the GeoFence device

1000." *Holcman* notes that the "characteristics of the dynamic GeoFence" may be "predefined"

and may be "created without the need for the user to determine his present location or for him to

define the perimeter of his dynamic GeoFence area." Ex. PA-6, ¶[0024]. Once the geofence is

created, "if the car (e.g., the first tracked device) moves outside the dynamic GeoFence area, an

alert message is sent to the GeoFence device 1000 (in the user's possession) to alert the user that

his car has moved." Ex. PA-6, ¶[0024].

    *Holcman* is analogous art to the '764 patent, which as previously noted, relates to vehicle

systems including an interconnected vehicle ecosystem linking a vehicle's systems with other

devices and systems through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40;

Ex. C, ¶181. *Holcman* is from the same field of endeavor as the claimed invention, since like the

'764 patent, it relates to integrating vehicle data with remote devices and networks, including a

system for tracking a vehicle's movements into and out of a predefined geofence area (Ex. PA-6,

¶¶[0002], [0024]) and transmitting related information from a "tracked device" (e.g., a vehicle,

¶[0024]) over a cellular data network. Ex. PA-6, ¶[0043] (describing "tracked device 601" being

connected to a "mobile network 604," which may be "CDMA, TDMA, [or] GSM" (e.g., a

cellular network that would have been well known to a POSITA by November 2011)), Fig. 4;

Ex. C, ¶181.

    *Holcman* is also reasonably pertinent to the problems faced by the '764 inventor, who

among other things, addressed issues relating to defining an area of a vehicle system "by one or

more techniques, for example, geo-fencing." Ex. A, 9:42-52; Ex. C, ¶182. *Holcman* similarly

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

addressed issues relating to defining areas using geofencing, including to track the location of a vehicle. Ex. PA-6, ¶¶[0002], [0024].

2.    **Claim 20: The vehicle system according to claim 4, wherein at least one of the plurality of predefined areas is defined by geo-fencing.**

As discussed above for claim 4 in Ground 3, *Namburu*'s vehicle modified in view of *Bosch* and *Breed* includes a vehicle system having a plurality of predefined areas. Ex. C, ¶183.

*Holcman* discloses an additional method of defining an area of a vehicle system, including through the "dynamic creation of a GeoFence area in a wireless system." Ex. PA-6, ¶¶[0001], [0002]. *Holcman* discloses setting a geofenced area around a vehicle, including doing so using "predefined" geofence characteristics (e.g., in a "predefined" geofenced area). Ex. PA-6, ¶[0024]. Once the geofence is created, "if the car (e.g., the first tracked device) moves outside the dynamic GeoFence area, an alert message is sent to the GeoFence device 1000 (in the user's possession) to alert the user that his car has moved." Ex. PA-6, ¶[0024].

A POSITA would have been motivated to modify *Namburu*'s vehicle system to incorporate *Holcman*'s system and method of creating a predefined area relative to the vehicle that is defined by geo-fencing. Ex. C, ¶185. A POSITA would have done so, for example, to gain the ability to track whether *Namburu*'s vehicle has moved into or out of the predefined geofenced area, as well as to obtain an alert if the vehicle does so. Ex. C, ¶185. *Namburu*'s vehicle includes a global positioning system that a POSITA would understand is capable of determining the location of the vehicle. Ex. PA-2, ¶[0035]; Ex. C, ¶185. Modifying *Namburu*'s vehicle system to include the geofencing functionality disclosed by *Holcman* (e.g., allowing a user to create a predefined geofenced area relative to the vehicle that sends the user alerts based on the location of the vehicle as determined by *Namburu*'s GPS system) would allow an owner of *Namburu*'s vehicle, for example, to monitor the location of the vehicle from a remote location

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

and to be notified if the vehicle is moved out of the geofenced area, such as if the vehicle is

stolen (e.g., Ex. PA-6, ¶[0024]). Ex. C, ¶185.

A POSITA would have had a reasonable expectation of success in modifying *Namburu*'s

vehicle system to incorporate the geofencing functionality disclosed by *Holcman*. Ex. C, ¶186.

As noted above, *Namburu*'s vehicle already includes a GPS system that determines the vehicle's

location (Ex. PA-2, ¶[0035]), as well as a system storing a user's navigation/GPS preferences,

including preferred locations such as "the user's home, office, favorite restaurants, or the like."

Ex. PA-2, ¶[0071]. Adding the capability of creating conditional alerts based on the location of

*Namburu*'s vehicle relative to a defined geofence area (e.g., setting a predefined geofenced

location while the car is parked near a user's favorite restaurant, as expressly disclosed in

*Holcman*'s exemplary system, Ex. PA-6, ¶[0024]) would be well within a POSITA's

capabilities, requiring only routine skill, knowledge, and standard computing techniques using

familiar elements and known methods to achieve a predictable result. *KSR*, 550 U.S. at 416-417,

421 ("The combination of familiar elements according to known methods is likely to be obvious

when it does no more than yield predictable results."); Ex. C, ¶186.

*Namburu*'s vehicle, modified in view of *Bosch*, *Breed*, and *Holcman*, includes a vehicle

system "wherein at least one of the plurality of predefined areas is defined by geo-fencing." Ex.

C, ¶¶183-187.

**F.    Ground 6: *Chutorash* in combination with *Holcman* renders obvious claims 1, 4, and 20.**

**1.    *Chutorash***

*Chutorash* (Ex. PA-8) discloses a vehicle that integrates portable devices with vehicle

systems to provide "improved user interface features and/or connectivity features." Ex. PA-8,

Abstract, ¶[0004]. Specifically, *Chutorash* aimed to address the problem that "conventional

85

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

vehicle control systems typically do not interface well with remote sources and portable devices." Ex. PA-8, ¶[0004]. Annotated Figure 1 shows a vehicle 100 that includes various subsystems integrated with a vehicle control system 106. Ex. PA-8, ¶[0046], Fig. 1; Ex. C, ¶188.



FIG. 1

As shown below in annotated Figure 3, a portable electronic device 116 "may communicably couple to vehicle control system 106 via a wired or wireless connection" and "may attach to or physically rest in a holder 302 configured to hold portable electronic device 116 and provide a physical connection (e.g., a power charging connection, a communication link connection, etc.) to vehicle control system 106." Ex. PA-8, ¶[0050], Fig. 3; Ex. C, ¶189. Through this connection, information may be "transmitted between portable electronic device 116 and vehicle control system 106." *Id.* For example, "vehicle control system 106 can provide information to [the] portable electronic device 116 for additional processing." *Id.*

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 3

Figure 4 is a block diagram of the vehicle control system 106, which "is capable of accessing data" from portable electronic devices 116 and other remote sources 117. Ex. PA-8, ¶[0051], Fig. 4. The vehicle control system 106 includes a communication device 120 for establishing communications with various devices. Ex. PA-8, ¶¶[0052]-[0058].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 4

The vehicle control system 106 can "interface with" and "utilize features and data" of the portable electronic device 116, which can be a mobile phone, a personal digital assistant (PDA), a media player, a personal navigation device (PND), a pager, or various other remote data sources. Ex. PA-8, ¶¶[0068], [0073], [0075]. The "processing system of portable device 116 may be configured to process information, files, streams, or signals provided from vehicle control system 106 to portable device 116." Ex. PA-8, ¶[0094].

As shown in Figure 7 below, the vehicle control system 106 is configured to leverage the computing capabilities of the portable device 116 by utilizing various modules and components 702-732 of the device. Ex. PA-8, ¶¶[0075]-[0091], Fig. 7. The vehicle system also provides two-way interface control, where the "vehicle touch screen 742 may be used to provide touch screen features to portable device 116." Ex. PA-8, ¶[0092].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 7

*Chutorash*'s vehicle system implements a communication network using multiple data transmission methods, including both wired and wireless communication protocols. For example, the vehicle control system 106 can communicate with components and device through "a wireless communication link such as with a Bluetooth communications protocol, an IEEE 802.11 protocol . . . a cellular phone protocol . . . or any other suitable wireless technology," and/or through "wired communication link such as with USB technology . . . serial or parallel port technology, or any other suitable wired link." Ex. PA-8, ¶[0053].

Additionally, as shown in Figure 10 below, the vehicle system includes a vehicle data bus 1002 for communications between components. Ex. PA-8, ¶[0101].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



**FIG. 10**

Furthermore, the vehicle control system 106 communicates with "vehicle subsystems 1004, 1006," which include sensors such as "a wheel speed sensor, a transmission, a GPS receiver, a compass, a light sensor, a rain sensor, a seating sensor, an occupancy sensor, an oxygen sensor, an impact sensor, a speed sensor, an emergency system, an air bag system, a gyroscope, a breathalyzer," and others. Ex. PA-8, ¶[0101]. The information from these vehicle subsystems "can be received at an interface communicably coupling the subsystem to the vehicle control system," and the vehicle control system 106 "may be configured to communicate" the information "to a portable electronic device brought into the vehicle." *Id.*

In summary, with reference to Figures 3, 4, 7, and 10, *Chutorash* teaches a vehicle system that includes exemplary elements including a vehicle (100), a communication network (118/1002), a vehicle control system (106), a power control module (302), and a device (116) configured to communicate with the vehicle control system (106), where the device is connected to the power control module (302) and attached to the vehicle (100), where a plurality of sensors (1004/1006) are configured to communicate via the communication network (118/1002) with the

90

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

vehicle control system (106) and the device (116), and where the vehicle control system (106) is configured to use computing capability (702-732) of the device (116). Ex. C, ¶¶188-196.

*Chutorash* is analogous art to the '764 Patent. Ex. C, ¶197. As described above, the '764 patent relates to vehicle systems including an interconnected vehicle ecosystem linking a vehicle's systems with other devices and systems through a communication network (Ex. A, Abstract, 2:66-3:39, 9:31-11:40), as well as providing "an enhanced user experience" in a vehicle (Ex. A, 9:31-41). *Chutorash* is from the same field of endeavor as the claimed invention, since like the '764 patent, it "relates generally to the fields of communication, navigation, and/or user control in a motor vehicle," including by "providing information to a portable electronic device for processing by the portable electronic device" from a "control system for mounting in a vehicle." Ex. PA-8, ¶¶[0002], [0006]; Ex. C, ¶197. *Chutorash* also relates to providing "improved user interface features and/or connectivity" in a vehicle, which relate to enhancing the driver's experience. Ex. PA-8, ¶[0004].

*Chutorash* is also reasonably pertinent to problems concerning the inventors of the '764 Patent. The '764 patent addresses issues relating to connecting and interfacing numerous vehicle systems and user devices, including through a communication network. Ex. A, Abstract, 2:66-3:39, 9:31-11:40; Ex. C, ¶198. Like the '764 Patent, *Chutorash* aimed to address the problem that "conventional vehicle control systems typically do not interface well with remote sources and portable devices," including through providing a communication interface between a vehicle control system and a portable electronic device. Ex. PA-8, Abstract, ¶¶[0004], [0006].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

### 2.    Independent Claim 1

#### a.    Claim 1(pre): A vehicle system, comprising:

As described in more detail below with respect to the claim elements that follow,

*Chutorash* discloses a vehicle system that includes a vehicle, communication network, vehicle

control system, power control module, device, and a plurality of sensors. Ex. C, ¶199. *Chutorash*

thus renders obvious the claimed "vehicle system."

#### b.    Claim 1(a): a vehicle;

*Chutorash* discloses a vehicle (e.g., vehicle 100). For example, with respect to Figure 1,

*Chutorash* states that "[v]ehicle 100 includes a number of subsystems for user convenience and

entertainment. For example, vehicle 100 may include a heating, ventilation, and air-conditioning

(HVAC) system, a sound system, and a vehicle control system." Ex. PA-8, ¶[0046], Fig. 1. The

vehicle and its systems "may be of any past, present, or future design capable of being physically

coupled to, communicably coupled to, and interacting with [a] vehicle control system." *Id.*,

¶[0046].

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 1

*Chutorash* thus discloses a vehicle. Ex. C, ¶¶200-201.

### c.    Claim 1(b): a communication network;

*Chutorash* discloses a communication network (e.g., communication device 120, communication link 118, and data bus 1002). For example, *Chutorash* states the vehicle control system 106 includes "a communication device 120" for external communications. Ex. PA-8, ¶[0052]. As shown in Fig. 4 below, the communication device 120 is "generally configured to establish communication link 118 with portable electronic device 116 or another remote source 116." *Id.*, ¶[0053], Fig. 4.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 4

The communication device 120 supports multiple communication protocols, including wireless protocols such as "a Bluetooth communications protocol, an IEEE 802.11 protocol . . . a cellular phone protocol," as well as "a wired communication link such as with USB technology, IEEE 1394 technology, Firewire technology, optical technology, [or] other serial or parallel port technology." *Id.*, ¶[0052].

Additionally, as shown in Fig. 10 below, *Chutorash* discloses exchanging internal vehicle communications among various vehicle components and systems through "a vehicle data bus 1002." *Id.*, ¶[0101]. For example, the vehicle control system uses a data bus to receive "vehicle subsystem data (e.g., sensor data, compass data)" from vehicle subsystems. *Id.*, ¶[0115], ¶[0117] (stating that "vehicle sensor data" may be received "via a vehicle data bus.").

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 10

A POSITA would have understood that, together, *Chutorash*'s communication device 120, communication link 118, and data bus 1002 form a communication network that may be used by the vehicle control system for both external communications (e.g., with portable devices) and internal communications (e.g., with vehicle subsystems). Ex. C, ¶205. That is, the combination of *Chutorash*'s communication device 120, communication link 118, and data bus 1002 are, collectively, a communication network in which the communication device 120 provides external connectivity via communication link 118 while the data bus 1002 provides internal connectivity. *Id.* This understanding is also consistent with how the '764 Patent defines "communication network" as "a collection of communication components capable of one or more of transmission, relay, interconnect, control, or otherwise manipulate information or data from at least one transmitter to at least one receiver." Ex. A, 4:59-64. The patent also explains that the communication network "can represent any type of wireless or wired communication system" and provides examples of both networking systems (such as Bluetooth, 802.11G/N, and Ethernet) and vehicle buses (such as CAN bus). *Id.*, 10:46-57. The '764 Patent also explains that

95

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

a "bus" may "specifically refer to a part of a communication hardware that interfaces the

communication hardware with the interconnects that connect to other components of the

corresponding communication network." *Id.*, 4:17-21. In other words, the '764 Patent expressly

contemplates that the claimed communication network can include a combination of both wired

and wireless networking protocols. *Id.*, 10:46-57.

In view of the foregoing, *Chutorash* renders obvious a communication network. Ex. C,

¶¶202-206.

### d.    Claim 1(c): a vehicle control system;

*Chutorash* teaches a vehicle control system. For example, *Chutorash* discloses a "vehicle

control system 106," which includes "an output display 108, one or more knobs 110, one or more

pushbuttons 112, and one or more tactile user inputs or pushbuttons 114, which facilitate

controlling various vehicle functions." Ex. PA-8, ¶[0047], Fig. 2.



FIG. 2

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

The vehicle control system 106 is described as a control system that "may be used to control" multiple vehicle subsystems including "vehicle door locking systems, vehicle cruise control systems, seat control systems, window control systems, hands-free communication systems, vehicle lighting systems, vehicle radio systems, wireless control systems, media control systems, and/or any other control system that may accept user input." *Id.*, ¶[0049]. Furthermore, *Chutorash* explains that the vehicle control system 106 may serve as "media system, navigational system, entertainment system, display system, communications systems, etc." *Id.*, ¶[0046]. This is like the '764 Patent's vehicle control system, which similarly provides "information to the user, receiv[es] input from the user, and control[s] the functions or operations of the vehicle." Ex. A, 9:67-10:3.

*Chutorash* also teaches that the vehicle control system 106 is specifically designed to interface with portable electronic devices, stating that "user interface elements, display elements, audio input and output elements and the like mounted in the vehicle and communicably coupled to vehicle control system 106 may be used to provide input and/or output features to a connected (e.g., wired, wirelessly) portable electronic device brought into the vehicle." *Id.*, ¶[0049]. Thus, in addition to controlling the vehicle subsystems, the vehicle control system 106 may also interface with portable devices. This is also like the '764 Patent's vehicle control system, which similarly is configured to "interface with" the user device. Ex. A, 10:31-33.

In view of the foregoing, *Chutorash* renders obvious a vehicle control system (e.g., vehicle control system 106). Ex. C, ¶¶207-210.

### e.    Claim 1(d): a power control module;

*Chutorash* teaches a power control module (e.g., power charging connection/circuitry implemented in holder 302). Specifically, *Chutorash* teaches that a "portable electronic device

97

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

116 may attach to or physically rest in a holder 302 configured to hold portable electronic device 116 and provide a physical connection (e.g., a power charging connection, a communication link connection, etc.) to vehicle control system 106." Ex. PA-8, ¶[0050]. That is, a "power charging connection" is specifically implemented in the holder 302.



FIG. 3

*Chutorash* provides additional implementation details of the power control functionality, explaining that the connection's wired interface includes "connectors or terminals in addition to electronics (e.g., filters, converters, security circuitry, power charging circuitry) that facilitates the communicative/functional connection between vehicle control system 106 (e.g., and its various processing circuitry) and the connected devices." *Id.*, ¶[0061]. The associated power charging circuitry of the physical holder 302 is a module for controlling charging (i.e., delivery of power) to the portable electronic device. This is like the '764 Patent's power control module, which similarly includes "power control logic, and/or ports for interconnecting" the user device to "an external source of power." Ex. A, 17:1-4.

98

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

In view of the foregoing, *Chutorash* renders obvious a power control module (e.g., power charging connection/circuitry implemented in holder 302). Ex. C, ¶¶211-213.

> **f.      Claim 1(e): a device configured to communicate with the vehicle control system, the device connected to the power control module and attached to the vehicle; and**

*Chutorash* discloses a device (e.g., portable electronic device 116) configured to communicate with the vehicle control system (e.g., vehicle control system 106) and that is connected to the power control module (e.g., power charging connection/circuitry implemented in holder 302) and attached to the vehicle (e.g., via holder 302). For example, *Chutorash* teaches a device in the form of "portable electronic device 116." Ex. PA-8, ¶[0050]. The device 116 is "in communication with vehicle control system 106." *Id.* The portable electronic device 116 may "communicably couple to vehicle control system 106 via a wired or wireless connection." *Id.* Thus, *Chutorash*'s device 116 is a device configured to communicate with the vehicle control system 106. This is like the '764 Patent's device, which similarly can be "a mobile device . . . temporarily associated with the automobile" that communicates with the vehicle control system. Ex. A, 10:26-33, Fig. 3.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 3

*Chutorash* also teaches that the portable electronic device 116 may "attach to or physically rest in a holder 302" that provides "a physical connection (e.g., a power charging connection, a communication link connection, etc.) to vehicle control system 106." *Id.* As previously explained, the power charging circuitry of the physical holder 302 is a power control module. Thus, *Chutorash*'s device 116 is connected to this power control module when it is in the holder 302.

Finally, *Chutorash* teaches that the portable electronic device 116 physically attaches to the vehicle via holder 302, which is mounted in the vehicle. Specifically, the device may "attach to or physically rest in a holder 302," which physically secures the device to the vehicle. *Id.*, ¶[0050].

In view of the foregoing, *Chutorash* renders obvious a device (e.g., portable electronic device 116) configured to communicate with the vehicle control system (e.g., vehicle control system 106), the device connected to the power control module (e.g., power charging

100

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

connection/circuitry implemented in holder 302) and attached to the vehicle (e.g., via holder

302). Ex. C, ¶¶214-217.

g.      **Claim 1(f): a plurality of sensors configured to communicate via the communication network with the vehicle control system and the device, wherein**

*Chutorash* teaches a plurality of sensors (e.g., vehicle subsystems 1004, 1006) configured

to communicate via the communication network (e.g., communication device 120 and data bus

1002) with the vehicle control system (e.g., vehicle control system 106) and the device (e.g.,

portable electronic device 116).

Specifically, *Chutorash* teaches a plurality of sensors in the form of "vehicle subsystems

1004, 1006" that include "a wheel speed sensor, a transmission, a GPS receiver, a compass, a

light sensor, a rain sensor, a seating sensor, an occupancy sensor, an oxygen sensor, an impact

sensor, a speed sensor, an emergency system, an air bag system, a gyroscope, a breathalyzer, an

accelerometer, an airbag sensor, an anti-lock brake sensor, a temperature sensor, a navigational

system, or other suitable vehicle systems that may indicate a vehicle state." Ex. PA-8, ¶[0101].

This is like the '764 Patent's sensors, which similarly include "one or more sensors for providing

information to the vehicle control system." Ex. A, 11:21-24, 12:33-13:27 (describing numerous

examples of sensors within the '764 Patent's vehicle that are the same type as *Chutorash*'s

vehicle sensors, including wheel speed sensors, acceleration sensors, and light sensors, and

several others).



**FIG. 10**

*Chutorash* further teaches these sensors are configured to communicate via the communication network with the vehicle control system. For example, the "vehicle subsystem 1006" may be "coupled to control system 106 via a vehicle data bus 1002." *Id.*, ¶[0101]. Specifically, "vehicle subsystem data (e.g., sensor data, compass data)" may be "received at the vehicle control system from subsystems" via the data bus. *Id.*, ¶[0115]. Moreover, "the vehicle control system may receive vehicle sensor data" via "a vehicle data bus." *Id.*, ¶[0117]. As previously explained, this data bus is part of the "communication network."

Additionally, *Chutorash* teaches these sensors are configured to communicate via the communication network with a device. For example, "the vehicle control system (e.g., a processing circuit (or data processing system 122) and a communications interface (or communication device 120) coupled thereto) may be configured to communicate the vehicle status information to a portable electronic device brought into the vehicle." *Id.*, ¶[0101]. This information includes sensor data such as the "speed of the vehicle, accelerometer information, compass information, global positioning system information, and/or vehicle error codes from an

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

engine control unit" received from "vehicle subsystems." *Id.*, ¶¶[0100]-[0101]. The

communication with the portable device is established through a communication link between

communication device 120 and portable electronic device 116. *Id.*, ¶[0053]. As previously

explained, this communication device is part of the "communication network."

In view of the foregoing, *Chutorash* renders obvious a plurality of sensors (e.g., vehicle

subsystems 1004, 1006) configured to communicate via the communication network (e.g.,

communication device 120 and data bus 1002) with the vehicle control system (e.g., vehicle

control system 106) and the device (e.g., portable electronic device 116). Ex. C, ¶¶218-222.

      **h.**      **Claim 1(g): wherein the vehicle control system is configured to use computing capability of the device.**

*Chutorash* discloses a vehicle control system (e.g., vehicle control system 106)

configured to use the computing capability (e.g., processing system for modules 702-732) of a

device (e.g., portable electronic device 116). Ex. PA-8, ¶¶[0075]-[0095]. For example,

*Chutorash* teaches that the "device 116 and/or vehicle control system 106 may be configured to

utilize features and data of the other device." Ex. PA-8, ¶[0075]. Figure 7 below shows a block

diagram that includes a vehicle control system 106 "for inheriting functions of [a] portable

device 116" and "for providing function to [the] portable device 116." *Id.* Fig. 7 also shows

various modules 702-732 of the portable device 116 that may be utilized by the vehicle control

system 106. *Id.* For example, *Chutorash* states that "a processing system of portable device 116

may be configured to process information, files, streams, or signals provided from vehicle

control system 106 to portable device 116." *Id.*, ¶[0094]. The processor of the portable electronic

device may be used when it is "more suitable and/or available for processing certain elements or

tasks." *Id.*

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764



FIG. 7

As examples of the modules 702-732, *Chutorash* teaches that voice recognition engine 708 of the portable device "may be used by voice recognition system 756 of vehicle control system 106 to provide additional features and extra processing capability to vehicle control system 106." *Id.*, ¶[0079]. Similarly, *Chutorash* states that connectivity applications 712 of the portable device, including "TCP/IP stack, communications protocol modules, security software, decryption algorithms, browser software, or other communications or connectivity software may be utilized by vehicle control system 106." *Id.*, ¶[0081].

In view of the foregoing, *Chutorash* renders obvious wherein the vehicle control system (e.g., vehicle control system 106) is configured to use computing capability (e.g., processing

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

system for modules 702-732) of the device (e.g., portable electronic device 116). Ex. C, ¶¶223-

225.

> 3.      **Claim 4: The vehicle system according to claim 1, wherein: said
> vehicle system comprises a plurality of predefined areas, the plurality
> of predefined areas comprises a first predefined area, the plurality of
> sensors comprises a first sensor, the first sensor is positioned in the
> first predefined area, and the first sensor is configured to collect and
> send environmental information about the first predefined area to at
> least one of the vehicle control system or device.**

> a.      ***Chutorash*'s vehicle system comprises a plurality of predefined
> areas including a first predefined area.**

As explained above, *Chutorash* renders obvious the vehicle system according to claim 1.

*Chutorash* also discloses a vehicle system comprising a plurality of predefined areas including a

first predefined area. Ex. C, ¶226.

Specifically, *Chutorash* teaches various sensors including a wheel speed sensor, rain

sensor, light sensor, temperature sensor, seating sensor, occupancy sensor, impact sensor, airbag

sensor, and anti-lock brake sensor. Ex. PA-8, ¶[0101]. A POSITA would have understood that

these sensors are conventionally positioned in specific, predefined areas of the vehicle for proper

functionality. Ex. C, ¶227. For example, a POSITA would have understood that wheel speed

sensors are conventionally positioned in the wheel shaft area, such as on a propeller shaft that

drives a wheel. *See, e.g.*, Ex. PA-11, 2:61-65; Ex. C, ¶227. Likewise, a POSITA would have

understood that impact sensors are conventionally positioned in the bumper. *See, e.g.*, Ex. PA-

12, 3:62-64; Ex. C, ¶227. An occupancy sensor would similarly be positioned in an area to detect

vehicle occupants, such as within a vehicle seat. Ex. C, ¶227.

Furthermore, a POSITA would have understood that these areas are "predefined" because

their locations are not arbitrarily chosen, but rather are determined during vehicle design to

ensure proper sensor operation. See Ex. C, ¶228. This understanding aligns with the '764 Patent's

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

description of predefined areas as locations "inside or outside of the vehicle" including areas "associated with the front passenger's and driver's seat." Ex. A, 11:44-45, 52-55. Thus, the wheel shaft area, bumper area, etc. are "predefined" areas where those sensors are chosen to be placed.

The element reciting "the plurality of predefined areas comprises a first predefined area" adds no meaningful limitation to the claim scope, as any disclosure of multiple areas necessarily includes a first area as a matter of mathematical necessity. Any of the areas where *Chutorash*'s sensors are positioned may be labeled as "first," "second," etc., as such identification is merely a labeling choice. Thus, the wheel shaft area serves as a first predefined area from among *Chutorash*'s plurality of predefined areas. Ex. C, ¶229.

In view of the foregoing, *Chutorash* renders obvious wherein said vehicle system comprises a plurality of predefined areas, the plurality of predefined areas comprises a.first predefined area. Ex. C, ¶¶226-230.

> **b.      *Chutorash*'s vehicle system includes a plurality of sensors including a first sensor positioned in the first predefined area.**

*Chutorash* teaches wherein the plurality of sensors comprises a first sensor (e.g., wheel speed sensor), the first sensor (e.g., wheel speed sensor) is positioned in the first predefined area (e.g., wheel shaft area). Specifically, *Chutorash* teaches multiple sensors including "a wheel speed sensor, a transmission . . . a rain sensor, a seating sensor, an occupancy sensor . . . an impact sensor . . . an airbag sensor, an anti-lock brake sensor." Ex. PA-8, ¶[0101]. As before, one of these sensors being labeled as "first" in the claim adds no meaningful limitation to the claim scope. Thus, the wheel speed sensor serves as a first sensor from among *Chutorash*'s plurality of sensors.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

As previously explained, a POSITA would have understood that wheel speed sensors are conventionally positioned on the wheel shaft area. Ex. C, ¶232. A POSITA would have recognized that positioning the wheel speed sensor on the wheel shaft area provides an effective implementation for accurately monitoring wheel rotation. *Id.*

In view of the foregoing, *Chutorash* renders obvious a plurality of sensors including a first sensor positioned in a first predefined area. Ex. C, ¶¶231-233.

<blockquote>
c.    ***Chutorash*'s first sensor is configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device.**
</blockquote>

*Chutorash* teaches wherein the first sensor (e.g., wheel speed sensor) is configured to collect and send (e.g., via an interface) environmental information (e.g., speed) about the first predefined area (e.g., wheel shaft area) to at least one of the vehicle control system (e.g., vehicle control system 106) or device (e.g., portable electronic device 116). For example, *Chutorash* teaches that "information (e.g., vehicle status information) communicated to the vehicle from" the sensors "can be received at an interface communicably coupling" the sensors "to the vehicle control system" and that "the vehicle control system (e.g., a processing circuit and a communications interface coupled thereto) may be configured to communicate the vehicle status information to a portable electronic device brought into the vehicle." Ex. PA-8, ¶[0101]. In other words, *Chutorash* teaches that the sensors are configured to send this information to both the vehicle control system and portable device. Ex. PA-8, ¶[0101]. The sensors send information to "an interface communicably coupling the subsystem to the vehicle control system," and the vehicle control system may "communicate the vehicle status information to a portable electronic device." *Id.*

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

Furthermore, the first sensor (*Chutorash*'s wheel speed sensor) collects speed information, which qualifies as "environmental information" under the '764 Patent's broad definition of environment as "the surroundings or conditions in which a person operates a vehicle." Ex. A, 3:51-53. A POSITA would have understood that the wheel speed of a vehicle is a condition in which a person operates the vehicle. Ex. C, ¶235.

In view of the foregoing, *Chutorash* renders obvious a first sensor configured to collect and send environmental information about the first predefined area to at least one of the vehicle control system or device. Ex. C, ¶¶234-236.

> **4.    Claim 20: The vehicle system according to claim 4, wherein at least one of the plurality of predefined areas is defined by geo-fencing.**

As discussed above, *Chutorash* renders claim 4 obvious. The combination of *Chutorash* and *Holcman* further renders obvious claim 20 in at least two distinct ways. Ex. C, ¶237.

**Obviousness Example 1:** Implementing geofencing for *Chutorash*'s device location monitoring system.

As a first example of how the combination of *Chutorash* and *Holcman* render claim 20 obvious, *Chutorash* discloses a vehicle system including both a vehicle and mobile device connected to the vehicle control system. Ex. PA-8, ¶¶[0115]-[0119]. For example, *Chutorash* discloses a vehicle GPS system, including "[v]ehicle GPS receiver 752 and/or vehicle subsystem data (e.g., sensor data, compass data) received at the vehicle control system from subsystems 1012 (e.g., via data bus 1010)" used to calculate a "precise location" of the vehicle. Ex. PA-8, ¶[0115]. *Chutorash* further discloses that its portable device "may include location coordinate electronics." *Id.* The vehicle control system may both send GPS information to a portable device and receive location information from a portable device. *Id.*, ¶¶[0115]-[0116].

108

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

Additionally, *Chutorash* states that the portable device may detect when it is moved away from the location of the vehicle control system. Ex. PA-8, ¶[0118] ("Portable device 116 may at some point detect a disconnect with the vehicle control system, a separation from the location information provided by the vehicle control system, and/or otherwise detect an 'on foot' mode of operation (e.g., detect that portable device 116 has left the vehicle."). *Id.* Upon detecting its removal from the area of the vehicle control system, "portable device 116 may discontinue use and/or reliance on location information from the vehicle" and may instead use its own GPS receiver information. *Id.*

A POSITA would have found it obvious to implement *Chutorash*'s described functionality of detecting when the portable device 116 is removed from the vicinity of the vehicle control system, such as by detecting "a separation from the location information provided by the vehicle control system" (Ex. PA-8, ¶[0118]), through geofencing. Ex. C, ¶240. Geofencing includes monitoring the location of a tracked item with respect to a defined geographic boundary. *See, e.g.,* Ex. PA-6, ¶[0002]. A POSITA would have been well aware of geofencing, which predated the earliest possible filing date of the '764 patent in November 2011, and would have understood it as a well-known technique suitable for implementing *Chutorash*'s described functionality of detecting when a portable device is removed from the predefined vicinity of the vehicle control system (e.g., when a mobile phone is taken out of the vehicle by a user). Ex. C, ¶240. Using geofencing in this manner would require nothing more than using a well-known technology for its intended purpose and would have been an obvious manner of implementing the functionality described in *Chutorash* with a reasonable expectation of success. Ex. C, ¶¶238-240.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

**Obviousness Example 2: Implementing *Holcman*'s geofencing functionality into *Chutorash*'s vehicle system.**

As a second example of how the combination of *Chutorash* and *Holcman* render claim 20 obvious, a POSITA would have alternatively been motivated to modify *Chutorash*'s vehicle system to include the geofencing system and functionality described in *Holcman*. Ex. C, ¶241.

*Holcman* discloses a system and method of defining an area of a vehicle system, including through the "dynamic creation of a GeoFence area in a wireless system." Ex. PA-6, ¶¶[0001], [0002]. *Holcman* discloses setting a geofenced area around a vehicle, including doing so using "predefined" geofence characteristics (i.e., in a "predefined" geofenced area). Ex. PA-6, ¶[0024]. Once the geofence is created, "if the car (i.e., the first tracked device) moves outside the dynamic GeoFence area, an alert message is sent to the GeoFence device 1000 (in the user's possession) to alert the user that his car has moved." Ex. PA-6, ¶[0024].

A POSITA would have been motivated to modify *Chutorash*'s vehicle system to incorporate *Holcman*'s system and method of creating a predefined area relative to the vehicle that is defined by geo-fencing. Ex. C, ¶243. A POSITA would have done so, for example, to gain the ability to track whether *Chutorash*'s vehicle has moved into or out of the predefined geofenced area, as well as to obtain an alert if the vehicle does so. Ex. C, ¶243. *Chutorash*'s vehicle includes a global positioning system that a POSITA would understand is capable of determining the location of the vehicle (Ex. PA-8, ¶¶[0093], [0101]), but does not expressly describe an ability of the vehicle system to create a predefined geofenced area relative to the vehicle sending the user alerts based on the location of the vehicle determined by *Chutorash*'s GPS system. Ex. C, ¶243. Modifying *Chutorash*'s vehicle system to include this functionality disclosed by *Holcman* would allow an owner of *Chutorash*'s vehicle, for example, to monitor the

110

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

location of the vehicle from a remote location and to be notified if the vehicle is moved out of

the geofenced area, such as if the vehicle is stolen (e.g., Ex. PA-6, ¶[0024]). Ex. C, ¶243.

A POSITA would have had a reasonable expectation of success in modifying

*Chutorash*'s system to incorporate the geofencing functionality disclosed by *Holcman*. Ex. C,

¶244. As noted above, *Chutorash*'s vehicle already includes a GPS system that determines the

vehicle's location (Ex. PA-8, ¶¶[0093], [0101]), as well as a system storing a user's

navigation/GPS preferences, including preferred locations such as "the user's home, office,

favorite restaurants, or the like." Ex. PA-2, ¶[0071]. Adding the capability of creating conditional

alerts based on the location of *Chutorash*'s vehicle relative to a defined geofence area (e.g.,

setting a predefined geofenced location while the car is parked near a user's favorite restaurant,

as expressly disclosed in *Holcman*'s exemplary system, Ex. PA-6, ¶[0024]) would be well within

a POSITA's capabilities, requiring only routine skill, knowledge, and standard computing

techniques using familiar elements and known methods to achieve a predictable result. *KSR*, 550

U.S. at 416-417, 421 ("The combination of familiar elements according to known methods is

likely to be obvious when it does no more than yield predictable results."); Ex. C, ¶244.

*Chutorash*'s vehicle, modified in view of *Holcman*, includes a vehicle system "wherein at

least one of the plurality of predefined areas is defined by geo-fencing." Ex. C, ¶¶237-245.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

## VII.  CONCLUSION

For the foregoing reasons, Requester respectfully requests reexamination and cancellation of claims 1-14, 19, and 20 of the '764 patent.

Requester is willing to provide appropriate assistance to permit the Examiner to address and decide the issues presented by this Request. As the M.P.E.P. explains, the Examiner may, when appropriate, cut and paste claim charts or other material within the Request to incorporate them within the body of an Office Action. M.P.E.P. § 2262. Requester is, thus, through the undersigned counsel, available to provide the Examiner with a digital copy of this Request, or any portion of it, in response to a request by email or phone. Requester also understands that the Examiner may, in appropriate circumstances, set forth specific rejections in an Office Action and incorporate by reference Requester's reasons for the proposed rejections, if the Examiner agrees with the proposed rejections and reasons supporting them.

Request for *Ex Parte* Reexamination
U.S. Pat. No. 10,862,764

If there is any additional fee due in connection with this filing that is not already submitted

herewith, please charge the fee to Deposit Account No. 06-0916.

Respectfully submitted,
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

Dated: August 13, 2025                    By: /Daniel F. Klodowski/_____
Daniel F. Klodowski
Reg. No. 72,693
Daniel.Klodowski@Finnegan.com
202-408-4216

**Attachments: (1) Certificate of Service to Patent Owner**
**(2) Information Disclosure Statement Form PTO/SB/08**
**(3) Exhibits listed on page iii of this Request**